UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

ROYALTYSTAT, LLC,

a Maryland limited liability company,

      Plaintiff,

          v.

INTANGIBLESPRING, INC.,

a Panamanian corporation,

and

RAUL PACHECO QUINTANILLA,

a resident of the United Mexican States,


      Defendant.

Case No.: 8:15-cv-03940-GJH

Hon. Paula Xinis

_____

## DEFENDANTS' BRIEF IN SUPPORT OF PARTIAL MOTION TO DISMISS

Defendant IntangibleSpring, Inc., by and through its attorneys Revision Legal, PLLC, hereby moves to dismiss several claims within Plaintiff's Complaint as follows:

## INTRODUCTION

Plaintiff, a competitor of Defendant IntangibleSpring, has filed this lawsuit without factual or legal basis to disrupt Defendant's business and to use as leverage in dissuading clients from doing business with Defendant. In doing so, Plaintiff has failed to plead its claims with any specificity so as to put Defendants on notice of the claims

against them. Even assuming Plaintiff had properly pled in its Complaint, the facts, as pled by Plaintiff, make clear that the vast majority of Plaintiff's claims are time barred.

Plaintiff's claim of copyright infringement must be dismissed because its database does not constitute copyrightable subject matter. In fact, Plaintiff has not pled that it owns copyright rights in or to the selection and arrangement of its database, which is the only means by which a database may obtain protection under copyright law. Further, the only copyright registration cited in Plaintiff's Complaint is for text, not for selection and arrangement, and Plaintiff fails to meet the pleading threshold for a copyright infringement claim, namely, the ownership of a registered copyright that applies to the subject matter complained of. If Plaintiff could, somehow, overcome these hurdles, its own facts make clear that its asserted copyright infringement claim is barred because it was not brought within the three-year statute of limitations. Similarly, Plaintiff has failed to state a claim for false advertising because it has failed to allege, with any specificity, that Defendants have undertaken any wrongful action. And, like its claim for copyright infringement, Plaintiff's claim under the Maryland Uniform Trade Secrets Act is barred by the statute of limitations.

For these reasons, Plaintiff has failed to state a claim for copyright infringement, false advertising, and a violation of the Maryland Uniform Trade Secrets Act upon which relief can be granted.

## FACTS

Plaintiff RoyaltyStat, LLC ("RoyaltyStat") is a limited liability company organized under the laws of the State of Maryland. Ednaldo Silva ("Silva"), a resident of the State of Maryland, is the owner of RoyaltyStat. Defendant IntangibleSpring, Inc.

("IntangibleSpring") is a corporation organized under the laws of the Republic of Panama. Raul Pacheco Quintanilla ("Raul Pacheco"), a resident of the United Mexican States, is an owner of shares in IntangibleSpring.

Plaintiff RoyaltyStat is in the business of providing a database of intellectual property royalty rates. These rates are obtained from publicly available sources, including Securities and Exchange Commission filings, and are used in the pricing and valuation of intellectual property. RoyaltyStat relies on independent contractors, such as Raul Pacheco, to review intellectual property license agreements and create a database of the royalty rates. (Compl. ¶ 24)

RoyaltyStat was established in 2000 and, shortly after its creation, Plaintiff engaged Mr. Pacheco as an independent contractor. (Compl. ¶ 24) From 2000 until the termination of his contractual relationship with RoyaltyStat in September 2011, RoyaltyStat tasked Mr. Pacheco with obtaining royalty agreements from third party providers, extracting data from those agreements, and inputting that data into a database maintained by Mr. Pacheco. (Compl. ¶ 24) Initially, these license agreements were provided by third party GSIOnline via compact disk. After the ninth CD, GSIOnline began sending the license agreements electronically.

From June to December of 2000, Mr. Pacheco created and maintained the RoyaltySat database in an Excel spreadsheet in his computer. Mr. Pacheco was never provided with an example of the database requested and he was instructed by Mr. Silva to "figure it out." Mr. Pacheco would review license agreements and create database fields based on his own discretion. Once Mr. Pacheco created the initial database fields, he would review each agreement and identify, extract, and normalize data fields associated

with the licensed intellectual property. As he reviewed the license agreements over time, he added new fields to the database as he found patterns within the agreements. For a period of approximately four years, Mr. Pacheco was the primary creator and curator of the RoyaltyStat database. Throughout Mr. Pacheco's relationship with RoyaltyStat, he exported data from the database, including for the purposes of data analysis and marketing. Mr. Silva also sent the database to Mr. Pacheco via email.

In September 2001, in addition to Mr. Pacheco's data processing duties, RoyaltyStat offered Mr. Pacheco a thirty percent (30%) commission to develop RoyaltyStat's business by selling subscriptions to the RoyaltyStat database. Mr. Pacheco worked as an independent contractor sales and marketing agent for RoyaltyStat from September 2001 through September 2011. In this capacity, Mr. Pacheco never signed a non-compete, non-disclosure, or employment agreement with RoyaltyStat.

