UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

ROYALTYSTAT, LLC,
a Maryland limited liability company,

      Plaintiff and Counter-Defendant,        Case No.: 8:15-cv-03940-GJH

             v.                    Hon. Paula Xinis

INTANGIBLESPRING, INC.,
a Panamanian corporation

and

RAUL PACHECO QUINTANILLA,
a resident of the United Mexican States,

      Defendants and Counter-Plaintiffs,

v.

EDNALDO SILVA,
a resident of the State of Maryland,

Counter-Defendant.

## **DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Defendants IntangibleSpring, Inc. and Raul Pacheco Quintanilla, by and through its attorneys Revision Legal, PLLC, hereby answers Plaintiff's Amended Complaint as follows:

1.      Denied.

2.      Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

3.      Denied.

4.      Denied.

5.      Denied.

## JURISDICTION AND VENUE

6.      Admitted that the Court would have jurisdiction over this case if Plaintiff had valid copyright rights, but denied that Plaintiff has valid copyright rights.

7.      Admitted.

## PARTIES

8.      Admitted.

9.      Admitted that IntangibleSpring Corp. is a corporation organized under the laws of Panama, that it provides a website for analyzing and evaluating the value of intangible property, and that it offers its services to clients located within the United States, but denied that its principal place of business is in Panama City, Panama.

10.      Admitted that Raul Pacheco Quintanilla is a shareholder in IntangibleSpring, Corp. and is a citizen of Mexico and Brazil, but the remainder of Plaintiff's allegations are denied.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### RoyaltyStat LLC Offers Unrivaled Access to License Agreement Data and Analysis

11.      Admitted that RoyaltyStat obtains unredacted license agreements from the SEC, but the remainder of Plaintiff's allegations are denied.

12.      Denied.

13.      Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

14.      Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

15.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

16.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

17.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

18.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

19.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

20.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

21.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

22.    Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

### Raul Pacheco Quintanilla's Relationship to RoyaltyStat LLC

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

**Raul Pacheco and IntangibleSpring Misappropriated RoyaltyStat's Trade Secrets**

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Defendant lacks knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

## COUNT I:

## VIOLATION OF THE COPYRIGHT ACT, 17 U.S.C. § 101 ET. SEQ.

42.     No answer is necessary.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

4

48.     Denied.

## COUNT II:

## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 USC § 1125(a)

49.     No answer is necessary.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

## COUNT III:

## VIOLATION OF THE MARYLAND UNIFORM TRADE SECRETS ACT

55.     No answer is necessary.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

## COUNT IV:

## TORTIOUS INTERFERENCE WITH CONTRACT

61.     No answer is necessary.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

**REQUEST FOR PERMANENT INJUNCTION**

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

**AFFIRMATIVE DEFENSES**

1.     Plaintiff is not entitled to relief because Plaintiff has failed to state a claim on which relief can be granted.

2.     Plaintiff is not entitled to relief because Plaintiff's claims are barred by the doctrine of laches.

3.     Plaintiff is not entitled to relief because Plaintiff's claims are barred by the doctrine of unclean hands.

4.     Plaintiff is not entitled to relief because Plaintiff's alleged copyrighted work lacks originality or creativity.

5.     Plaintiff is not entitled to relief because Defendants' work is independently created.

6.     Plaintiff is not entitled to relief because Plaintiff's work constitutes non-copyrightable subject matter.

7.     Plaintiff is not entitled to relief because of Plaintiff's unclean hands.

8.      Plaintiff is not entitled to relief because its claims are barred in whole or in part by the statute of limitations.

9.      Plaintiff is not entitled to relief because its alleged trade secrets are generally known to the public.

10.     Plaintiff is not entitled to relief because it failed to undertake reasonable measures to protect its alleged trade secrets.

11.     Plaintiff is not entitled to relief because its alleged trade secrets were not misappropriated.

12.     Plaintiff is not entitled to relief because of copyright misuse.

13.     Defendants reserve the right to add additional affirmative defenses as they become known throughout discovery.

## **JURY DEMAND**

Defendants hereby request a jury trial on all claims contained within Plaintiff's Complaint and Defendants' Counter-Claim.

## **DEFENDANTS' FIRST AMENDED COUNTER-CLAIMS AGAINST PLAINTIFF ROYALTYSTAT, LLC**

### **Parties**

1.      Counter-Defendant RoyaltyStat, LLC ("RoyaltyStat") is a limited liability company organized under the laws of the State of Maryland.

