**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Greenbelt Division

| | |
|---|---|
| RoyaltyStat LLC, | * |
| Plaintiff | * |
| v. | * Case No.: 8:15-cv-03940-PX |
| IntangibleSpring, Corp. and Raul Pacheco Quintanilla, | * |
| Defendants. | * |

## SECOND AMENDED COMPLAINT

1. Over 20 years, Ednaldo Silva ("Dr. Silva") drew upon his expertise in economics, statistical analysis, transfer pricing and intangible valuation to develop a unique way to aggregate information relating to licensing of intangible assets and transfer pricing to make such information accessible to clients. Dr. Silva's business, RoyaltyStat LLC ("RoyaltyStat") has become the leading purveyor of this information to governments, businesses, and legal professionals alike. The significance of RoyaltyStat's curated data and statistical tools has been widely recognized around the world because Dr. Silva has invested in data collection, document classification, quality control, software development, and promoting the RoyaltyStat brand.

2. RoyaltyStat has invested several million dollars in developing and promoting its database, and continues to invest over a million dollars each year to maintain the high quality product and customer service that RoyaltyStat's clients and potential clients have come to expect.

3. In the spring of 2013, however, RoyaltyStat's primary competitor noticed a new-comer to the intangible license/tax field and brought it to Dr. Silva's attention. Most

significantly, this new business, IntangibleSpring, Corp. ("IntangibleSpring") boasted it possessed the same client list as RoyaltyStat, and began asserting it provided the same data provided by RoyaltyStat at a significantly lower cost.

4. Alerted to this information, RoyaltyStat began investigating IntangibleSpring and learned that it was started by one of RoyaltyStat's own former independent contractors, Raul Pacheco Quintanilla ("Mr. Pacheco"). Further investigation revealed that Mr. Pacheco, immediately prior to being terminated by RoyaltyStat, accessed its data files and stole RoyaltyStat's proprietary data, which he used to form a competitor business under the name IntangibleSpring.

5. IntangibleSpring's misappropriation of RoyaltyStat's trade secrets and proprietary data significantly eroded RoyaltyStat's profits. Moreover, its false advertising claims have lured clients from RoyaltyStat, thereby causing irreparable harm. By relying upon and incorporating RoyaltyStat's data, IntangibleSpring violated federal and state laws. This action seeks redress for these injuries.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332(a)(2) and 1338.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

8. RoyaltyStat LLC is a limited liability company formed under the laws of the State of Maryland with its principal place of business at 6931 Arlington Road, Suite 580, Bethesda, Maryland.

9. IntangibleSpring, Corp. is a corporation organized under the laws of Panama with its principal place of business in Panama City, Panama. Defendant Raul Pacheco Quintanilla is a principal in IntangibleSpring. The company provides a database of royalty rates ostensibly based upon unredacted license agreements filed with the United States Securities & Exchange Commission ("SEC"). IntangibleSpring claims to provide a website featuring non-downloadable software for analyzing and evaluating the value of intangible property such as royalties and license fees. According to a declaration signed under penalty of perjury by IntangibleSpring's representative, John Di Giacomo, IntangibleSpring offers its services in interstate commerce in the U.S. and has done so since April 1, 2013. *See* Exhibit E, IntangibleSpring U.S. Trademark App. No. 86/174,112. IntangibleSpring maintains a toll-free telephone number (888-743-5498) by and through which it solicits customers and potential customers throughout the United States. *See* http://intangiblespring.com/home/contracts/. IntangibleSpring apparently hosts its website, www.intangiblespring.com, through a domain host located in Houston, Texas.

