# EXHIBIT III

IN THE UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF MARYLAND<br>
Greenbelt Division

RoyaltyStat LLC,

    Plaintiff/Counter Defendant,

v.                            Case No.: 8:15-cv-03940-PX

IntangibleSpring, Corp., et al.

    Defendants/Counter Plaintiff,

v.

Ednaldo Silva,

    Counter Defendant.

*  *  *  *  *  *  *  *  *  *  *  *  *  *

---

## PLAINTIFF ROYALTYSTAT, LLC'S RESPONSES TO DEFENDANT INTANGIBLESPRING CORP.'S FIRST SET OF INTERROGATORIES

Plaintiff RoyaltyStat LLC ("RoyaltyStat") hereby present its objections and responses to

*Defendant IntangibleSpring Corp.'s First Set of Interrogatories* served on April 2, 2018.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

RoyaltyStat objects to the Definitions and Instructions to the extent the impose

requirements that go beyond those of the Federal Rules of Civil Procedure or the discovery rules

of this Court.

### OBJECTIONS AND RESPONSES TO DEFENDANT'S INTERROGATORY REQUESTS

**INTERROGATORY NO. 1:** State the factual basis for the allegation contained in Paragraph 4 of Your Complaint that Pacheco "accessed its data files and stole RoyaltyStat's proprietary data…."

**RESPONSE:**

Plaintiff objects to this Interrogatory as merely duplicative of other interrogatories,

including numbers 7 and 8, and therefore not proportional to the needs of the case.

RoyaltyStat's Database includes the RoyaltyStat Tableau, tables consisting of a row for each license agreement included in the Database and a column for each data field. The data fields include data that are proprietary to RoyaltyStat, such as the address where the agreement can be found at the SEC.

According to the electronic activity records of RoyaltyStat, on December 1, 2010, Pacheco accessed and downloaded/exported the complete Royalty Tableau from RoyaltyStat's database into an Excel spreadsheet. On two subsequent occasions, December 14, 2010 and January 28, 2011, Pacheco downloaded additional data from the RoyaltyStat Database.

On three additional dates, Pacheco accessed RoyaltyStat's back-office library and downloaded unredacted license agreements collected by RoyaltyStat. By December 2010, Pacheco was not allowed access to these materials in the Database because he was no longer doing quality control work regarding data entered into the database. As became subsequently clear, Pacheco misappropriated the RoyaltyStat data for his own personal gain.

The items that Pacheco downloaded were proprietary to RoyaltyStat, and the misappropriated information included protected trade secrets. The tables and other data were only accessible for download using access afforded to a strictly limited and tightly controlled number of persons associated with RoyaltyStat and were only allowed to be downloaded to perform assigned quality control tasks on behalf and for the sole benefit of RoyaltyStat. The information Pacheco purloined could not be downloaded from RoyaltyStat's Database or servers using a client access login. It required back-office access using an additional administrative login.

Unbeknownst to RoyaltyStat, Pacheco then established a company that would compete

directly with RoyaltyStat using the tables and data that Pacheco had illegally taken with him when he was fired from RoyaltyStat. On August 8, 2012, IntangibleSpring Corp. was formed in Panama. RoyaltyStat first learned of IntangibleSpring's existence from a competitor on April 2013.

RoyaltyStat first learned of IntangibleSpring's existence in April 2013 when a competitor, ktMine, contacted Dr. Silva to alert him that Pacheco/IntangibleSpring was offering what "seems like [RoyaltyStat's] database and cust[omer] list." When RoyaltyStat inquired as to the basis for these conclusions, ktMine responded that "Just that your guy Raul is owner. Ironic he has only 10k agreements. Is that how many you had when he left? He also seems to have a good customer list. I wonder where he got that?" The number of records cited by the competitor was almost identical to the number of records downloaded by Pacheco on the dates identified above.

By April 19, 2013, IntangibleSpring claimed that its database contained more than 10,000 records, and that it was adding an average of 600 records per month to the database. IntangibleSpring also claimed to offer a database that was the same in quality as the RoyaltyStat Database. IntangibleSpring could not have achieved a database of that size and of the same quality as RoyaltyStat's in that time by its own independent development.