During his time with RoyaltyStat, both the license agreements and the database were sent to and maintained within Mr. Pacheco's Google Docs account. Every invoice for every RoyaltyStat subscriber was contained within the RoyaltyStat receipts spreadsheets, and these spreadsheets were hosted in Mr. Pacheco's personal Google Docs account. RoyaltyStat used these receipt spreadsheets as its only record of client invoicing and payments. Throughout Mr. Pacheco's relationship with RoyaltyStat, he exported data from the database, including for the purposes of data analysis and marketing. (Compl. ¶ 29).

In September 2011, after Plaintiff had reduced Mr. Pacheco's commissions on over five occasions, RoyaltyStat terminated its relationship with Mr. Pacheco. (Compl. ¶ 28) Prior to terminating its relationship with Mr. Pacheco, RoyaltyStat terminated Mr.

Pacheco's ability to export data from the RoyaltyStat product. RoyaltyStat alleged that Mr. Pacehco had abandoned his attempts to sell subscriptions to the RoyaltyStat platform. In reality, however, Mr. Pacheco had become increasingly busy after undertaking an MBA program and could no longer devote his full time to selling the RoyaltyStat product. In fact, in June of 2010, Mr. Silva wrote Mr. Pacheco a letter of recommendation for his MBA program. At no time, previous to the filing of its Complaint approximately five years later, had RoyaltyStat alleged that Mr. Pacheco was responsible for embezzlement or engaged in purported deception.

From 2003 to 2010, Mr. Pacheco managed all of RoyaltyStat's invoicing and payments in yearly spreadsheets, which were hosted in Mr. Pacheco's personal Google Docs account. Only Mr. Pacheco and Mr. Silva had access to these spreadsheets. Throughout this period, subscriptions of Mexican clients were invoiced by Diadorim SA de CV, a Mexican entity, which was managed by Mr. Pacheco. Payments of approximately $287,000 were made to Diadorim's bank account. As registered in these spreadsheets, Mr. Silva was aware of these Mexican payments, which he used to offset Mr. Pacheco's commissions for international sales. Contrary to Plaintiff's allegations, Mr. Pacheco never received payments from RoyaltyStat subscribers into his personal bank account, and it is unclear whether RoyaltyStat ever properly accounted for this Mexican revenue.

After the termination of the relationship between the parties, and beginning in April 2013, Mr. Silva began regularly contacting Mr. Pacheco to threaten him with lawsuits and criminal prosecution. Specifically, Mr. Silva, on several occasions, informed Mr. Pacheco that both the FBI and Interpol were investigating him and that Mr. Silva

intended to sue him for stealing data from RoyaltyStat. After the launch of Defendant's product, IntangibleSpring, Mr. Silva then began contacting customers of Defendant to also inform them that Mr. Pacheco and IntangibleSpring were under criminal investigation and imploring them to not do business with Defendant. As early as November 2013, Mr. Silva was regularly informing third parties that he had initiated legal action against Defendant and Mr. Pacheco. It was not until four years later that Plaintiff filed this instant lawsuit on December 23, 2015.

Plaintiff RoyaltyStat, LLC (RoyaltyStat) claims to be the "leading purveyor" of "information relating to licensing of intangible assets…." (Compl. at ¶ 1). RoyaltyStat's database makes available "unredacted license agreements" and annual reports of publically traded companies to its subscribers. *Id*. at ¶ 16. These "unredacted license agreements" are obtained through FOIA requests and from the Securities and Exchange Commission. *Id*. at ¶¶ 11, 12, 17. RoyaltyStat alleges to own a registered copyright in its "database" under the '781 registration, granted in 2009. RoyaltyStat alleges the "database" is also subject to a pending copyright application entitled "RoyaltyStat Royalty Tableau," filed in December 2015. Ultimately, RoyaltyStat claims the scope of its copyright rights as:

> RoyaltyStat's copyrights protect the original expression in (a) the selection, coordination and arrangement involved in choosing material and data for inclusion in the database; classifying, categorizing, ordering, or grouping the material and data; and determining the placement and arrangement of material and data within the database as a whole; (b) RoyaltStat's original authorship, such as original textual content, that appears within the database.

*Id.* at ¶ 44. RoyaltyStat fails to provide any explanation as to how the two copyrights differ.

RoyaltyStat alleges Defendant IntangibleSpring is liable for copyright infringement. Specifically, RoyaltyStat claims "IntangibleSpring's database records contain content copied verbatim from RoyaltyStat" and provides Exhibits A and B in support. *Id.* at ¶ 38. RoyaltyStat alleges "a comparison of database data from the two companies reveals identical sentence structure and punctuation in both databases." *Id.* RoyaltyStat alleges the "cited text" does not appear in the original source agreements filed with the SEC. *Id.*

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a claim where the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In examining a motion to dismiss, the Court takes "the facts in the light most favorable to the plaintiff," but it "need not accept the legal conclusions drawn from the facts," and it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Associates Ltd. P'ship*, 231 F.3d 175, 180 (4th Cir. 2000). A motion to dismiss may be granted if, "after accepting the plaintiff's well-pleaded allegations as true, it appears certain that the plaintiff can prove no set of facts in support of his claim entitling him to relief." *Mays & Assocs., Inc. v. Euler*, 370 F. Supp. 2d 362, 365 (D. Md. 2005).