2.      Counter-Defendant Ednaldo Silva ("Silva"), a resident of the State of Maryland, is the owner of RoyaltyStat.

3.      Counter-Plaintiff IntangibleSpring, Inc. ("IntangibleSpring") is a corporation organized under the laws of the Republic of Panama.

4.      Counter-Plaintiff Raul Pacheco Quintanilla ("Pacheco"), a resident of Mexico City, Mexico, is a shareholder in IntangibleSpring.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1338 because this matter raises federal questions under the Copyright Act over which this Court has original jurisdiction.

6.      Additionally, this Court has supplemental jurisdiction over the claims that arise under the common law of the State of Maryland pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

7.      This Court has personal jurisdiction over Counter-Defendants RoyaltyStat and Silva because Counter-Defendants reside in the State of Maryland and have committed intentional and tortious acts within this state.

8.      This Court further has jurisdiction over Counter-Defendant Silva because in the absence of Counter-Defendant Silva the Court cannot accord complete relief among the existing parties.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Counter-Defendants reside in the State of Maryland.

## Counter-Plaintiff's Creation of the RoyaltyStat Database

10.      RoyaltyStat is in the business of providing a database of intellectual property royalty rates.

11.     These rates are obtained from publicly available sources, including Securities and Exchange Commission filings, and are used in the pricing and valuation of intellectual property.

12.     RoyaltyStat relies on independent contractors, such as Counter-Plaintiff Raul Pacheco, to review intellectual property license agreements and create a database of royalty rates.

13.     RoyaltyStat was established by Silva in 2000 and, shortly after its creation, RoyaltyStat engaged Counter-Plaintiff Pacheco as an independent contractor.

14.     Starting in 2000, RoyaltyStat tasked Mr. Pacheco with obtaining royalty agreements from third party providers, extracting data from those agreements, and inputting that data into a database maintained by Mr. Pacheco.

15.     Initially, these license agreements were provided by third party GSIOnline via compact disc.

16.     After the ninth compact disc, GSIOnline began sending the license agreements electronically.

17.     From June to December of 2000, Mr. Pacheco created and maintained the RoyaltyStat database in an Excel spreadsheet in his computer.

18.     Mr. Pacheco was never provided with an example of the database requested and he was instructed by Mr. Silva to "figure it out."

19.     Mr. Pacheco would review license agreements and create database fields based on his own discretion.

20.     Once Mr. Pacheco created the initial database fields, he would review each agreement and identify, extract, and normalize data fields associated with the licensed intellectual property.

21.     As he reviewed the license agreements over time, he added new fields to the database as he found patterns within the agreements.

22.     For a period of approximately four years, Mr. Pacheco was the primary creator and curator of the RoyaltyStat database.

23.     Thereafter, Mr. Pacheco worked with other independent contractors to create and curate the RoyaltyStat database.

24.     RoyaltyStat intended for Mr. Pacheco's independent contributions to the RoyaltyStat database to be merged into an inseparable whole.

25.     Throughout Mr. Pacheco's relationship with RoyaltyStat, he exported data from the database, including for the purposes of data analysis and marketing.

26.     Mr. Silva and Mr. Pacheco regularly exchanged copies of the database via email.

**Counter-Plaintiff's Sales Efforts**

27.     In September 2001, in addition to Mr. Pacheco's data processing duties, RoyaltyStat offered Mr. Pacheco a thirty percent (30%) commission to develop RoyaltyStat's business by selling subscriptions to the RoyaltyStat database.

28.     Mr. Pacheco worked as an independent contractor sales and marketing agent for RoyaltyStat from September 2001 through September 2011.

29.     In this capacity, Mr. Pacheco never signed a non-compete, non-disclosure, or employment agreement with RoyaltyStat.

30.     During his time with RoyaltyStat, Mr. Pacheco was provided with unfettered access to the database which was hosted by Woodbourne.

31.     Also during his time with RoyaltyStat, the company's invoices were maintained in Mr. Pacheco's personal Google account and both the license agreements and the database were sent to, created, and maintained by Mr. Pacheco.

32.     Every invoice for every RoyaltyStat subscriber was contained within the RoyaltyStat receipts spreadsheets, and these spreadsheets were hosted in Mr. Pacheco's personal Google Docs account.