10. Upon information and belief, Raul Pacheco Quintanilla is a citizen of Brazil and Mexico. He resides at various times throughout the year in either France, Belo Horizonte, Brazil, or Mexico City, Mexico. Upon information and belief, Mr. Pacheco runs IntangibleSpring, and makes claims to such effect in the business network LinkedIn. Mr. Pacheco is the only known officer of IntangibleSpring, and, as previously noted by the Court and confirmed by Defendants' counsel, "Defendant Pacheco is IntangibleSpring." Case 8:15-cv-03940-PX, Document 39, Transcript of Motions Hearing (Jan. 18, 2017), at 30:12-18.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**RoyaltyStat LLC Offers Unrivaled Access to License Agreement Data and Analysis**

11. Since launching its online presence on December 14, 1999, RoyaltyStat has provided to paid subscribers a reliable source of royalty rates extracted from unredacted license agreements. An unredacted license agreement contains disclosed royalty rate information, and other monetary licensing consideration, such as upfront and milestone payments. A large percentage of material license agreements filed with the SEC are redacted to remove critical information such as the royalty rate, upfront fees, minimum license fees, and other forms of monetary compensation. This information can be very valuable to government tax administrations and to corporate taxpayers complying with the arm's length standard of IRC section 482, and complying with similar standards under the OECD (Organization for Economic Cooperation and Development). RoyaltyStat has expended and continues to expend a great deal of effort and money to identify and obtain unredacted agreements, and to extract searchable data fields from them. The information RoyaltyStat makes available to paid subscribers is used in transfer pricing, purchase price allocation, intellectual property valuation, and for due diligence connected with litigation, corporate bankruptcy, business development, and mergers and acquisitions.

12. RoyaltyStat's online database of license agreements represents a significant investment in time and money over the course of its 20 year business history. Many of the license agreements in the collection can only be obtained through exhaustive public record searches or by submission of Freedom of Information Act ("FOIA") requests.

13. Full access (*e.g.*, the capability to search for comparables, read records, select comparable records to the taxpayer's intangible property, and download data) is tightly

controlled within RoyaltyStat. Only a limited number of authorized employees and contractors have been given such access. Mr. Pacheco was among those given such access while he was supposed to be working exclusively for RoyaltyStat.

14. All of RoyaltyStat's employees and contractors have been required to sign confidentiality/non-disclosure agreements as a condition of receiving access to the database. Sometime in 2009 RoyaltyStat asked its employees and contractors to re-execute these agreements.

15. RoyaltyStat has a client base of more than 200 subscribers ranging from corporations to government agencies to professional services firms (*e.g.*, law firms and international accounting firms). RoyaltyStat's client list is also closely guarded. RoyaltyStat has never made its customer list public and restricts access to the information to certain employees and contractors of the company on a need-to-know basis.

16. RoyaltyStat's subscribers, who pay an annual subscription fee, can search its unique proprietary online database containing more than 19,500 unredacted license agreements to identify comparable royalty rates by selecting filters, including Standard Industrial Classification ("SIC") codes, intangible property type (copyright, patent, trademark) , and keywords. In addition, subscribers get access to financial information and annual reports for more than 34,000 publicly traded companies.

17. In order to keep its database current, RoyaltyStat is one of the most prolific filers of FOIA requests. Because so much of the data in its database can only be compiled from information that is only available through this laborious and expensive process, a significant time commitment and investment were and are necessary to build and maintain the database to its current level.

18. Before receiving access to the RoyaltyStat database, subscribers must execute a Subscription Agreement.

19. The Subscription Agreement expressly prohibits subscribers from "modify[ing], decompil[ing], disassembl[ing], or reverse engineer[ing] RoyaltyStat, the License Agreements Database, its process, its content, or any portion thereof." RoyaltyStat Subscription Agreement, ¶ 5.6.

20. Further the Subscription Agreement expressly prohibits subscribers from "assembl[ing] or us[ing] the License Agreements Database, or any data or documents obtained from the License Agreements Database, in any manner that violates RoyaltyStat's copyrights or that competes with, substitutes for, or is an alternative to RoyaltyStat's subscription services." *Id.*, ¶ 5.7.