An examination of IntangibleSpring's database then revealed that it contained records and data fields copied verbatim from RoyaltyStat. In addition, as reflected in Exhibits A and B to the Amended Complaint, a comparison of databases from the two companies reveals identical sentence structure and punctuation in both databases. The text contains striking similarity to the structure and punctuation adopted and used consistently by RoyaltyStat for the original text added to its Database.

Further, some of the records in IntangibleSpring's database included content copied verbatim from RoyaltyStat and correspond to records added to RoyaltyStat's database after September 2013. IntangibleSpring could only have obtained the copied material in conjunction with someone possessing access to RoyaltyStat's database and in violation of a confidentiality agreement.

**INTERROGATORY NO. 2:** State the factual basis for the allegation contained in Paragraph 5 of Your Complaint that "IntangibleSpring's misappropriation of RoyaltyStat's trade secrets and proprietary data significantly eroded RoyaltyStat's profits."

**RESPONSE:**

RoyaltyStat directs defendant to its Response to Interrogatory No. 1. Pacheco has contacted several of RoyaltyStat's customers and offered subscriptions of stolen data for as low as 1/3 of the RoyaltyStat regular subscription price. RoyaltyStat's customer list is not and never has been publicly available. Several former RoyaltyStat customers who switched to IntangibleSpring, who are reputable businesses, have confirmed that they would not have switched except for the deception and significantly lower prices offered by Pacheco.

By misrepresenting its offers as being comparable in content, but lower in price to that provided by RoyaltyStat, IntangibleSpring has enticed some of RoyaltyStat's customers to switch to its service. RoyaltyStat has lost revenue from the subscriptions switched to IntangibleSpring.

In addition, beginning in 2013, RoyaltyStat began being forced to increase investments in promoting its database subscription services to existing and potential subscribers, which included substantial increase in domestic and international travel expenses. The increased expenses resulted in a significant negative impact on RoyaltyStat's profits. The increased expenses and resulting eroded profits coincided with IntangibleSpring's beginning of operations and

approaches to RoyaltyStat customers.

Raul Pacheco Quintanilla's and IntangibleSpring's wrongful actions proximately caused RoyaltyStat to suffer injury in the form of, *inter alia*, lost subscription revenue and lost profits.

RoyaltyStat also directs defendant to its Response to Interrogatory No. 15.

**INTERROGATORY NO. 3:** State the gross and net profit received by RoyaltyStat from the sale of its services for the years 2012, 2013, 2014, 2015, 2016, and 2017.

**RESPONSE:**

Plaintiff objects to this interrogatory as ambiguous and overbroad in seeking information regarding profits received from RoyaltyStat "from the sale of its services" without further definition as to the services Defendants contemplate as covered by this interrogatory. Plaintiff objects to this interrogatory to the extent it calls for sensitive business information that is highly confidential, proprietary, and/or trade secret information. Such information will be withheld until an appropriate Protective Order may be entered by the Court.

**INTERROGATORY NO. 4:** State the factual basis for the allegation contained in Paragraph 13 of Your Complaint that "[f]ull access (e.g., the capability to search for comparables, read records, select comparable records to the taxpayer's intangible property, and download data) is tightly controlled within RoyaltyStat. Only a limited number of authorized employees and contractors have been given such access."

**RESPONSE:**

RoyaltyStat controlled access to and disclosure of the Administrative (back-office) functions in its database through, *inter alia*:

    a.    Controlling access to its database through double assigned login/password combinations to certain assigned employees and independent contractors;

    b.    No customer has knowledge or access to the back-office Administrative functions

of RoyaltyStat, such as customer list, redacted vs. unredacted license agreements classification, data field extraction, data normalization, and quality control;

c.    Requiring every person accessing the RoyaltyStat Database, including those accessing the Administrative Database internally at RoyaltyStat, to first acknowledge and accept that the Database and its contents are proprietary to RoyaltyStat and are not to be used except as expressly permitted by RoyaltyStat;

d.    Limiting the scope of access to persons based upon the level of access required for their respective duties; e.g., data extractors had no access to the active or live searchable Royalty Tableau;

e.    Requiring employees and contractors to execute confidentiality and/or non-disclosure agreements;

f.    Requiring customers/subscribers to execute Subscription Agreements containing confidentiality and non-disclosure provisions, including the acknowledgement and acceptance noted above that the Database and its contents are proprietary to RoyaltyStat and are not to be used except as expressly permitted by RoyaltyStat;

g.    Controlling and limiting access to its customer list.