## ARGUMENT

This is a case involving a competitor that, after firing its first independent contractor, has attempted to prohibit its former independent contractor from creating and

operating a competing business. Plaintiff has couched its anticompetitive behavior in the language of intellectual property law, but yet it has no basis for its assertion of intellectual property rights or the misappropriation of those rights. Throughout the last four years, Plaintiff has falsely represented to third parties that it has sued Defendant and that Defendant is under investigation by various criminal agencies. Now, four years later, Plaintiff has filed a lawsuit in which Plaintiff has failed to properly serve Defendants, despite several requests that it do so. Defendants now move to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted with respect to several of the claims contained in Plaintiff's Complaint.

a. **Plaintiff's claim of copyright infringement must be dismissed because RoyaltyStat's database does not constitute copyrightable subject matter.**

Plaintiff's claim of copyright infringement must be dismissed because the RoyaltyStat database does not constitute copyrightable subject matter. Plaintiff's RoyaltyStat database consists of a collection of facts obtained from SEC filings. (Compl. ¶ 9). "Since facts do not owe their origin to an act of authorship, they are not original and, thus, are not copyrightable." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). RoyaltyStat emphasizes it has worked hard[1] to create a database; however, the "sweat of the brow" does not establish copyright rights in a post-*Feist* world. *Id*. at 359-60 ([T]he 1976 revisions to the Copyright Act leave no doubt that originaility, not 'sweat of the brow,' is the touchstone of copyright protection in directories and other fact-based works.") Although copyright protection may extend to the selection and arrangement of

---

[1] "RoyaltyState has invested several million dollars in developing and promoting its database, and continues to invest over a million dollar each year…." (Compl. at ¶ 2); "RoyaltyStat's online database of license agreements represents a significant investment in time and money…[the records within the database] can only be obtained through exhaustive public record searches or submission of [FOIAs]." Id. at ¶ 12; "RoyaltyStat is one of the most prolific filers of FOIA requests…a significant time commitment and investment were and are necessary to build and maintain the database to its current level." *Id*. at ¶ 17.

facts, copyright protection extends "only to those components of the work that are original to the author, not to the facts themselves." *Id*.

RoyaltyStat advances a very narrow claim to copyright infringement. Specifically, RoyaltyStat claims "[t]he IntangibleSpring database contains text, material, and data that is substantially similar, if not identical, to that of RoyaltyStats' original authorship in its database." Compl. at ¶ 45. Since these facts are arranged in an unoriginal manner, they do not constitute, and Plaintiff has failed to plead, copyrightable subject matter. Therefore, Plaintiff's claim of copyright infringement must be dismissed.

This case is similar to *Want Ad Digest, Inc. v. Display Advert., Inc. See Want Ad Digest, Inc. v. Display Advert., Inc.*, 653 F. Supp. 2d 171, 179 (N.D.N.Y. 2009). Want Ad produced a weekly publication called Want Ad Digest. The Want Ad Digest contained classified advertisements, which Want Ad asserted were edited by its team prior to publication. The Digest was organized into four columns, and the top of each left-handed page contained the weekly deadline for ad placement, the name of the publication, the issue number, and the date. The right-hand side of the publication contained the name of the publication, two phone numbers for Want Ad, the issue number, and the date. The Digest contained a table of contents, which was composed of main headings that were alphabetically arranged by general categories of goods, such as "Animals" or "Appliances," and alphabetically arranged subcategories, which set forth the types of goods, such as "Dish Washers" and "Washing Machines." The classified ads were published alphabetically by year under their corresponding subheading.

At some point, Display Advertising solicited and obtained display ads for publication in Want Ad Digest pursuant to a contract between the parties. This

relationship eventually terminated, and Display Advertising created its own publication, which was titled Classified Advertiser. Display Advertising copied ads appearing in Want Ad Digest and published them in Classified Advertiser, which, though it contained no table of contents, had an index composed of main headlines that were alphabetically arranged by general categories of goods, such as "Animals" and "Appliances," and subheadings under each main heading, such as "Dish Washers" and "Washing Machines." These advertisements were arranged alphabetically or by year under their respective subheadings. Want Ad filed suit for copyright infringement, alleging that Classified Advertiser infringed upon its copyright rights.

In examining the copyrightability of Want Ad Digest, the Northern District of New York first examined whether copyright protection extended to the classified ads contained within the Digest. Want Ad contended that it edited and arranged information submitted by advertisers into the ads that were included in its publication. But the Court was skeptical:

> Nonetheless, even if the court were to accept that editing and arranging information into an advertisement is sufficient to warrant copyright protection, there are disputes as to whether Want Ad actually engages in these efforts. Defendants have provided evidence which establishes that, in at least some instances, Want Ad publishes classified ads which are virtually identical to its customers' submissions. As such, questions exist as to whether Want Ad has imbued its classified advertisements with the minimal degree of originality required to provide a copyright therein.

*Id*. at 178. Next, the Northern District of New York examined Want Ad's assertion that it arranged the information that it obtained from its advertisers in a particular manner, which included the use of font sizes, bolding certain text, the creation and use of categories, subcategories, and headers, the organization of each page within the Digest, and the use of an index and a contents section. In reviewing these elements, the Court noted that Want Ad could not claim copyright rights in the selection of its classified advertisements because it "it did not exercise any judgment in deciding which classifieds to include in the Want Ad Digest." *Id*. at 197.