33.     RoyaltyStat used these receipt spreadsheets as its only record of client invoicing and payments.

34.     Throughout Mr. Pacheco's relationship with RoyaltyStat, he exported data from the database, including for the purposes of data analysis and marketing.

35.     In September 2011, after Plaintiff had reduced Mr. Pacheco's commissions on over five occasions, RoyaltyStat terminated its relationship with Mr. Pacheco.

36.     Prior to terminating its relationship with Mr. Pacheco, RoyaltyStat terminated Mr. Pacheco's ability to export data from the RoyaltyStat product.

37.     RoyaltyStat alleged that Mr. Pacheco had abandoned his attempts to sell subscriptions to the RoyaltyStat platform.

38.     In reality, however, Mr. Pacheco had become increasingly busy after undertaking an MBA program and could no longer devote his full time to selling the RoyaltyStat product.

39.     In fact, in June of 2010, Mr. Silva wrote Mr. Pacheco a letter of recommendation for his MBA program.

40.     At no time, previous to the filing of its Complaint approximately five years later, had RoyaltyStat alleged that Mr. Pacheco was responsible for embezzlement or engaged in purported deception.

41.     From 2003 to 2010, Mr. Pacheco managed all of RoyaltyStat's invoicing and payments in yearly spreadsheets, which were hosted in Mr. Pacheco's personal Google Docs account.

42.     Only Mr. Pacheco and Mr. Silva had access to these spreadsheets.

43.     Throughout this period, subscriptions of Mexican clients were invoiced by Diadorim SA de CV, a Mexican entity, which was managed by Mr. Pacheco.

44.     Payments of approximately $287,000 were made to Diadorim's bank account.

45.     As registered in these spreadsheets, Mr. Silva was aware of these Mexican payments, which he used to offset Mr. Pacheco's commissions for international sales.

46.     Mr. Pacheco never received payments from RoyaltyStat subscribers into his personal bank account, and it is unclear whether RoyaltyStat ever properly accounted for this Mexican revenue.

47.     In fact, instead of transferring these funds to the United States, Mr. Silva regularly instructed Mr. Pacheco to purchase art on his behalf and to ship it to Mr. Silva in Maryland.

**Counter-Defendants' Unlawful Actions**

48.     As an independent contractor who created the RoyaltyStat database and the works now claimed as copyrighted by RoyaltyStat, copyright rights in and to those works vested in Raul Pacheco ("Pacheco Works").

49.     At no time did Raul Pacheco assign his copyright rights in and to the Pacheco Works to RoyaltyStat or Silva.

50.     Nor did Raul Pacheco execute a license agreement between himself and RoyaltyStat under which Pacheco's exclusive rights to the Pacheco Works were licensed to RoyaltyStat.

51.     After the termination of the relationship between the parties, RoyaltyStat continued to utilize the Pacheco Works without compensating Mr. Pacheco and in violation of his exclusive rights to reproduce, prepare derivative works of, distribute copies of, and display publicly the Pacheco Works.

52.     It was not brought to the attention of Mr. Pacheco that Counter-Defendant RoyaltyStat continued to utilize the Pacheco Works until Counter-Defendants filed their Complaint in this matter.

53.     RoyaltyStat has filed for and was granted copyright registration of the Pacheco Works on May 7, 2009, which is evidenced by US Copyright Registration TX0007233781. See **Exhibit A**, Copyright Registration.

54.     Pursuant to 17 U.S.C. § 411(a), Defendant Pacheco may rely on RoyaltyStat's copyright registration as a basis for standing to bring an action for copyright infringement. *See Tang v. Hwang*, 799 F. Supp. 499, 503-04 (E.D. Pa. 1992) ("There is no requirement under the statute that the only person who may bring an action

is the person who applies for the copyright registration. The law merely provides that there must be registration of the copyright claim, pursuant to the Copyright Act, before an action may be instituted. (citation omitted). Thus, this court holds that Tang has established his ownership interest in a valid copyright and has standing to bring the action for copyright infringement….").

55.     To further support federal jurisdiction and standing for his counter-claim, Pacheco has filed for and has been denied copyright registration of "Contribution to RoyaltyStat Database," the deposit copy of which constituted Pacheco's contributions to the database believed to be reflected in US Copyright Registration TX0007233781. See **<u>Exhibit B</u>**, Letter from US Copyright Office.