21. In addition, by signing the Subscription Agreement, subscribers acknowledged and agreed that "RoyaltyStat, the License Agreements Database, its process, its content, and any portion thereof constitute and contain valuable proprietary information and trade secrets of RoyaltyStat and/or its suppliers, embodying substantial creative efforts and confidential information, ideas, and expressions. Accordingly, Subscriber[s] agree[s] to treat (and take precautions to ensure that [their] employees treat) RoyaltyStat, the License Agreements Database, its process, its content, and any portion thereof as confidential and to exercise at all times a reasonable degree of care in the protection of confidential information." *Id.*, ¶ 8.

22. Each of these controls was put in place to protect RoyaltyStat's copyrights and trade secrets.

### Raul Pacheco Quintanilla's Relationship to RoyaltyStat LLC

23. From 1982 until 1990, Ednaldo Silva served as a very successful and well-regarded professor of economics on the Graduate Faculty of the New School for Social Research in New York City. While teaching, he became a dissertation advisor to Claudio Gontijo. As a result of this relationship, Dr. Silva developed a long standing personal relationship with Dr. Gontijo's stepson, Mr. Pacheco.

24. In 2000, Dr. Silva offered Mr. Pacheco an internship working with RoyaltyStat. Subsequently, working as an outside contractor, Mr. Pacheco began as a reader extracting data fields from license agreements that RoyaltyStat purchased. Ultimately, Mr. Pacheco began working in customer service and sales. In both capacities, he was given unlimited access to the RoyaltyStat License Agreements Database, its process, its content, and its trade secrets. As a result of the unfettered access he was given to this confidential and proprietary information, Mr. Pacheco owed a fiduciary duty of loyalty to RoyaltyStat.

25. Mr. Pacheco's primary responsibility at RoyaltyStat was to sell new subscriptions and to provide customer service to subscribers. For each subscription he sold, Mr. Pacheco was obligated to obtain an executed Subscription Agreement and he was required to ensure such subscribers understood the limitations of use embodied in the Subscription Agreement as set forth *supra*.

26. For each such subscription sold, Mr. Pacheco received a commission. His right to payment continued for periodic customer service functions he performed related to renewals of subscriptions he had sold.

27. In late 2009, RoyaltyStat learned that Mr. Pacheco was embezzling funds from the company by having certain Latin American subscription fees routed to his personal account in Mexico, instead of going to RoyaltyStat's account in the U.S.

28. On September 23, 2011, RoyaltyStat terminated its relationship with Mr. Pacheco for cause, including abandonment of customer support work, deception, and failure to sell new subscriptions.

**Raul Pacheco and IntangibleSpring Misappropriated RoyaltyStat's Trade Secrets**

29. Even before his termination, Mr. Pacheco began sowing the seeds of his efforts to undermine RoyaltyStat. On December 1, 2010, Mr. Pacheco accessed and downloaded/exported RoyaltyStat's database data into an Excel spreadsheet. On two other occasions, December 14, 2010 and January 28, 2011, he stole additional data from RoyaltyStat.

30. On three additional dates, Mr. Pacheco accessed RoyaltyStat's back-office library and downloaded unredacted license agreements collected by RoyaltyStat not for use in connection with performing his duties to RoyaltyStat, but to use for his own personal gain.

31. All of these items that Mr. Pacheco downloaded were protected trade secrets. They were only accessible for download using access afforded to a strictly limited and tightly controlled number of persons associated with RoyaltyStat, and were only allowed to be downloaded to perform assigned quality control tasks on behalf and for the sole benefit of RoyaltyStat. The information Mr. Pacheco purloined could not be downloaded from RoyaltyStat's database or servers using a client access login. It required back-office access using an additional administrative login.

32. Having stolen RoyaltyStat's proprietary and confidential trade secrets, Mr. Pacheco set out to establish a company that would compete directly against RoyaltyStat. On August 8, 2012, IntangibleSpring Corp. was formed in Panama.

33. RoyaltyStat first learned of IntangibleSpring's existence in April 2013 when a competitor, contacted Dr. Silva to alert him. At that time the competitor advised RoyaltyStat that, to the competitor's surprise, IntangibleSpring had RoyaltyStat's customer list and had almost precisely the same number of records in its database as RoyaltyStat had as of the time Mr. Pacheco was fired. Not coincidentally, the number of records cited by the competitor was almost identical to the number of records stolen by Mr. Pacheco on the dates, identified above.