As a result, Administrative functions access is provided only to certain RoyaltyStat employees, and to certain contractors subject to the controls noted above. As a further safeguard, RoyaltyStat does not allow trial access to its Royalty Tableau to further help protect against the pirating of the Database or portions thereof and to protect RoyaltyStat's substantial cumulative investment in developing its proprietary Database.

**INTERROGATORY NO. 5:** State the date on which the Subscription Agreement described in Paragraphs 18, 19, 20, and 21 of Your Complaint was first implemented.

**RESPONSE:**

RoyaltyStat has required execution of a Subscription Agreement to access its Database from the online launching of its Database on December 14, 2009. The form of the Subscription Agreement changed somewhat over the years, but all versions included prohibitions on the copying, caching, reverse engineering, etc., of the Database as noted in Paragraphs 18-21 of the First Amended Complaint. At one point, RoyaltyStat worked with outside professionals regarding revisions to simplify the Subscription Agreement. Pacheco was designated as the liaison with the outside legal counsel and RoyaltyStat regarding the revising of the Subscription Agreement. Pacheco also provided the Subscription Agreement to RoyaltyStat customers for whose accounts Pacheco was responsible. Prior versions contained language identical or substantially like that cited in the version cited in Paragraphs 18-21. This language was developed internally by law intern Linwood Smith and subsequently refined with the assistance of the outside legal counsel with whom Pacheco acted as RoyaltyStat's liaison.

**INTERROGATORY NO. 6:** State the factual basis for the allegation contained in Paragraph 27 of Your Complaint that "Mr. Pacheco was embezzling funds from the company by having certain Latin American subscription fees routed to his personal account in Mexico, instead of going to RoyaltyStat's account in the U.S.

**RESPONSE:**

Prior to Pacheco's dismissal, it had been discovered during an audit conducted by a potential investor that Pacheco had falsified records of the amount of sales commissions he had earned resulting in an overpayment of approximately $30,000.00. Pacheco was confronted about this unlawful act but was not able to reconcile the accounting discrepancies or mismatches between customers and receipts from all the customers. Pacheco was not dismissed immediately because of several personal appeals and the trust that Dr. Silva had rested on him. In the motion

to dismiss filed by defendants on May 9, 2017, Pacheco admitted he "managed" a Mexican entity, Diadorim SA de CV, through which $287,000 in payments for subscriptions by RoyaltyStat's customers were made to Diadorim's bank account. Doc. 49-1 at 5.

Consistent with the disregard Pacheco has shown for RoyaltyStat's intellectual property, he is employing the name Diadorim without a license. The URL Diadorim.com is owned by Dr. Silva; however, Dr. Silva does not use the name Diadorim for commercial purposes, and his URL remains inactive, because he was unable to obtain a license form the literary executor of João Guimarães Rosa, creator of the character Diadorim on his novel *Grande Sertão: Veredas*, published in Brazil in 1956. Dr. Silva introduced Pacheco to this great Brazilian novel in which Diadorim, a woman impersonating a man, has a life pursuit to revenge the traitor who murdered her father and thereafter lived in hiding.

Diadorim is not and was not an entity authorized to receive invoice payments due RoyaltyStat. Until the admission in defendants' motion to dismiss, RoyaltyStat was unaware of the $287,000 payments being made to Diadorim. The amount, which Pacheco admits RoyaltyStat is entitled to, was not known and was never received by RoyaltyStat. Pacheco was entrusted with collected subscription fees from RoyaltyStat customers, but instead diverted those fees to his own Mexican bank account to use for his sole purpose.

**INTERROGATORY NO. 7:** State the factual basis for the allegation contained in Paragraph 29 that "[o]n December 1, 2010, Mr. Pacheco accessed and downloaded/exported RoyaltyStat's database data into an Excel spreadsheet. On two other occasions, December 14, 2010 and January 28, 2011, he stole additional data from RoyaltyStat."