The Court also examined whether Want Ad could claim copyright protection of its selection of headings and subheadings and determined that it could not: "Headings and subheadings such as 'Animals,' 'Cars,' and 'Furniture' are 'entirely typical' for a classified advertisement publication, and using such headings 'is not only unoriginal, it is practically inevitable.'" *Id*. at 179, *citing BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Pub., Inc.*, 999 F.2d 1436, 1443 (11th Cir. 1993). Finally, the Court examined whether Want Ad's table of contents, index, and listing of advertisements, which are arranged alphabetically or chronologically, were copyrightable. In finding that they were not, the Court noted that "'arrangement refers to the ordering of groups of [materials] into lists or categories that go beyond mere mechanical grouping[s] as such, for example, the alphabetical, chronological, or sequential listings of data.'" *Id*., *citing Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*, 945 F.2d 509, 513 (2nd Cir. 1991). Thus, the mere listing of categories was not enough to trigger copyrightability.

Extensive discovery is unnecessary in this matter, as Plaintiff has failed to state a copyright claim on which relief can be granted as a matter of law. Just as in *Want Ad*, the

content contained within the RoyaltyStat database is provided by third party aggregators of SEC filings and is not created by RoyaltyStat. (Compl. ¶ 9). As evidenced by Exhibits A, B, C, and D of Plaintiff's Complaint, the content complained of as infringing by Plaintiff is pulled from these license agreements of third parties, which are publicly available. By way of example, Plaintiff contends that the Defendant's use of the following language in its description of a license agreement executed by MetaMorphix, Inc. constitutes copyright infringement: "TGF-B Factor formulations, antibodies, receptors, antisense molecules, pharmaceutical products, antagonists, vaccines, and modulators." (Compl. Ex. A). For a license agreement executed by Avant Immunotherapeutics, Plaintiff asserts that the following language is infringing: "products and processes related to rotavirus vaccines for humans." (Compl. Ex. A). And for a license agreement executed by QuickLogic, Plaintiff asserts that the following language is infringing: "integrated circuits employing high performance CMOS processes on a silicon substrate having only an array of programmable logic cells consisting of basic gate and flip-flop elements interconnected by row and columns of programmable wiring channels." (Compl. Ex. B). These are descriptions of technology that are covered by the license agreements in question—not Shakespearian sonnets. These descriptions are facts about the world for which copyright protection does not extend. *See BellSouth* at 1445 ("Given that the copyright protection of a factual compilation is "thin," a competitor's taking the bulk of the factual material from a preexisting compilation without infringement of the author's copyright is not surprising."); *Projector-Recorder Belt Corp. v. Consol. Elecs., Inc.*, 972 F.2d 348 (6th Cir. 1992) ("The court held, however, that Consolidated Electronics did not infringe Projector-Recorder's copyrights because

although it copied some of the facts contained in Projector-Recorder's catalogs, it did not copy the only aspect of the catalogs that was protected by copyright, namely, their selection and arrangement of facts."); *Victor Lalli Enterprises, Inc. v. Big Red Apple, Inc.*, 936 F.2d 671, 673 (2nd Cir. 1991) (finding that the arrangement of factual data into functional grids did not suffice for copyright protection). Consequently, Plaintiff's has failed to state a claim.

Similar to *Want Ad*, Plaintiff has also failed to state a claim that its addition of headers and categories to the data contained within its RoyaltyStat database constitutes copyrightable subject matter. Just as the *Want Ad* court decried Want Ad's organization of existing classified ads into new categories, subcategories, and headers, so too does Plaintiff's organization of the data contained within publicly available license agreements fail to constitute copyrightable subject matter. Plaintiff's application of headers, which are dictated by the very content of the license agreements, to publicly available license terms is not sufficiently original to warrant copyright protection. *See Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 730-31 (8th Cir. 2002) ("It is true that Anderson and Schoolhouse group many of their topics under similar headings, such as 'Classes Offered' and 'Certified Staff.' Such headings, however, are obvious labels for those categories and therefore lack originality.'"); *see also Salestraq Am., LLC v. Zyskowski*, No. 2:08 CV 013 68 LRH L, 2010 WL 186003, at *2 (D. Nev. Jan. 15, 2010), clarified on denial of reconsideration, No. 208-CV-01368-LRH-LRL, 2010 WL 1006656 (D. Nev. Mar. 16, 2010) ("However, the issue before the court is not whether the entire SalesTraq compilation is copyrightable, but whether the floor plans and numeric designators, once completely removed from the SalesTraq search algorithms and the additional content

they reference, are copyrightable expression. First, the court finds that the floor plans are uncopyrightable facts. The floor plans were originally provided by the home builders and developers to the public. SalesTraq did not create these floor plans, they only collected them. Thus, the floor plans are akin to the phone listings at issue in Feist.").