56.     Upon information and belief, RoyaltyStat also filed for copyright registration of "RoyaltyStat Royalty Tableau," which was filed with the US Copyright Office on December 21, 2015. See Dkt. #1, § 43.

57.     Upon information and belief, the US Copyright Office rejected RoyaltyStat's application for registration of "RoyaltyStat Royalty Tableau" in the same manner in which Defendant Pacheco's copyright application for "Contribution to RoyaltyStat Database" was rejected.

58.     Pacheco's "Contribution to RoyaltyStat Database" was denied registration because the US Copyright Office does not allow contributions to automated databases to be registered.

59.     The Copyright Office's denial of registration of "Contribution to RoyaltyStat Database" is a substantive denial supporting jurisdiction pursuant to 17 U.S.C. § 411(a).

60.     Defendants' Answer and Counter-Claim has been personally served upon the Register of Copyrights pursuant to 17 U.S.C. § 411(a).

61.     Defendant Pacheco, therefore, may rely on his rejected application, or upon RoyaltyStat's rejected application for "RoyaltyStat Royalty Tableau," as a basis for federal jurisdiction.

62.     Since RoyaltyStat cannot own copyright rights in or to the Pacheco Works, and because RoyaltyStat continues to utilize the Pacheco Works without Pacheco's approval or authorization, RoyaltyStat is liable for copyright infringement.

63.     This copyright infringement continues to this day, as RoyaltyStat continues to, without authorization, license the Pacheco Works to third parties.

64.     Not satisfied simply misappropriating Pacheco's works, beginning in April 2013, Mr. Silva began regularly contacting Mr. Pacheco to threaten him with lawsuits and criminal prosecution.

65.     Specifically, Mr. Silva, on several occasions, informed Mr. Pacheco that both the FBI and Interpol were investigating him and that Mr. Silva intended to sue him for stealing data from RoyaltyStat.

66.     After the launch of Defendant's product, IntangibleSpring, Mr. Silva then began contacting third parties, including customers of Defendant, to also inform them that Mr. Pacheco and IntangibleSpring were under criminal investigation and imploring them to not do business with Defendant.

67.     As early as November 2013, Mr. Silva was regularly informing third parties that he had initiated legal action against Defendant and Mr. Pacheco.

68.     But it was not until four years later that Plaintiff filed this instant lawsuit on December 23, 2015.

69.     Between October 2013 and the present, IntangibleSpring lost numerous customers and potential customers due to the actions of Mr. Silva, including, but not limited to, Deloitte, Baker and Mackenzie, and Duff and Phelps.

70.     Specifically, Mr. Silva has communicated with both prospective and existing customers of IntangibleSpring, stating that IntangibleSpring and Pacheco are in possession of "stolen intellectual property," that Pacheco was released from RoyaltyStat for "malfeasance," that Pacheco had "stolen the proprietary and self-developed RoyaltyStat database of royalty rates and license agreements, plus trade secrets, and [RoyaltyStat's] customer list," that Pacheco and the IntangibleSpring website are under investigation by the FBI, that "sooner or later Raul Pacheco will end-up in jail and his illicit website will be destroyed by the French or the US authorities," and that Pacheco "attempted to defraud" potential customers.

71.     These communications were made as early as November of 2013 and as late as October 30, 2017.

72.     Upon information and belief, Mr. Silva continues, to this day, to communicate with both prospective and existing customers of IntangibleSpring in an attempt to dissuade them from doing business with it.

73.     Due to these actions, Counter-Plaintiffs hereby claim against RoyaltyStat and Ednaldo Silva in his individual capacity.

### COUNT I – COPYRIGHT INFRINGEMENT AGAINST ROYALTYSTAT

74.     Counter-Plaintiffs restate all paragraphs above as if fully restated herein.

75.     Pacheco is the owner of a copyright registration for the Pacheco Work

76.     RoyaltyStat has filed for and was granted copyright registration of the Pacheco Work on May 7, 2009, which is evidenced by US Copyright Registration TX0007233781. See **Exhibit A**, Copyright Registration.

77.     Pursuant to 17 U.S.C. § 411(a), Pacheco may rely on RoyaltyStat's copyright registration as a basis for standing to bring an action for copyright infringement. *See Tang v. Hwang*, 799 F. Supp. 499, 503-04 (E.D. Pa. 1992) ("There is no requirement under the statute that the only person who may bring an action is the person who applies for the copyright registration. The law merely provides that there must be registration of the copyright claim, pursuant to the Copyright Act, before an action may be instituted. (citation omitted). Thus, this court holds that Tang has established his ownership interest in a valid copyright and has standing to bring the action for copyright infringement….").