34. RoyaltyStat's customer list was not publicly available at that time, or any time before or thereafter.

35. By April 19, 2013, IntangibleSpring claimed that its database contained more than 10,500 records. IntangibleSpring falsely claimed to be adding more than 600 records per month.

36. Upon information and belief, IntangibleSpring and Mr. Pacheco have falsely claimed to offer the same data and analysis that is the same or substantially the same in quality and content as that provided by RoyaltyStat.

37. The only analysis IntangibleSpring offers comparable to that provided by RoyaltyStat has been stolen from RoyaltyStat.

38. For example, some of IntangibleSpring's database records contain content copied verbatim from RoyaltyStat. As reflected in Exhibits A and B, a comparison of database data from the two companies reveals identical sentence structure and punctuation in both databases. Such similarity can only occur by rote copying from one source to another because the text at

issue was drafted by RoyaltyStat personnel analyzing source agreements. The cited text does not appear in the original source agreements filed with the SEC.

39. Further, some of these records in IntangibleSpring's database containing content copied verbatim from RoyaltyStat correspond to records added to RoyaltyStat's database after September 2013. IntangibleSpring could only have obtained the copied material in conjunction with someone possessing access to RoyaltyStat's database. Such person necessarily must be either RoyaltyStat personnel or a RoyaltyStat customer. In either case, the individual IntangibleSpring obtained the information from could only provide the information in violation of a confidentiality agreement.

40. Mr. Pacheco has contacted several of RoyaltyStat's customers and offered subscriptions of stolen data for about 1/3 of the RoyaltyStat regular subscription price. Several former RoyaltyStat customers who switched to IntangibleSpring, who are reputable businesses have confirmed that they would not have switched except for the deception and significantly lower prices offered by Mr. Pacheco.

41. Mr. Pacheco's false and misleading statements were made by and on behalf of IntangibleSpring in the course and for the purpose of offering IntangibleSpring's services in interstate commerce. By misrepresenting the product it offers as being comparable in content, but lower in price to that provided by RoyaltyStat, IntangibleSpring has enticed some of RoyaltyStat's customers to switch to its service. This has caused RoyaltyStat to lose significant revenue and profits.

## COUNT I:

## VIOLATION OF THE COPYRIGHT ACT, 17 U.S.C. § 101 ET SEQ.

42. RoyaltyStat incorporates paragraphs 1-41 as if fully set forth herein.

43. RoyaltyStat is the owner of all rights, title and interest in and to the copyrights in its database. RoyaltyStat's database is the subject of U.S. Copyright Registrations TX0007233781, dated May 7, 2009 (the "'781 Registration") and TX0008580811, dated December 21, 2015 (the"'811 Registration"). A copy of the '781 Registration as obtained from the U.S. Copyright Office's online records is attached as Exhibit C. The RoyaltyStat database is also the subject of U.S. Copyright Application entitled "RoyaltyStat Royalty Tableau," which was filed with the U.S. Copyright Office on December 21, 2015 (the "Royalty Tableau Application"). A copy of the Royalty Tableau Application as filed is enclosed as Exhibit D. The Royalty Tableau Application issued as the '811 Registration in August 2018 following examination by the Copyright Office. A copy of the '811 Registration as received from the Copyright Office is attached as Exhibit F.

44. RoyaltyStat's copyrights protect the original expression in (a) the selection, coordination and arrangement involved in choosing material and data for inclusion in the database; classifying, categorizing, ordering, or grouping the material and data; and determining the placement and arrangement of material and data within the database as a whole; and (b) RoyaltyStat's original authorship, such as original textual content, that appears within the database.

45. Defendant Raul Pacheco Quintanilla had access to and copied RoyaltyStat's original authorship which was then used by Mr. Pacheco and Defendant IntangibleSpring to create the IntangibleSpring database. The IntangibleSpring database contains text, material and data that is substantially similar, if not identical, to that of RoyaltyStat's original authorship in its database.