**RESPONSE:**

RoyaltyStat objects to this interrogatory as merely duplicative of other interrogatories, including Interrogatory No. 1. RoyaltyStat therefore directs defendants to its Response to

Interrogatory No. 1.

**INTERROGATORY NO. 8:** State the date on which You first discovered that Mr. Pacheco "accessed and downloaded/exported RoyaltyStat's database data…" as stated in Paragraph 29 of Your Complaint.

**RESPONSE:**

RoyaltyStat first discovered that Pacheco had accessed and downloaded/exported RoyaltyStat's database data on or about April 18, 2013.

**INTERROGATORY NO. 9:** State the name, address, contact information, dates of correspondence with, and content of correspondence with, the competitor that You state informed you of IntangibleSpring's existence in April 2013 in Paragraph 33 of Your Complaint.

**RESPONSE:**

RoyaltyStat objects to this interrogatory as overly burdensome and not proportional to the needs of the case in seeking all communications with the competitor referenced in Paragraph 33 of the Amended Complaint. Subject to this objection, RoyaltyStat states that on or about April 18, 2013, Dr. Ednaldo Silva of RoyaltyStat received an email from David Jarczyk, President of ktMine, forwarding information about IntangibleSpring, including Mr. Jarczyk view that the information seemed to describe RoyaltyStat's database *and* customer list. On that same day, Dr. Silva responded "Thank you for the information. What do you know about IntangibleSpring?" On April 20, 2013, Mr. Jarczyk replied:

> Just that your guy Raul is owner. Ironic he has only 10k agreements. Is that how many you had when he
> left?
>
> He also seems to have a good customer list. I wonder where he got that?

**INTERROGATORY NO. 10:** State the factual basis for the allegation contained in Paragraph 35 of Your Complaint that "IntangibleSpring claimed that its database contained more than

10,500 records. IntangibleSpring falsely claimed to be adding more than 600 records per month."

**RESPONSE:**

RoyaltyStat's factual allegations in Paragraph 35 of the First Amended Complaint are based primarily on statements made by IntangibleSpring on its website located at www.intangiblespring.com.

**INTERROGATORY NO. 11:** Identify all text entries contained within the RoyaltyStat database that You believe have been copied by IntangibleSpring and that have in the past appeared or now appear in the IntangibleSpring database.

**RESPONSE:**

RoyaltyStat objects to this request as unduly burdensome to the extent it requests that each text entry copied by IntangibleSpring be individually identified. Moreover, RoyaltyStat cannot identify all text entries copied by IntangibleSpring until it has had a chance to review the entire IntangibleSpring database. Subject to this objection, RoyaltyStat directs defendant, pursuant to Fed. R. Civ. P. 33, to the business records identified in its Answer to Request for Production 11. RoyaltyStat also directs defendants to Exhibits A and B of the Amended Complaint. RoyaltyStat will supplement this response after it has had the opportunity to review the IntangibleSpring database.

**INTERROGATORY NO. 12:** Identify the selection, coordination, and arrangement contained within the RoyaltyStat database that You believe has been copied by IntangibleSpring and that has in the past appeared or now appears in the IntangibleSpring database as alleged in Paragraph 44 of Your Complaint.

**RESPONSE:**

RoyaltyStat objects to this request as unduly burdensome to the extent it requests that each text selection, coordination, and arrangement contained within the RoyaltyStat database and

copied by IntangibleSpring be individually identified. Subject to this objection, RoyaltyStat responds as follows.

RoyaltyStat does not include information in its database for every agreement it obtains from the SEC. Rather, RoyaltyStat begins by selecting specific agreements from which data are to be taken and included in the database. The process of selecting the appropriate license agreements is time-consuming and requires human review to determine whether an agreement is a license appropriate for selection for inclusion in the Database. In addition, many licenses selected by RoyaltyStat are redacted and certain unredacted versions must be acquired from the SEC through a Freedom of Information Act ("FOIA") request. The SEC publishes the location of and the party to whom such agreements are released via the FOIA process.