      **b.** **Plaintiff's claim for copyright infringement must be dismissed because the '781 registration does not cover Plaintiff's selection and arrangement of public facts.**

The copyright in a work of authorship created or first published after January 1, 1978 is protected from the moment it is created, provided that the work is original and fixed in a tangible medium of expression. 17 U.S.C. §§ 102(a), 408(a); Compendium § 502. In other words, formal registration with the U.S. Copyright Office is not a requirement to the acquisition of copyright rights. As a result, the U.S. Copyright Office does not *issue* copyrights, but instead, "*registers claims* to copyright. 17 U.S.C. § 408(a); Compendium § 502 (emphasis added). A copyright "claim" is an "assertion of copyright [ownership in]…the work." Compendium § 502 citing *Applications for Registration of Claim to Copyright Under Revised Copyright Act*, 42 Fed. Reg. 48, 944 (Sept. 26, 1977). "Thus, when an applicant files an application to register a work of authorship, the applicant is asserting a claim of ownership in the copyright in that work. Compendium § 502. <u>The Compendium makes clear that only the specific authorship claimed in the application is what is reviewed and ultimately registered</u>:

> As a general rule, a registration for a work of authorship covers the entire copyrightable content of the authorship that is (i) claimed in the application, (ii) is owned by the claimant, and (iii) is contained in the deposit copy[ies].
>
> The applicant should assert a claim in this authorship in the online application by completing the Author Created field, and if appropriate, the New Material Included

field…Together, these fields and spaces provide important information about the scope of the claim of authorship in a work. Applicants are encouraged to be specific when completing these portions of the application. A clear description of the copyrightable expression that the applicant intends to register creates an accurate record of authorship and ownership for the benefit of the copyright owner, the courts, and the general public.

The fact that a work was submitted for registration and was registered by the U.S. Copyright Office does not necessarily mean that the registration covers all the authorship that appears in the work as a whole. As discussed in Section 503.3, the Office examines and registers only the copyrightable authorship that is expressly claimed in the application and that is included in the deposit copy(ies). The Office does not examine any authorship that is not claimed in the application, and it cannot examine any authorship that does not appear in the deposit copy(ies).

Compendium § 504.

The Compendium also provides information relating to the protection of "databases." Importantly, it instructs applicants how to assert a "claim" to copyright within the database. The Compendium states that if an applicant "intends to register the authorship involved in selecting, coordinating, and/or arranging the material that appears in the database, the applicant may use any of the terms listed below, provided that they accurately describe the copyrightable authorship that appears in the deposit copies…compilation of data, compilation of database information, compilation of photographs, compilation of artwork, compilation and text, revised and updated compilation." See § 727.3(D).

But, that is **not** what Plaintiff claimed. Specifically, Plaintiff only asserted a claim to copyright in "text." See **Exhibit 1**, '781 Registration. Because Plaintiff only asserted a

claim to "text," the Copyright Office never reviewed the deposit[2] material for any other type of claim to copyright. Compendium § 504. The '781 Registration defines the scope of copyrights Plaintiff may claim and it does not include the selection or arrangement of public data. See *Express, LLC v Fetish Group, Inc*, 424 F Supp 2d 1211, 1219 (CD Cal 2006) ("Thus, if the registration does not cover certain aspects of a claimed copyright, then it simply does not make sense to grant those aspects of the claimed copyright a presumption of validity. Why would those aspects of the claimed copyright have earned a presumption of validity if they were not represented in the registration application? Cases from other courts support this view.") As a result, Plaintiff cannot sue for copyright infringement of the selection or arrangement of facts based on the '781 registration.

c. **Plaintiff's claim for copyright infringement must be dismissed because Plaintiff has failed to allege facts explaining how its database was selected and arranged and stating the basis for the originality of its selection and arrangement.**

Even assuming Plaintiff could sue under the '781 registration, Plaintiff has failed to allege facts explaining how its database was selected and arranged or facts that explain the basis for the originality of that selection and arrangement, which is a prerequisite to copyright protection. Plaintiff's database consists of standard categories that are required to make sense of a license agreement: licensor name, agreement title, effective date, agreement type, industry, licensor's country, royalty rate, duration, licensed territory,

---

[2] Copyright Circular No. 65 describes the process to register a database, including the type of specimen that should be deposited (i.e., the first and last 25 pages of records for single-file database or 50 data records or pages for a multiple-file database). See **Exhibit 2**, Circular 65. Plaintiff's deposit, attached to its '781 Registration, is merely a printout of nine records allegedly within the database and fails to comply with Circular 65. This, combined with Plaintiff's failure to make a claim to the selection and arrangement confirms that Plaintiff does not own a registered copyright to a database, but instead, owns a registered copyright to text on its website. Further compounding the problem, Plaintiff failed to disclaim any material that Plaintiff did not author. See Compendium at § 503.5. Plaintiff failed to disclaim any material whatsoever, which calls the entire '781 Registration into question.

description of intangibles, other payments, and comments. (Compl. Ex. D). Plaintiff makes no specific allegation regarding how its database was selected or arranged or how it was created in a "systematic" manner. A reading of the Complaint leaves Defendant unaware of exactly how or why Plaintiff claims the data was selected or how or why it is arranged in a specific manner. While the Complaint alleges that users can use "filters" to find records relating to "Standard Industrial Classifications," "intellectual property type," and "keywords," the Complaint fails to provide any specific factual allegations as to what makes the "selection" or "arrangement" of the public facts deserving of copyright protection. Instead, to prove the arrangement is subject to copyright protection, Plaintiff points to the mere existence of the '781 registration and its pending copyright application. Plaintiff argues these "registrations" provide prima facie evidence of the validity of its copyrights that Defendant has failed to rebut.