78.     Pacheco has filed for and has been denied copyright registration of "Contribution to RoyaltyStat Database," the deposit copy of which constituted the Pacheco Work, namely, Pacheco's contributions to the database believed to be reflected in US Copyright Registration TX0007233781. See **Exhibit B**, Letter from US Copyright Office.

79.     Upon information and belief, RoyaltyStat also filed for copyright registration of "RoyaltyStat Royalty Tableau," which was filed with the US Copyright Office on December 21, 2015. See Dkt. #1, § 43. Upon information and belief, the deposit copy associated with RoyaltyStat Royalty Tableau also contains the Pacheco Work.

80. Pacheco may rely on both the denial of "Contribution to RoyaltyStat Database" and the denial of "RoyaltyStat Royalty Tableau" as the basis for a claim for copyright infringement.

81. The Pacheco Work is an original work of authorship created solely by Pacheco.

82. RoyaltyStat's database is a slavish copy of, substantially similar to, and a derivative work of Pacheco Work.

83. After receiving express notice of Pacheco's copyright rights, RoyaltyStat willfully continued to reproduce, prepare derivative works of, distribute copies of, and display publicly the Pacheco Work.

84. RoyaltyStat's continued licensing of the Pacheco Work is in violation of the exclusive rights guaranteed to Pacheco under 17 U.S.C. § 106.

85. RoyaltyStat's actions constitute copyright infringement pursuant to 17 U.S.C. § 501.

86. RoyaltyStat's acts of infringement were willful, intentional, and purposeful.

87. As a result of RoyaltyStat's infringement, Pacheco is entitled to actual damages and RoyaltyStat's profits.

88. As a result of RoyaltyStat's infringement, Pacheco is entitled to his costs and attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT AGAINST SILVA

89. Counter-Plaintiff Intangible Spring restates all paragraphs above as if fully restated herein.

90.     Counter-Defendant Silva has made false, disparaging, and defamatory statements both orally and in writing to clients of IntangibleSpring.

91.     IntangibleSpring is a direct commercial competitor of Defendant Silva's company, RoyaltyStat.

92.     In making these false, disparaging, and defamatory statements, Counter-Defendant Silva had a tortious intent, namely, to persuade IntangibleSpring's clients to terminate their contractual relationships with IntangibleSpring.

93.     These false, disparaging, and defamatory statements concerning IntangibleSpring began as early as November of 2013 and have continued as late as October 30, 2017.

94.     Upon information and belief, Defendant continues to make statements to IntangibleSpring's current clients intending to dissuade them from performing their contractual agreements, about which Defendant was aware, with IntangibleSpring.

95.     Counter-Defendant Silva's conduct was wrongful because he used intimidation, injurious falsehood, and fraud, and because he threatened, and later instituted, a groundless civil suit and threatened criminal prosecution in bad faith.

96.     Counter-Defendant Silva's actions resulted in the termination of several contracts between IntangibleSpring and its customers.

97.     The termination of these contracts has resulted in monetary damages to IntangibleSpring.

## COUNT III – TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONSHIPS AGAINST SILVA

98.     Counter-Plaintiff IntangibleSpring restates all paragraphs above as if fully restated herein.

99.     Counter-Defendant Silva has made false, disparaging, and defamatory statements both orally and in writing to potential clients of IntangibleSpring.

100.    IntangibleSpring is a direct commercial competitor of Defendant Silva's company, RoyaltyStat.

101.    In making these false, disparaging, and defamatory statements, Counter-Defendant Silva had a tortious intent, namely, to dissuade IntangibleSpring's potential clients, about which Defendant had knowledge, from entering into contractual relationships with IntangibleSpring.

102.    These false, disparaging, and defamatory statements concerning IntangibleSpring began as early as November of 2013 and have continued as late as October 30, 2017.

103.    Upon information and belief, Defendant continues to make statements to IntangibleSpring's prospective clients intending to dissuade them from entering into a business relationship with IntangibleSpring.

104.    Counter-Defendant Silva's conduct was wrongful because he used intimidation, injurious falsehood, and fraud, and because he threatened, and later instituted, a groundless civil suit and threatened criminal prosecution in bad faith.