46. Defendants have thus reproduced, prepared a derivative work based on, and/or distributed RoyaltyStat's copyrighted work, including the original expression identified above and covered by the '781 Registration and the '811 Registration that issued from the Royalty Tableau Application. Defendants' actions have been without RoyaltyStat's permission or authority, and violate RoyaltyStat's exclusive rights in its original work of authorship. Defendants' actions therefore constitute copyright infringement pursuant to the Copyright Act, 17 U.S.C. § 501.

47. RoyaltyStat has been damaged by Defendants' infringement, including suffering harm for which there is no adequate remedy at law.

48. RoyaltyStat is entitled to an award of either statutory or actual damages suffered by it as a result of Defendants' infringement, and any profits of Defendants that are attributable to the infringement. RoyaltyStat is also entitled to entry of an injunction against further violations of RoyaltyStat's copyrights by Defendants.

## COUNT II:

## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 USC § 1125(a).

49. RoyaltyStat incorporates paragraphs 1-48 as if fully set forth herein.

50. Upon information and belief, Defendants' have represented to their clients and potential clients, including those who are current or former clients of RoyaltyStat, that IntangibleSpring's database is the same as RoyaltyStat's in content and quality, but is offered for a lower price. RoyaltyStat devotes substantial resources to updating its database and assuring that the data is of the highest integrity. As a result of these substantial efforts over many years, RoyaltyStat and its founder, Dr. Silva, have developed a reputation for the high-quality of the RoyaltyStat database. Apart from portions of RoyaltyStat's database that they have copied,

Defendants have not and cannot maintain a database of similar quality. Defendants cannot therefore offer a database product that is similar to RoyaltyStat's in content and quality for a lower price.

51. Defendants' statements constitute a false and misleading representation of fact regarding the nature and quality of both the RoyaltyStat database and the IntangibleSpring database. Defendants' statements were material because they influenced the purchasing decision of RoyaltyStat subscribers, and have the tendency to deceive a substantial segment of the intended audience, namely, subscribers and potential subscribers to royalty rate databases. Defendants' statements were made in the course of offering their subscription services in interstate commerce. Defendants' actions were undertaken to deliberately trade on the goodwill and reputation RoyaltyStat has developed as a result of the high quality of its product and services. Defendants' actions therefore constitute unfair competition and false advertising pursuant to § 43(a) of the Lanham Act, 15 U.S.C § 1125(a).

52. Defendants' actions have been undertaken willfully and with a deliberate intent to deceive.

53. RoyaltyStat has suffered damages as a result of Defendants' actions, including harm for which there is no adequate remedy at law.

54. RoyaltyStat is therefore entitled to recover Defendants' profits, damages sustained by it, increased up to three times, costs of this action, and RoyaltyStat's attorney fees. RoyaltyStat is also entitled to entry of an injunction against further violations by Defendants.

## COUNT III:

## VIOLATION OF THE MARYLAND UNIFORM TRADE SECRETS ACT

55. RoyaltyStat incorporates paragraphs 1-54 as if fully set forth herein.

56. RoyaltyStat's customer list, its License Agreements Database, its process, and its content each constitutes and contains valuable proprietary information and trade secrets of RoyaltyStat.

57. At all times relevant hereto, RoyaltyStat took reasonable measures designed to protect the confidentiality of its trade secrets. Among the measures employed, RoyaltyStat controlled access and disclosure through, *inter alia*:

   a. Controlling access to its database through assigned login/password combinations;

   b. Limiting the scope of access to persons based upon the level of access required for their respective purpose;

   c. Requiring employees and contractors to execute confidentiality and/or non-disclosure agreements;

   d. Requiring customers to execute Subscription Agreements containing confidentiality and non-disclosure provisions;

   e. Controlling and limiting access to its customer list.

58. RoyaltyStat derives independent economic value from its trade secrets inasmuch as subscribers pay for the service for the sole purpose of receiving access to the substantial creative efforts and confidential information, ideas and expressions appearing in its License Agreements Database.