RoyaltyStat then extracts specific data, *e.g.*, licensor/licensee name, royalty rate, royalty base, exclusivity, contract duration, territory, etc., drawn directly from the agreements. RoyaltyStat then adds information not found in the agreements, such as the identification of the industry to which the licensed intangibles pertain, SIC codes metadata, and text synopsizing the intangible being licensed. RoyaltStat does not use a "cut and paste" approach to entering the data into the Database. Rather, RoyaltyStat has a system of protocols that are implemented by its contractors and employees at RoyaltyStat's direction and under its control whereby all data and information, both that taken from the agreements and that added by RoyaltyStat, are normalized. RoyaltyStat then coordinates and arranges this selected and normalized information into a relational database that is searchable online, subject to a paid access subscription.

Because IntangibleSpring has not independently obtained the agreements, it has simply copied RoyaltyStat's selection. For example, any records in the IntangibleSpring database that are drawn from unredacted agreements only available through the FOIA process outlined above

could only have been independently obtained by IntangibleSpring if IntangibleSpring is identified by the SEC as a party to whom the unredacted agreements were provided. As noted above, IntangibleSpring's synopses copy RoyaltyStat's original language verbatim or in a strikingly similar fashion such that similar searches on the two databases will return identical or nearly identical results.

The 10,525 records purloined from RoyaltyStat by Pacheco were derived from over nine and half million exhibits contained in RoyaltyStat's Administrative function SEC document repository. Therefore, the misappropriated records contained well-classified, extracted, normalized, and copy-edited data fields obtained from substantial cumulative effort and expenses. A review of IntangibleSpring's database records may therefore reveal additional copying of RoyaltyStat's selection, coordination and arrangement.

RoyaltyStat further directs defendant, pursuant to Fed. R. Civ. P. 33, to the business records identified in its Answer to Request for Production 11.

**INTERROGATORY NO. 13:** State the factual basis for the allegation contained in Paragraph 40 of Your Complaint that "Mr. Pacheco has contacted several of RoyaltyStat's customers and offered subscriptions of stolen data for about 1/3 of the RoyaltyStat regular subscription price."

**RESPONSE:**

The following RoyaltyStat customers reported to RoyaltyStat that Mr. Pacheco contacted them and offered subscriptions of unlimited stolen data for as much as 1/3 of the regular RoyaltyStat subscription price: Arsene-Taxand (France), Baker Tilly (England); Brand Finance (England); NCR Corp. (USA); PwC (Italy).

**INTERROGATORY NO. 14:** State the factual basis for the allegation contained in Paragraph 41 of Your Complaint that IntangibleSpring has "misrepresent[ed] the product it offers as being

comparable in content, but lower in price to that provided by RoyaltyStat…."

**RESPONSE:**

IntangibleSpring has represented to its clients and potential clients, including those who are current or former clients of RoyaltyStat, that IntangibleSpring's database is the same as RoyaltyStat's in content and quality, but is offered for a lower price. RoyaltyStat devotes substantial resources to updating its database and assuring that the data and the database is of the highest integrity. Because of these substantial efforts over 20 years, RoyaltyStat and its founder, Dr. Silva, have developed a reputation for the high-quality of the RoyaltyStat database. Apart from portions of RoyaltyStat's database that they have copied, Defendants have not and cannot maintain a database of similar quality without incurring substantial financial investment amounting to several millions, including paying for a high number of qualified professionals with acquired knowledge of license agreements as legal contracts. Defendants cannot therefore offer a database product that is like RoyaltyStat's in content and quality for a lower price, because the expenses incurred in development (including the development of a customer list) is time-consuming and substantial.

**INTERROGATORY NO. 15:** Identify all actual damages suffered by RoyaltyStat as alleged in Paragraph 48 of Your Complaint.

**RESPONSE:**

Raul Pacheco Quintanilla's and IntangibleSpring's wrongful actions proximately caused RoyaltyStat to suffer injury in the form of, *inter alia*, lost subscription revenue, and lost profits. In addition, the offering by Pacheco and IntangibleSpring of a database from misappropriated information at a substantial discount off RoyaltyStat's regular subscription prices has resulted in substantial lost opportunity costs to RoyaltyStat. In one instance, a potential investor upon

independently discovering IntangibleSpring during its due diligence, dropped its investment offer by half. The reason given was the existence of a competitor, IntangibleSpring, that was offering a competing product at rates substantially below what RoyaltyStat could feasibly offer and maintain a profit.

RoyaltyStat also directs defendant to its Response to Interrogatory No. 2.