Though Plaintiff asserts that it has copyright protection in its selection and arrangement, (Compl. ¶44), Plaintiff has also failed to allege that Defendant has *copied* its selection and arrangement. See (Compl. ¶¶ 44-46). *See Projector-Recorder Belt Corp. v. Consol. Elecs., Inc.*, 972 F.2d 348 (6th Cir. 1992) (finding no copyright infringement where defendant copied facts from catalogs, but did not copy the selection and arrangement of those facts). Regardless, even assuming that Plaintiff had pled that Defendant copied Plaintiff's selection and arrangement, Plaintiff's ordering of facts is "mechanical," "typical," and "garden-variety," entirely devoid of creativity, and, therefore, undeserving of copyright protection because it fails to insert even a modicum of creativity into an otherwise factual database. *See Victor Lalli Enterprises, Inc.* at 673 ("We find that Lalli's compilation fails to meet this minimum requirement. In *Feist*, the

Supreme Court relied on the fact that the telephone book's ordering of facts was 'mechanical,' 'typical,' and 'garden-variety' to decide that its selection and arrangement were entirely devoid of creativity, and therefore undeserving of copyright protection. Although novelty is not required, some 'modicum of creativity' is necessary to transform simple compilation into copyrightable expression. In Lalli's charts, as Judge Glasser correctly found, he arranges factual data according to 'purely functional grids that offer no opportunity for variation.' The format of the charts is a convention: Lalli exercise neither electivity in what he reports nor creativity in how he reports it. Because Lalli's charts do not demonstrate the requisite minimal originality, they are not entitled to copyright protection, and Big Red's use of them cannot constitute infringement."). Plaintiff has neither pled that it has selected and arranged facts in a manner that is copyrightable, nor has it pled that such selection and arrangement is original and, therefore, its Complaint must be dismissed.

   d. **Plaintiff's claim of copyright infringement must be dismissed because it was not brought within the three-year statute of limitations applicable to copyright claims.**

   Plaintiff's claim of copyright infringement must also be dismissed because Plaintiff failed to raise its claim within the three-year statute of limitations. Pursuant to 17 U.S.C. § 507(b), "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." A claim for copyright infringement accrues when "one has knowledge of a violation or is chargable with such knowledge." *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 202 (4th Cir. 1997), *citing Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).

Plaintiff asserts that it learned that Mr. Pacheco was "embezzling funds from the company" in late 2009. (Compl. ¶ 27). Plaintiff also asserts that Mr. Pacheco downloaded Plaintiff's RoyaltyStat database in full on December 1, 2010, and that Plaintiff "stole additional data from RoyaltyStat" on December 14, 2010 and January 28, 2011. (Compl ¶ 29-30). Despite this purported theft, Plaintiff did not terminate Defendant's employment until September 23, 2011. (Compl. ¶ 28).

If Plaintiff's allegations are accepted as true, Plaintiff knew or should have known that Defendant had copied the RoyaltyStat database in December 2010. Presumably Plaintiff would have performed an investigation of Mr. Pacheco's access to the RoyaltyStat database when it discovered, as alleged, that Mr. Pacheco was "embezzling funds from the company." (Compl. ¶ 27). If Plaintiff's allegations concerning embezzlement are accepted as true, Plaintiff should, at a minimum, have inspected Mr. Pacheco's access to that database to determine whether one of its rights guaranteed under 17 U.S.C. § 106 had been violated. Since Mr. Pacheco's purportedly infringing actions, as alleged by Plaintiff, occurred five years prior to the filing of the Complaint in this matter, and because Plaintiff knew or should have known of these actions at the time that they occurred, Plaintiff's claim of copyright infringement is wholly barred by the statute of limitations.

e.  **Plaintiff has failed to state a claim for false advertising.**

The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which… in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or

another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A plaintiff asserting a false advertising claim must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening or goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002). Allegations "upon information and belief" are insufficient to defeat a motion to dismiss where such allegations are used as a substitute for providing detail as to why the element is present in an action. *Bracken, LLC v. Executive Risk Indem., Inc.*, No. CV DKC 15-1406, 215 WL 5721632, at *7 (D. Md. Sept. 28, 2015), *reconsideration denied*, No. CV DKC 15-1406, 2015 WL 8316333 (D. Md. Dec. 9, 2015). Instead, the federal rules demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation…. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Here, Plaintiff has plead "upon information and belief" that "Defendants' have represented to their clients and potential clients… that IntangibleSpring's database is the same as RoyltyStat's in content and quality, but is offered for a lower price." (Compl. ¶ 50). Plaintiff pleads that it learned about IntangibleSpring's existence in 2013. (Compl. ¶ 32). And at this time, Plaintiff alleges IntangibleSpring had "almost precisely the same number of records in its database as RoyaltyStat had as of the time Mr. Pacheco was fired." *Id*. Plaintiff continues, "[n]ot coincidentally, the number of records cited by the competitor was almost identical to the number of records stolen by Mr. Pacheco on the dates identified above." Plaintiff also alleges that Defendant obtained its records subsequent to 2013. (Compl. at ¶ 39).