105.    Counter-Defendant Silva's actions resulted in the termination of several potential business relationships between IntangibleSpring and third parties.

106.    The termination of these business relationships has resulted in monetary damages to IntangibleSpring.

## COUNT IV – COMMON LAW UNFAIR COMPETITION AGAINST ROYALTYSTAT AND SILVA

107.    Counter-Plaintiff IntangibleSpring restates all paragraphs above as if fully restated herein.

108.    Counter-Defendant Silva has made false, disparaging, and defamatory statements both orally and in writing to potential and actual clients of IntangibleSpring.

109.    Counter-Defendant Silva has also made false, disparaging and defamatory statements both orally and in writing to third parties concerning the origin, quality, completeness, and legality of IntangibleSpring's services.

110.    These false, disparaging, and defamatory statements concerning IntangibleSpring began as early as November of 2013 and have continued as late as October 30, 2017.

111.    Upon information and belief, Counter-Defendant Silva continues to make these false, disparaging, and defamatory statements to third parties.

112.    In making these false, disparaging, and defamatory statements, Counter-Defendant Silva had a tortious intent, namely, to dissuade IntangibleSpring's potential and actual clients from utilizing IntangibleSpring's services.

113.    Counter-Defendant Silva made these false, disparaging, and defamatory statements on behalf of himself and on behalf of RoyaltyStat, a company in which he is a member.

114.    Counter-Defendant Silva and RoyaltyStat have falsely and unlawfully attempted to use intellectual property law to harm their competitors and to secure a monopoly on the processing and use of public information.

115.    Counter-Defendants RoyaltyStat and Silva have undertaken these efforts to secure and maintain their monopoly position in the marketplace and to prevent new entrants into the market.

116.    Counter-Defendants'    actions    have    caused    Counter-Plaintiff IntangibleSpring damages and constitute unfair competition.

WHEREFORE, Counter-Plaintiffs respectfully ask that the Court enter the following judgment against Counter-Defendants:

1.    That the Court rule and declare that Counter-Defendant RoyaltyStat has infringed upon Counter-Plaintiff Pacheco's copyright rights;

2.    That the Court rule and declare that Counter-Defendant Silva is liable for tortious interference with contractual relationships;

3.    That the Court rule and declare that Counter-Defendant Silva is liable for tortious interference with economic relationships;

4.    That the Court rule and declare that Counter-Defendants Silva and RoyaltyStat are liable for unfair competition;

5.    That the Court award Counter-Plaintiffs their actual damages, lost profits, consequential damages, exemplary damages, punitive damages, and any other damages allowable under law;

6.    That the Court award Counter-Plaintiffs prejudgment interest according to law;

7.    That the Court award Counter-Plaintiffs their costs and attorneys' fees; and

8.      That the Court award Counter-Plaintiffs any other relief to which they are entitled or that the Court may deem proper and just.

JURY DEMAND

Counter-Plaintiffs hereby requests a trial by jury for all eligible counts contained within this Counter-Complaint.

Respectfully Submitted,

Date:   March 23, 2018

 /s/ *John P. Lynch*
John P. Lynch
McNamee, Hosea, Jernigan, Kim,
Greenan & Lynch, P.A.
6411 Ivy Lane, Suite 200
Greenbelt, Maryland 20770
Phone: 301.441.2420
Fax: 301.982.9450
jlynch@mhlawyers.com
Attorneys for Counter-Plaintiffs

 /s/ *John Di Giacomo*
John Di Giacomo
*Pro Hac Vice*
Revision Legal, PLLC
444 Cass St., Suite D
Traverse City, MI 49684
john@revisionlegal.com
Attorneys for Counter-Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2018, I electronically filed the foregoing First Amended Answer and Counter-Claim with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Billy B Ruhling , II
DiMuroGinsberg PC
1101 King Street
Suite 600
Alexandria, VA 22314
703-684-4333
Fax: 703-548-3181
Email: bruhling@dimuro.com

Respectfully submitted,

McNamee, Hosea, Jernigan, Kim,
Greenan & Lynch, P.A.

By: /s/ *John P. Lynch*
John P. Lynch
6411 Ivy Lane, Suite 200
Greenbelt, Maryland 20770
Phone: 301.441.2420
Fax: 301.982.9450
jlynch@mhlawyers.com
Attorneys for Counter-Plaintiffs