59. Raul Pacheco Quintanilla and IntangibleSpring misappropriated RoyaltyStat's trade secrets by using the information Mr. Pacheco downloaded from RoyaltyStat's database and publishing the same as if it was IntangibleSpring's own work product in direct competition with RoyaltyStat.

60. Raul Pacheco Quintanilla's and IntangibleSpring's wrongful actions proximately caused RoyaltyStat to suffer injury in the form of, *inter alia*, lost subscription revenue and profits.

## COUNT IV:

## TORTIOUS INTERFERENCE WITH CONTRACT

61. RoyaltyStat incorporates paragraphs 1-60 as if fully set forth herein.

62. RoyaltyStat had existing contracts with customers obligating them to protect the confidentiality of RoyaltyStat's proprietary information and trade secrets as defined in the Subscription Agreement.

63. RoyaltyStat's employees and contractors all executed, and are bound by, non-disclosure and non-competition agreements that obligate the employees to protect the confidentiality of RoyaltyStat's proprietary information and trade secrets.

64. Raul Pacheco Quintanilla and IntangibleSpring knew or should have known of the obligations imposed on RoyaltyStat's customers by virtue of the Subscription Agreement.

65. Raul Pacheco Quintanilla and IntangibleSpring knew or should have known of the obligations imposed on RoyaltyStat's employees and contractors by virtue of the non-disclosure and non-competition agreements such persons executed in the course of their employment.

66. Raul Pacheco Quintanilla and IntangibleSpring tortiously interfered with RoyaltyStat's contracts by inducing one or more of RoyaltyStat's subscribers or employees, after Mr. Pacheco was no longer associated with RoyaltyStat, to provide him with copies of RoyaltyStat database content.

67. The defendants' actions are the direct and proximate cause of significant injury to RoyaltyStat in an amount to be proved at trial.

# REQUEST FOR PERMANENT INJUNCTION

68. RoyaltyStat incorporates paragraphs 1-67 as if fully set forth herein.

69. As detailed above, the defendants' wrongful actions are causing, and will continue to cause irreparable injury to RoyaltyStat in the form of loss of goodwill and reputation, loss of business opportunities, and price erosion, in a manner for which there is no adequate remedy at law.

70. RoyaltyStat therefore seeks, and is entitled to, an order enjoining the defendants from using, publishing, or selling any of RoyaltyStat's data, proprietary information, or trade secrets on the internet or in any other form.

71. RoyaltyStat will suffer irreparable harm if the relief sought herein is not granted.

72. Because of the unique nature of the injuries caused by the defendants' wrongful actions, RoyaltyStat has no adequate remedy at law.

**WHEREFORE**, the Plaintiff, RoyaltyStat, LLC, requests:

A. That this Court award compensatory damages jointly and severally against the defendants in an amount equal to the value of RoyaltyStat's actual damages and/or defendants' profits resulting from the violation of RoyaltyStat's intellectual property rights;

B. That this Court award statutory damages jointly and severally against the defendants and pursuant to 17 U.S.C. § 504(c)(1) in an amount not less than $30,000.00 for each violation of the United States Copyright Laws;

C. That this Court award punitive damages jointly and severally against the defendants in an amount up to three times the amount of the damage award to RoyaltyStat;

D. That this Court enter an Order temporarily and permanently enjoining the defendants from using, publishing, or selling any of the data, proprietary information, or trade secrets misappropriated from RoyaltyStat;

E. That this Court award Plaintiff their costs of suit and their reasonable attorney's fees incurred pursuing this action; and

F. Such other and further relief as this Court deems necessary and appropriate.

Dated: August 24, 2018                                  Respectfully Submitted,


*/s/ Billy B. Ruhling, II*
Billy B. Ruhling, II (Fed. Bar No. 17827)
Cecil E. Key (Bar No. 805447)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Tel: 703-684-4333
Fax: 703-548-3181
bruhling@dimuro.com
ckey@dimuro.com
*Counsel for RoyaltyStat LLC*