**INTERROGATORY NO. 16:** Identify all occasions on which IntangibleSpring stated to a third party that its database "is the same as RoyaltyStat's in content and quality, but is offered for a lower price" as alleged in Paragraph 50 of Your Complaint and provide for each occasion: (1) the name of the third party to which this statement was communicated; (2) the address of the third party to which this statement was communicated; (3) the means by which the statement was communicated to the third party, whether by email, telephone, or written letter; and (4) the date on which the statement was communicated to the third party.

**RESPONSE:**

RoyaltyStat objects to this request as unduly burdensome to the extent it requests that RoyaltyStat identify each occasion IntangibleSpring engaged in conduct or communications to which RoyaltyStat was not a party. Subject to this objection, RoyaltyStat states that RoyaltyStat was informed by Arsene-Taxand, Baker Tilly, Brand Finance, and NCR Corp. that IntangibleSpring had approached them and represented that it could offer a royalty database that is the same in quality as RoyaltyStat's but for a price much lower than RoyaltyStat offers. These communications were received by email and in face-to-face conversations over several months in 2015.

RoyaltyStat also directs defendant to its Response to Interrogatory No. 13 and 14.


**INTERROGATORY NO. 17:** Identify all damages suffered by RoyaltyStat as a result of its allegations of False Advertising as alleged in Paragraph 53 of Your Complaint.

**RESPONSE:**

Raul Pacheco Quintanilla's and IntangibleSpring's wrongful actions proximately caused RoyaltyStat to suffer injury in the form of, *inter alia*, lost subscription revenue, and lost profits. As described above, RoyaltyStat also experienced significant increases in expenses directly related to sales to counter the loss of subscriptions, and these significant increases coincided with Pacheco's and IntangibleSpring's activities outlined in the First Amended Complaint and in these responses.

RoyaltyStat also directs defendant to its Response to Interrogatory No. 2 and 15.


**INTERROGATORY NO. 18:** State all facts on which You will rely at trial supporting the allegation contained in Paragraph 57 of Your Complaint that "RoyaltyStat took reasonable measures designed to protect the confidentiality of its trade secrets," including, but not limited to, the manner in which RoyaltyStat controlled access to its database, the means by which RoyaltyStat limited the scope of access to its database, and the means by which RoyaltyStat controlled and limited access to its customer list.

**RESPONSE:**

RoyaltyStat objects to this interrogatory as unduly burdensome as it cannot possibly identity all facts on which it will rely at trial to support a specific allegation. RoyaltyStat also objects to this interrogatory as unduly burdensome and as not proportional to the needs of the case because it is merely duplicative of Interrogatory No. 4. Subject to this objection, RoyaltyStat also directs defendant to its Response to Interrogatory No. 4.


**INTERROGATORY NO. 19:** State all facts on which You will rely at trial supporting the allegation contained in Paragraph 66 of Your Complaint that "Raul Pacheco Quintanilla and IntangibleSpring tortuously interfered with RoyaltyStat's contracts by inducing one or more of RoyaltyStat's subscribers or employees, after Mr. Pacheco was no longer associated with RoyaltyStat, to provide him with copies of RoyaltyStat database content."

**RESPONSE:**

RoyaltyStat objects to this request as unduly burdensome as it cannot possibly identity all

facts on which it will rely at trial to support a specific allegation. Subject to this objection, RoyaltyStat states that its investigation into IntangibleSpring's database revealed records with information copied from RoyaltyStat's database that were not entered into RoyaltyStat's database until after Mr. Pacheco was fired and/or IntangibleSpring was formed. IntangibleSpring could only have obtained the copied material in conjunction with someone possessing access to RoyaltyStat's database for sharing with IntangibleSpring in violation of a confidentiality agreement. In addition, Pacheco induced a RoyaltyStat independent contractor performing customer service to work for Intangible Spring. Upon knowledge of this fact, Dr. Silva communicated with the FBI who sent two agents to London to intercede on Pacheco's arranged meeting with the RoyaltyStat independent contractor, but Pacheco (according to the FBI, probably acting on a tip) did not show and did not respond to further queries by the contractor.