What did Defendants do that constitutes false advertising? Plaintiff states the following allegations provides its claim for false advertising:

> 35. By April 19, 2013, IntangibleSpring claimed that its database contained more than 10,500 records. IntangibleSpring falsely claimed to be adding more than 600 records per month.

> 40. Mr Pacheco has contacted several of RoyaltyStat's customers and offered subscriptions of stolen data for about 1/3 of the RoyaltyStat regular subscription price. Several former RoyaltyStat customers who switched to IntangibleSpring, who are reputable businesses have confirmed that they would not have switched except for the deception and significantly lower prices offered by Mr. Pacheo.

> 41. By misrepresenting the product it offers as being comparable in content, but lower in price to that provided by RoyaltyState, IntangibleSpring has enticed some of RoyaltyStat's customers to switch to its service. This has caused RoyaltyStat to lose significant revenue and profits.

> 50. Upon information and belief, Defendants' have represented to their clients and potential clients, including those who are current or former clients of RoyaltyStat, that IntangibleSpring's data base is the same as RoyaltyStat's in content and quality, but is offered for a lower price. RoyaltyStat devotes substantial resources to updating its database and assuring that the data is of the highest integrity. As a result of these substantial efforts over many years, RoyaltyStat and its founder Dr. Silva, have developed a reputation for the high-quality of the RoyaltyStat

database. Apart from portions of RoyaltyStat's database that they have copied, Defendants have not and cannot maintain a database of similar quality. Defendants' cannot therefor offer a database product that is similar to RoyaltyStat's in content and quality for a lower price.

51. Defendants' statements constitute a false and misleading representation of fact regarding the nature and quality of both RoyaltyStat database and IntangibleSpring database. Defendant's actions were undertaken to deliberately trade on the goodwill and reputation RoyaltyStat has developed as a result of the high quality of its product and services. Defendant's actions therefore constitute unfair competition and false advertising pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

In others words, ¶ 35's allegations of the total number of records within IntangibleSpring's database, according to Plaintiff, was correct. (See Compl. at ¶ 39). ¶ 40's allegations pertain only to price and contain no facts or allegations regarding "deception." ¶ 41 repeats the claimed misrepresentation in comparable content, which again is at odds with ¶ 39's admission that the two competitors provided nearly identical content. ¶ 50, based on "information and belief"[3] claims Defendant cannot maintain a database of "similar quality." But Plaintiff never make any specific allegations of the "quality" Defendant alleged attributed to its database. Finally, ¶ 51 is a mere conclusory statement and of no weight when considering whether Plaintiff stated a claim. These allegations are impermissibly conclusory and fail to identify a tangible, real-world act or event for which Defendant can be held liable. *See In re Lilley*, No. 10-81078C-13D, 2011 WL 1428089, at *3 (Bankr. M.D.N.C. Apr. 13, 2011) ("An allegation is impermissibly conclusory when it is necessary to establish a viable claim but fails to identify a tangible,

---

[3] Many courts require plaintiffs to comply with Fed. R. Civ. P. 9(b)'s heightened pleading requirements for claims of false advertising under the Lanham Act. The Forth Circuit has not addressed or decided this issue. See *Trident Products & Services, LLC v Canadian Soiless Wholesale, Ltd*, No. 3:10CV877-HEH, 2011 WL 2938483, at *3 (ED Va July 19, 2011) (and cases cited therein). Defendants contend this is the proper standard of analysis, but that Plaintiff fails to state a claim under traditional Fed. R. Civ. P. 8(a) standards as well.

real-world act or event."), citing Adam N. Steinman, *The Pleading Problem*, 62 Stan. L. Rev. 1293, 1339 (2010).

The spurious nature of Plaintiff's allegations is especially concerning in light of the fact that Plaintiff attempts, in its Complaint, to seek relief under both the Copyright Act and the Lanham Act. In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the Supreme Court acknowledged the Court's own history of being "careful to caution against misuse or over-extension of trademark and related protections" in construing the Lanham Act, so as to avoid treading "into areas traditionally occupied by patent or copyright." *Id.* at 34; *see also Mays & Associates, Inc. v. Euler,* 370 F. Supp. 2d 362, 371 (D. Md. 2005) (rejecting a Lanham Act claim pursuant to Rule 12(b)(6) after differentiating between tangible goods (covered under the Lanham Act) and the ideas, concepts, and the communications embodied in those goods (the province of copyright law)). Plaintiff's "naked assertions[,] devoid of further factual enhancement," *Iqbal*, *id.,* 556 U.S. at 678, fail to reveal how the Lanham Act provides it with any basis for relief, especially in light of the Supreme Court's reluctance to invoke the Lanham Act where the Copyright Act should rightly govern.