**INTERROGATORY NO. 20:** Identify all independent contractors who contributed to the RoyaltyStat database from 2000 to the present and provide for each independent contractor: (a) their name; (b) their last known address; (c) their telephone number; (d) the date on which they began providing services to RoyaltyStat; and (e) the date on which they stopped providing services to RoyaltyStat.

**RESPONSE:**

RoyaltyStat objects to this interrogatory as unduly burdensome and not proportional to the needs of the case in seeking detailed discovery about personnel records of RoyaltyStat contractors over a period of 19 years when Defendants have admitted that multiple independent contractors worked on the RoyaltyStat database and has identified some of those contractors in response to RoyaltyStat's interrogatories. RoyaltyStat further objects to this interrogatory as unduly burdensome because it seeks a large amount of sensitive personnel information.

As a result of its objections, RoyaltyStat will provide no further response at this time.

**INTERROGATORY NO. 21:**  Identify all employees of RoyaltyStat from 1999 to the present and provide for each employee: (a) their name; (b) their last known address; (c) their telephone number; (d) the date on which they began employment with RoyaltyStat; and (e) the date on which they ceased employment with RoyaltyStat.

**RESPONSE:**

RoyaltyStat objects to this interrogatory as unduly burdensome and not proportional to the needs of the case in seeking detailed discovery about personnel records of RoyaltyStat employees over a period of 19 years when the information is not relevant to a claim of defense in this matter.  RoyaltyStat further objects to this interrogatory as unduly burdensome because it seeks a large amount of sensitive personnel information.

As a result of its objections, RoyaltyStat will provide no further response at this time.

**INTERROGATORY NO. 22:**  For each license agreement record contained within the deposit material submitted with Your application for copyright registration of "Royaltystat website royalty tableau" (Reg. No. TX0007233781), please provide: (a) the name of the individual(s) who created or processed the license agreement record; (b) the date on which the license agreement record was created or processed; and (c) the manner by which you identified the information requested in (a) and (b), including, but not limited to, the file name and creation date of the file used to procure this information.

**RESPONSE:**

RoyaltyStat objects to this request as unduly burdensome and not proportional to the needs of the case because it seeks information that is not relevant to any claim or defense in the case.  The only records of the RoyaltyStat database for which any question concerning authorship is at issue are those for which Pacheco has belatedly claimed authorship in his unsustainable copyright claim.  Once Pacheco has identified the precise records he says are his authorship, RoyaltyStat will confirm whether and to what extent Pacheco had any involvement in

creating any authorship.  Subject to this objection, RoyaltyStat directs defendant, pursuant to Fed. R. Civ. P. 33, to the information contained in Exhibits A and B to the First Amended Complaint.

May 2, 2018                                 Respectfully Submitted,

                                            *As to Objections:*

                                            */s/ Billy B. Ruhling, II*
                                            Billy B. Ruhling, II (Fed. Bar No. 17827)
                                            Cecil E. Key (Bar No. 805447)
                                            DiMuroGinsberg, P.C.
                                            1101 King Street, Suite 610
                                            Alexandria, VA 22314
                                            Tel: 703-684-4333
                                            Fax: 703-548-3181
                                            bruhling@dimuro.com
                                            ckey@dimuro.com
                                            *Counsel for RoyaltyStat LLC and Dr. Ednaldo Silva*

## VERIFICATION

I hereby declare under penalty of perjury that the facts stated in the foregoing Plaintiff RoyaltyStat, LLC's Objections and Responses to Defendant IntangibleSpring Corp.'s First Set of Interrogatories are true and correct to the best of my knowledge, information and belief.


Date: May 2, 2018

_____
Dr. Ednaldo Silva

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 2, 2018, a true and correct copy of the foregoing was sent by email and U.S. Mail, first-class, postage pre-paid, to:

John P. Lynch
McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.S.
6411 Ivy Lane, Suite 200
Greenbelt, MD  20770
Tel: 301-441-2420
Fax: 301-982-9450
Email: mgreen@gcpc.com

John Anthony Di Giacomo
Revision Legal, PLLC
444 Cass St., Suite D
Traverse City, MI  49684
Tel: 231-714-0100
Fax: 231-714-0200
Email: john@revisionlegal.com

*/s/ Billy B. Ruhling, II*
Billy B. Ruhling, II (Fed. Bar No. 17827)