Further, Plaintiff has failed to allege: (1) that a false or misleading description of fact was made in a commercial advertisement; (2) that such a misrepresentation was material in that it was likely to influence the purchasing decision of a third party; (3) that the misrepresentation actually deceives or has the tendency to deceive; and (4) that this statement was placed in interstate commerce. Plaintiff's reliance on conclusory allegations on information and belief is insufficient to state a claim upon which relief can be granted and, therefore, dismissal is proper.

f.  **Plaintiff's claim under the Maryland Uniform Trade Secrets Act is barred by the statute of limitations.**

Plaintiff's claim under the Maryland Uniform Trade Secrets Act is also barred by the statute of limitations. Pursuant to that Act, "An action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Md. Com. Law II Code Ann. § 11-1206(a). Additionally, "a continuing misappropriation constitutes a single claim." Md. Com. Law II Code Ann. § 11-1206(b). Misappropriation, in turn, means the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Md. Com. Law II Code Ann. § 11-1201(c).

As previously stated, Plaintiff's Complaint asserts that Mr. Pacheco was "embezzling funds from the company" in late 2009. (Compl. ¶ 27). Presumably, if Plaintiff discovered that Mr. Pacheco was embezzling funds as alleged, Plaintiff also would have investigated, through an exercise of reasonable diligence as required by the statute, that Defendant accessed and exported content from the RoyaltyStat database. The acquisition by wrongful means, downloading the data outside Mr. Pacheco's purported authority, starts the clock, not IntangibleSpring's later use. Plaintiff certainly had the capability to perform this investigation, as Plaintiff readily admits this capability in stating that that Mr. Pacheco downloaded Plaintiff's RoyaltyStat database in full on December 1, 2010, and that Plaintiff "stole additional data from RoyaltyStat" on December 14, 2010 and January 28, 2011. (Compl ¶ 29-30). The acquisition by wrongful means, downloading the data outside Mr. Pacheco's purported authority, starts the clock, not IntangibleSpring's later use. Even presuming that Plaintiff did not have actual

knowledge of Defendant's purported exports on December 1, 2010, December 14, 2010, and January 28, 2011, Plaintiff should have discovered, by reasonable diligence, that its purported trade secrets were misappropriated.

Plaintiff will assert that its claim is not time barred because the statute of limitations does not begin to toll until the trade secret is used. Plaintiff bases this incorrect conclusion on *Sokol Crystal Products, Inc. v DSC Communications Corp*, 15 F.3d 1427, 1429 (CA 7 1994), a case based on Wisconsin state law that defined misappropriation "as either (1) acquiring a trade secret by improper means, Wis.Stat. § 134.90(2)(a), or (2) "disclosing or using ... a trade secret of another," *id.* at § 134.90(2)(b)." Maryland law does not provide a "use-based" trigger to the limitations period. See Md. Code Ann., Com. Law § 11-1201(c)(1).

Defendant will also attempt to muddy the waters by arguing that the limitations period should not start until its discovery of IntangibleSpring's sale of the allegedly stolen data. Again, Plaintiff will rely on case law interpreting another state's trade secret act, such as South Carolina's, that also provides a "use" based definition of trade secret misappropriation. See *Hoechst Diafoil Co v Nan Ya Plastics Corp*, 174 F3d 411, 417 (4th Cir. 1999) citing S.C. Code § 39–8–1(2)(ii)(B)(III) (finding the defendant engaged in a second "statutorily-recognized injury" when it "used" the technology at a later date). There is no such second "statutorily-recognized injury" in this case. Instead, this is a continuing misappropriation, which does not restart the clock. Md. Code Ann., Com. Law § 11-1206(b). While Defendant contends the alleged 2009 embezzlement should start the clock, at the latest, Plaintiff's allegation of a December 1, 2010 misappropriation

certainly does. (See Compl. at ¶ 29). Plaintiff's suit filed in 2015 is outside the three-year limitations period and is time barred. Md. Code Ann., Com. Law § 11-1206(b).

Since Plaintiff failed to bring its claim for a trade secret violation within three years after the misappropriation was discovered or should have been discovered, Plaintiff's claim must be dismissed.

## CONCLUSION

Plaintiff has failed to state a claim for copyright infringement, false advertising, and a violation of the Maryland Uniform Trade Secrets Act upon which relief can be granted. Accordingly, these claims must be dismissed from Plaintiff's Complaint.

Respectfully submitted,


Date:   May 9, 2017

_/JAD/_____
John Di Giacomo
Revision Legal, PLLC
Attorneys for Plaintiff
109 E. Front St. Ste. 309
Traverse City, MI 49684
eric@revisionlegal.com
john@revisionlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2017, I electronically filed the foregoing Motion to Dismiss with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Billy B Ruhling , II
DiMuroGinsberg PC
1101 King Street
Suite 600
Alexandria, VA 22314
703-684-4333
Fax: 703-548-3181
Email: bruhling@dimuro.com

Respectfully submitted,

_/JAD/_____
John Di Giacomo
Revision Legal, PLLC
Attorneys for Defendant
109 E. Front St. Ste. 309
Traverse City, MI 49684
eric@revisionlegal.com
john@revisionlegal.com