IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

RoyaltyStat LLC,

        Plaintiff,                  *

                              *

v.                               *

                              *

IntangibleSpring, Inc.,         *         Case No.: 8:15-cv-03940-GJH

                              *

and                           *

                              *         Hon. Paula Xinis

Raul Pacheco Quintanilla,     *

                              *

        Defendants.

---

**PLAINTIFF'S COMBINED MEMORANDUM IN SUPPORT
OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction..................................................................................................................... 1

I.   STATEMENT OF MATERIAL FACTS ............................................................ 2

    A.   RoyaltyStat and Its Database ................................................................... 3

    B.   Pacheco's Work For RoyaltyStat........................................................... 5

    C.   Pacheco's Relationship With IntangibleSpring ...................................... 7

    D.   IntangibleSpring's Database And Efforts To Compete With RoyaltyStat .................... 8

    E.   The Expert Comparison Of The Parties' Databases ............................... 9

II.   ROYALTYSTAT CROSS-MOTION FOR SUMMARY JUDGMENT ........................ 11

    **A.   LEGAL STANDARD** ........................................................................... 11

        1.   Summary Judgment .................................................................... 11

        2.   Trade Secret Misappropriation Under The MUTSA ............................. 12

    B.   ARGUMENT ........................................................................................ 13

        1.   By Defendants Own Admission, RoyaltyStat's Compilation Of Royalty Rate Data And Internal Processes Constitute Protectable Trade Secrets That Defendants Misappropriated ........................................................................ 13

            a.   Pacheco admits that RoyaltyStat's compiled data and processes were not readily ascertainable by the public.......................................................... 13

            b.   Pacheco admits that RoyaltyStat's compiled data and processes have independent economic value, and Defendants admitted to taking copies of the assembled data and materials embodying the processes................................ 14

            c.   Pacheco admits that substantial efforts were taken to maintain the confidentiality of RoyaltyStat's trade secrets.................................................. 15

            d.   Defendants have admitted to misappropriating RoyaltyStat's trade secrets........... 15

III.   ROYALTYSTAT OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ........................................................................................... 16

    **A.   LEGAL STANDARD** ........................................................................... 16

        1.   Copyright ..................................................................................... 16

        2.   False Advertising ........................................................................ 17

    **B.   ARGUMENT** ...................................................................................... 17

        1.   Defendants Have Not Established That No Jury Could Reasonably Find That RoyaltyStat's Copyrights Are Valid And Infringed. ........................... 17

a.  According to Defendants' own admissions, RoyaltyStat owns all rights in its copyrights.................................................................................................... 18

b.  Defendants rely on erroneous legal standards regarding the scope and validity of RoyaltyStat's copyrights ............................................................... 21

c.  RoyaltyStat's evidence of slavish copying by Defendants is uncontroverted ........ 25

d.  Defendants have serious credibility questions that preclude granting of summary judgment in their favor ............................................................... 27

2.  RoyaltyStat Has Established That It Is Entitled To Summary Judgment As To Its Trade Secret Claim. ....................................................................................... 28

3.  Defendants Have Not Established That No Jury Could Reasonably Find That IntangibleSpring's Express Statements Constitute False Advertising............................. 30

4.  Defendants Have Not Established That No Jury Could Reasonably Find That Defendants Have Tortiously Interfered With RoyaltyStat's Contracts With Its Customers 32

IV.  CONCLUSION........................................................................................... 33

**TABLE OF EXHIBITS**

**Cases**
**Ex. 1**.................................................................................................................. passim
**Ex. 2**.................................................................................................................. passim
**Ex. 3**......................................................................................................................... 4
**Ex. 4A**...................................................................................................................... 6
**Ex. 4B**...................................................................................................................... 4
**Ex. 5**......................................................................................................................... 3
**Ex. 6**......................................................................................................................... 7
**Ex. 7**......................................................................................................................... 9
**Ex. 8**......................................................................................................................... 9
**Ex. 9**......................................................................................................................... 9
**Ex. 10**....................................................................................................................... 9
**Ex. 11**....................................................................................................................... 8
**Ex. 12**.................................................................................................................... 5, 6
**Ex. 13**....................................................................................................................... 6
**Ex. 14**....................................................................................................................... 9
**Ex. 15**.................................................................................................................. 10, 11
**Ex. 16**....................................................................................................................... 8

iii

Pursuant to Fed. R. Civ. P. 56 and L.R. 105, Plaintiff RoyaltyStat LLC ("RoyaltyStat") hereby (a) moves for partial summary judgment against Defendants IntangibleSpring, Inc. ("IntangibleSpring"), and Raul Pacheco Quintanilla ("Pacheco") (collectively, "Defendants") on Count III of its Second Amended Complaint, violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), ECF 112 ("Compl.") ("RoyaltyStat's Cross-Motion"), and (b) presents its opposition to Defendants' Motion for Summary Judgment, ECF 124 ("Defendants' Motion"). The undersigned counsel certifies that the parties conferred and agreed pursuant to L.R. 105(2)(c) that Defendants would first file their summary judgment motion and RoyaltyStat would then respond with its cross-motion for summary judgment and opposition.

In support of its combined cross-motion and opposition, RoyaltyStat states as follows:

## INTRODUCTION

There is a central theme that runs through all the claims in this case and, as a result, through Defendants' Motion and RoyaltyStat's Cross-Motion, and it is one that fundamentally undermines and dooms Defendants' positions. After he was fired by RoyaltyStat, Pacheco was entitled to start a business of his choosing, provided he did so within the boundaries of the law. That law required him to do his own work: build his own set of data, develop his own know-how, and advertise honestly and fairly. Pacheco chose instead to take shortcuts. He took data, know-how, and original expression that did not belong to him and used it to start a company, IntangibleSpring, to compete with the very entity to which it did belong — RoyaltyStat. Pacheco thereby bypassed the large investment he would have been required to make had he not taken these shortcuts. And he did all of this with full knowledge that all the creative output he misappropriated was developed for the exclusive use and benefit of RoyaltyStat. Defendants'

1

unfair acts had their intended affect; Defendants have successfully diverted customers from RoyaltyStat

Tellingly, aside from Pacheco, no one who has performed work for or on behalf of RoyaltyStat has ever suggested that anyone other than RoyaltyStat owns the intellectual property at issue here. Pacheco is alone in that category. In roughly a decade of working exclusively for RoyaltyStat, he likewise never suggested he had any ownership in that intellectual property. Until he got sued. Then, after consulting with lawyers, he changed his story.

Now, as shown in Defendants' Motion, Pacheco and his company are claiming both that he owned the output for which RoyaltyStat paid and that Defendants are only doing what is common practice for others offering royalty rate databases. But there is no suggestion that any other competitor slavishly copied RoyaltyStat's intellectual property. Defendants are, again, alone in that category. They did not do their own work and they must now face the consequences.

The undisputed record evidence is clear—*indeed Pacheco admits*—that the elements of trade secret misappropriation are met in this case and that Pacheco misappropriated RoyaltyStat's compiled data used to create its RoyaltyStat Database. Accordingly, summary judgment is appropriate and should be awarded as to Count III in RoyaltyStat's favor and against Defendants. RoyaltyStat's remaining claims must move forward for consideration by the jury. The best that can be said for Defendants' Motion is that it highlights material disputes of fact, including as to Defendants' credibility, that are the province of the jury. Defendants' Motion must therefore be denied in its entirety.

## I.    STATEMENT OF MATERIAL FACTS

In support of RoyaltyStat's Cross-Motion and in response to the Facts states in

Defendants' Motion, RoyaltyStat asserts the following material facts as to which Defendants can raise no material dispute:

**A.     RoyaltyStat and Its Database**

1.      RoyaltyStat maintains a database of royalty rate data that it offers on a subscription basis to its customers.  **Ex. 1**, Deposition of Raul Pacheco Quintanilla (Aug. 30, 2018) ("Pacheco Depo.") at 22:16-14:19-20; **Ex. 2**, Raul Pacheco Quintanilla, Corporate Designee (Aug. 30, 2018) ("IntangibleSpring Depo.") at 32:10-13.  RoyaltyStat was officially formed in February 2, 2000.  ECF 125-5 at 3.

2.      RoyaltyStat assembles certain data from license agreements obtained from the Securities and Exchange Commission ("SEC").  Dkt. 112, ¶ 11.  The agreements themselves are obtained from the SEC and certain data is then extracted and organized in a particular way.  ECF 125-52 at 30 (RoyaltyStat follows a "strict formula" when creating license descriptions).  The earliest agreements were purchased from a vendor, GSI, beginning on June 6, 2000, several months after RoyaltyStat was formed.  ECF 125-6.

3.      The data as compiled by RoyaltyStat from the SEC documents is not available to the public in the compiled form.  **Ex. 1**, Pacheco Depo. at 96:10-12, 110:17-111:20 ("I was building a product and I knew I could not give this product without payment. So I would not disclose it to potential clients.").  Access to and disclosure of the compiled data required an assigned login/password combination, a given person's access was limited based on the level of access required for their respective purpose, and RoyaltyStat instructed those working with the compiled data, including Pacheco, that it was to be treated as confidential.  **Ex. 1,** Pacheco Depo. at 96:10-12, 110:17-111:20; **Ex. 4A**, Deposition of Dr. Ednaldo Silva as RoyaltyStat corporate designee (Aug. 29, 2018) ("RoyaltyStat Depo.") Vol. I at 141:19-143:20; **Ex. 5**, E. Silva Apr. 2, 2003 email to L. Smith, R. Pacheco, K. Lynch and J. Fendrick (INTANGIBLE266806).

4.     Substantial effort was needed to assemble the RoyaltyStat data. *See id.*; *see also* **Ex. 2**, IntangibleSpring Depo. at 76:13-77:9; **Ex. 3**, Pacheco Resp. Second Interrog. No. 5 (testifying that it took Pacheco over a year to read and extract 1,644 agreements which resulted in the first 922 active records at the launch of RoyaltyStat).

5.     The data compiled by RoyaltyStat from the SEC documents has independent economic value. *See* **Ex. 1**, Pacheco Depo. at 155:9-16.

6.     RoyaltyStat was careful to employ proper procedures to protect the database and its content. *See* ECF 125-20 (describing password protection being employed); ECF 125-22 at 18 (Silva instructions regarding steps to protect trade secrets); ECF 125-27 at 5 (Silva instruction to Pacheco regarding steps to protect confidentiality of database information); **Ex. 4B**, RoyaltyStat Depo. Vol. II (Aug. 31, 2018) at 75:10-77:5.   RoyaltyStat also required and still requires customers to execute Subscription Agreements containing confidentiality and non-disclosure provisions.  **Ex. 1**, Pacheco Depo. at 113:16-21; **Ex. 2**, IntangibleSpring Depo. at 31:4-32:13.  Certain information, such as the "field that tells the source of the license agreement, who's the filer, the filing, and the date" was only accessible to subscribers who accepted the non-disclosure terms. **Ex. 2**, IntangibleSpring Depo. at 31:17-32:13.

7.     Other industry participants likewise treat certain information as confidential and ███████████████████████████ *See* ECF 125-51 (███████████████████████ ███████████████).

8.     RoyaltyStat's database is the subject of U.S. Copyright Registrations TX0007233781, dated May 7, 2009 (the "'781 Registration") and TX0008580811, dated December 21, 2015 (the "'811 Registration"). *See* ECF 125-45.

9.     The RoyaltyStat database is also the subject of a U.S. Copyright Application

entitled "RoyaltyStat Royalty Tableau," which was filed with the U.S. Copyright Office on December 21, 2015 (the "Royalty Tableau Application"). *See* ECF 125-46. The Royalty Tableau Application issued as the '811 Registration in August 2018 following examination by the Copyright Office. *See id.*

10.     RoyaltyStat's copyrights protect the original expression in (a) the selection, coordination and arrangement involved in choosing material and data for inclusion in the database; classifying, categorizing, ordering, or grouping the material and data; and determining the placement and arrangement of material and data within the database as a whole; and (b) RoyaltyStat's original authorship, such as original textual content, that appears within the database. *See* ECF 125-45; ECF 125-46.

**B.    Pacheco's Work For RoyaltyStat**

11.     Pacheco began working for RoyaltyStat in 2000. **Ex. 1**, Pacheco Depo. at 17:14-22, 79:19-81:22. From 2000-2011, RoyaltyStat was Pacheco's only employer and his sole source of income. **Ex. 1**, Pacheco Depo. at 16:15-18, 17:14-22, 18:1-12, 58:8-15.

12.     Pacheco performed extraction and organization of data while he worked for RoyaltyStat based on license agreements obtained and provided to him by RoyaltyStat. **Ex. 1**, Pacheco Depo. at 86:7-88:9, 105:3-107:14, 108:3-9, 109:13-110:16, 160:18-161:15. Pacheco was given CDs containing the agreements that RoyaltyStat had purchased to be reviewed for inclusion in its database. **Ex. 1**, Pacheco Depo. at 75:22-76:7; *see also* **Ex. 12**, Deposition of Linwood Smith (Oct. 30, 2018) ("Smith Depo.") at 21:25-22:2.

13.     Pacheco worked on a computer provided by RoyaltyStat. **Ex. 1**, Pacheco Depo. at 69:19-70:3.

14.     Pacheco was paid by Dr. Silva and RoyaltyStat a regular amount monthly, regardless of whether any milestones or level of output were reached, plus a commission based

on sales of database subscriptions. **Ex. 1**, Pacheco Depo. at 79:19-81:22, 83:22-84:5, 138:15-139:3. Pacheco was moved to sales even though he "hated sales." *Id.* at 162:5-163:8.

15.     Pacheco worked out of Dr. Silva's home at first and then worked out of an apartment paid for by Dr. Silva and RoyaltyStat. **Ex. 1**, Pacheco Depo. at 15:11-17, 22:16-23:7.

16.     Extracting data and populating the database did not require a high level of skill or training, and Pacheco had no specific skill or training relevant to the task. **Ex. 1**, Pacheco Depo. at 61:4-62:16, 131:3-11.

17.     Dr. Silva conceived of the idea for the database that Pacheco worked on and outlined the early stages of the databased in an article Dr. Silva wrote titled "Royalty Rates in the Pharmaceutical Industry." **Ex. 1**, Pacheco Depo. at 55:12-56:2; *see also* **Ex. 12**, Smith Depo. at 14:6-15.

18.     Dr. Silva decided who worked on the database and the type of work that they performed. **Ex. 1**, Pacheco Depo. at 95:20-96:12, 97:14-98:11; **Ex. 4A**, RoyaltyStat Depo. Vol. I (Aug. 29, 2018) at 141:19-142:22.

19.     All decisions made about content had to be approved by Dr. Silva. **Ex. 12**, Smith Depo. at 11:6-11:16, 36:6-18; **Ex. 13**, Deposition of Marcia Maurao Coutinho (June 15, 2018) ("Coutinho Depo.) at 106:15-107:13.

20.     Defendants have produced multiple documents showing that Dr. Silva, RoyaltyStat's managing director, was directly supervising and giving instructions to Pacheco and others about what work was to be done on building the RoyaltyStat database. *See* ECF 125-8 (noting instruction to Pacheco to meet with GSI regarding identification of agreements being collected); ECF 125-13 (Silva request to see database so he can review work done by Pacheco); ECF 125-15 (Silva instructions to "[a]dd three fields to the royalty *tableau*"); ECF 125-17 (Silva

email detailing information to be kept "in tabular" form in database); ECF 125-22 at 6-7 (Silva instructions and directions to Pacheco regarding work being done on database), 9 (same), 11 (same), 13 (same), 21 (same), 44 (same), 48 (same), 51 (same), 60-61 (same), 63 (Silva approving suggestion made by Pacheco); ECF 125-26 (Silva instructions regarding adding person to populate fields); ECF 125-27 at 3 (K. Lynch of Woodbourne noting Silva approval needed to add Pacheco to "RS admin"), 22 (Dr. Silva outline of potential future database).

21.     Dr. Silva never represented Pacheco's work on the RoyaltyStat database to be anything other than "reviewing license agreements and extracting specified data fields." ECF 125-34 (Silva recommendation letter to IESE Business School for Pacheco).

22.     At the same time that Pacheco worked on inputting data into the database, he was also trying to sell subscriptions as an agent of RoyaltyStat. **Ex. 1**, Pacheco Depo. at 77:3-78:12, 155:21-156:10.   Pacheco held himself out as representing RoyaltyStat, including using RoyaltyStat's name, address, telephone number and website address in his email signature. ECF 125-27 at 18; ECF 125-48 at 5-6.   As a RoyaltyStat salesperson, Pacheco had RoyaltyStat subscribers sign agreements requiring them to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.   *See* **Ex. 6**, Pacheco Oct. 20, 2004 email to bespindola@mazars.com.mx (INTANGIBLE266806).

23.     Ultimately, Pacheco was fired by RoyaltyStat.   According to Pacheco, his dismissal occurred because he "worked less" because he "felt cheated" and was therefore "quite hostile" and "angry." **Ex. 1**, Pacheco Depo. at 162:5-165:4.

24.     Prior to conferring with his lawyers about this lawsuit, Pacheco never claimed to own any rights in the RoyaltyStat database or its content. **Ex. 1**, Pacheco Depo. at 160:18-22.

**C.      Pacheco's Relationship With IntangibleSpring**

25.     Pacheco is General Manager and sole shareholder of IntangibleSpring. **Ex. 2**,

IntangibleSpring Depo. at 14:3-11.  Pacheco is the only known officer of IntangibleSpring, and, as previously noted by the Court and confirmed by Defendants' counsel, "Defendant Pacheco is IntangibleSpring."   ECF 39, Transcript of Motions Hearing (Jan. 18, 2017), at 30:12-18. IntangibleSpring is a competitor of RoyaltyStat.  **Ex. 2**, IntangibleSpring Depo. at 10:20-22.

**D.    IntangibleSpring's Database And Efforts To Compete With RoyaltyStat**

26.    IntangibleSpring began with a compilation of approximately 10,000 license agreements, roughly the same number of license agreements as in RoyaltyStat's database as of January 31, 2011, that Pacheco obtained based on the RoyaltyStat "field that tells the source of the license agreement, who's the filer, the filing, and the date."  **Ex. 2**, IntangibleSpring Depo. at 31:4-32:9, 35:2-13; **Ex. 11**, ROYALTYSTAT000231 (RoyaltyStat summary of Records and Agreements as of Jan. 31, 2011 reflecting 10,525 Records and 8,831 Agreements).    That information was not known even to RoyaltyStat's subscribers.  **Ex. 2**, IntangibleSpring Depo. at 32:1-3.

27.    The number of agreements represented in the parties' respective royalty rate databases is important to the parties' customers and potential customers.  ECF 125-44 at 3-5 (potential RoyaltyStat customer inquiring "What is the approximate number of license agreements in the database?").  As of the end of 2018, RoyaltyStat had approximately 20,000 agreements in its database.  ECF 125-3.  IntangibleSpring started with approximately 10,000 records.  **Ex. 2**, IntangibleSpring Depo. at 35:11-13; 46:8-19.  According to IntangibleSpring, these records were derived from approximately 7,000 agreements.  **Ex. 2**, IntangibleSpring Depo. at 37:10-38:18.  For years, IntangibleSpring represented through its website that it was adding 600 agreements per month to its database.  **Ex. 16**, IntangibleSpring Webpages from Internet Archive "Waybackmachine" dated Sept. 15, 2013 and Feb. 15, 2015.  During this time, IntangibleSpring claims it had "people coming to the company, leaving competitors."  **Ex. 2**,

8

IntangibleSpring Depo. at 83:11-21.  As of the end of 2018, however, it had only ▮▮▮▮ records. ECF 125-52 at 9.

28.     Pacheco testified that IntangibleSpring's database contains no "mineral agreements" or "FOIA documents," unredacted agreements obtained from the SEC through a Freedom of Information Act request. **Ex. 2**, IntangibleSpring Depo. at 37:10-38:18.

29.     Defendants have in their possession RoyaltyStat documents reflecting RoyaltyStat's nonpublic compilation of data and RoyaltyStat's nonpublic internal information. *See* **Ex. 7**, INTANGIBLE096686 (agreements collected by RoyaltyStat); **Ex. 8**, INTANGIBLE087291, INTANGIBLE089177, INTANGIBLE091259, INTANGIBLE172445 and INTANGIBLE173416 (composite exhibit containing RoyaltyStat internal operating details); **Ex. 9**, INTANGIBLE090589 (RoyaltyStat internal report detailing number of agreements added monthly and broken down by subject matter, SIC codes, auto ID, filing date, etc.); **Ex. 10**, INTANGIBLE091771 (agreements annotated as to portions to be extracted per RoyaltyStat nonpublic internal operation instructions); **Ex. 1**, Pacheco Depo. at 63:20-65:10 ("Q. So as you extracted this data from the very first agreement you looked at [for RoyaltyStat], what did you do with it? … A. "I produced it.  You have it.").

30.     IntangibleSpring also admits to having in its possession training materials developed by Pacheco at RoyaltyStat. *See* ECF 124 at 19; ECF 125-50.

**E.     The Expert Comparison Of The Parties' Databases**

31.     RoyaltyStat's designated expert, John Fendrick, reviewed what IntangibleSpring purported to be the contents of its database as well as the records from the RoyaltyStat database through January 2011.  Mr. Fendrick identified numerous records where the language appearing in the descriptions added by RoyaltyStat to its records did not appear in the original license agreements. **Ex. 14**, Expert Declaration of John Fendrick (Dec. 14, 2018) ("Fendrick Decl.") at

9

18-19, ¶¶ 44-47.  He also identified language in IntangibleSpring's descriptions that is ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  *Id.*, at 18-20, ¶¶ 44-

50.

      32.     Mr. Fendrick concluded that IntangibleSpring used ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆  *Id.*, at 13, ¶ 35.  Mr. Fendrick also concluded that IntangibleSpring did not

produce its database as it actually exists and that data had been altered since the time the

complaint was filed in 2015.  *Id.*, at 2, ¶ 6 ("I also do not believe that the IntangibleSpring

database that was provided was the database of record at the time of the original filing in 2015

and that the data was changed after the original filing.").  He further determined that the

IntangibleSpring database contains ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  *Id.*, at 13, ¶ 37.

      33.     Defendants' designated expert did not rebut or dispute Mr. Fendrick's analysis.

ECF 125-52 at 8; **Ex. 15**, Deposition of Frederick Haggerty (Jan. 16, 2019) ("Haggerty Depo.")

at 56:12-57:8.  Mr. Haggerty performed a "Term Finder" analysis on the license descriptions in

the respective databases whereby he removed certain words and then determined the percentage

of times a term appeared in both the RoyaltyStat or IntangibleSpring database, on the one hand,

and the original license agreements, on the other.  *Id.*, at 80:13-86:4.  For the RoyaltyStat

database, the comparison included only the original license agreement; for the IntangibleSpring

database the comparison included the license agreement as well as ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆  *Id.*, 85:9-86:4.  Mr. Haggerty's Term Finder analysis provided no information about

the context in which the words he searched were used, sentence syntax, or whether language

from the agreements had been paraphrased.  *Id.*, at 112:10-113:12.  Mr. Haggerty did, however,

find that RoyaltyStat's descriptions contain language not contained in the original agreements.

ECF 125-52 at 29.

34.    Mr. Haggerty also compared RoyaltyStat's data to reports from a company called

RoyaltyRange.  He did not choose RoyaltyRange as a party from whom reports were to be

obtained nor did he choose the reports to be requested or the criteria for those reports.  **Ex. 15**, at

42:11-46:5, 54:15-56:17.  Mr. Haggerty did not know whether RoyaltyRange is the only

competitor to RoyaltyStat and IntangibleSpring.  *Id.*, at 50:4-9.  He did not compare the data

from any third party except RoyaltyRange.  *See generally* ECF 125-52.

## II.    ROYALTYSTAT CROSS-MOTION FOR SUMMARY JUDGMENT

### A.    LEGAL STANDARD

#### 1.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, however, "this

standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986)

(emphasis in original).  And only "facts that might affect the outcome of the suit under the

governing law" are material.  *Id.* at 248.  In assessing whether a movant is entitled to summary

judgment, the court must "view the facts and draw reasonable inferences 'in the light most

favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S.

372, 378, 127 S. Ct. 1769 (2007) (alteration in original) (quoting *United States v. Diebold*, 369

U.S. 654, 655, 82 S. Ct. 993 (1962)).  This inference, however, is tempered by the court's

"affirmative obligation … to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted); *McCain v. Waste Mgt, Inc.*, 115 F. Supp. 2d 568, 572-73 (D. Md. 2000) (Williams, J.) (citation omitted).  At the same time, summary judgment is not appropriate unless the evidence is so one-sided that one party must prevail as a matter of law and the evidence does not present a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 251–52.

### 2.      Trade Secret Misappropriation Under The MUTSA

"To prove misappropriation of a trade secret [under the MUTSA], a plaintiff must show (1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citing Md. Code Com. Law § 11-1201(c)(1)).  Under the MUTSA, a "trade secret" is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>    (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>    (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Com. Law § 11-1201(e). Before the MUTSA was codified, Maryland applied the Restatement's factor-based definition of "trade secret," which remains useful in a MUTSA analysis.  *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (citing *Trandes*, 996 F.2d at 661).  Under the Restatement, a trade secret can be identified by:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount or effort or money expended by him in developing the information; (6) the

ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. b.

After demonstrating an item is a trade secret, a plaintiff must show that the defendant has misappropriated it. *AirFacts*, 909 F.3d at 95 (citing *Trandes*, 996 F.2d at 660). "Misappropriation" under the MUTSA is, in relevant part, "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who" improperly acquired it or knew another person improperly or mistakenly acquired it. Md. Code Com. Law § 11-1201(c).

The record evidence demonstrates as a matter of undisputed fact that Defendants misappropriated RoyaltyStat's trade secrets by taking royalty rate data by improper means and therefore RoyaltyStat is entitled to judgment as a matter of law. *See AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018).

**B.   ARGUMENT**

**1.   By Defendants Own Admission, RoyaltyStat's Compilation Of Royalty Rate Data And Internal Processes Constitute Protectable Trade Secrets That Defendants Misappropriated**

**a.   Pacheco admits that RoyaltyStat's compiled data and processes were not readily ascertainable by the public.**

RoyaltyStat's compilation of data was assembled by analyzing certain agreements from the SEC and extracting that data according to certain specified protocols. Part I, Statement of Material Facts ("SMF"), ¶ 2. A great deal of effort was needed to compile the data and assemble it in the desired form. SMF, ¶ 4. Pacheco himself considered it important to guard the compiled data from public access. SMF, ¶ 3 ("I was building a product and I knew I could not give this product without payment. So I would not disclose it to potential clients."). He also had

13

RoyaltyStat subscribers sign agreements requiring them to ████████████████ ████████████████████████████████████████████. SMF, ¶¶ 6, 22. RoyaltyStat's compilation of data therefore qualifies as a trade secret under the MUTSA. *AirFacts*, 909 F.3d at 95.

Pacheco also helped develop internal processes and procedures for identifying and extracting data for inclusion in a database, and he admits that he did so while he was being paid by his sole employer, RoyaltyStat. *See* Defendants' Motion at 19. There is no suggestion that these processes and procedures were ever publicly available. Indeed, Defendants produced written "training materials" from their files and designated them as "Confidential," which is an acknowledgment that the materials are "not generally known to others." ECF 79 at 3-4, § 2.1.

> **b.      Pacheco admits that RoyaltyStat's compiled data and processes have independent economic value, and Defendants admitted to taking copies of the assembled data and materials embodying the processes.**

Pacheco knew that the confidentiality of the RoyaltyStat compilation, which was assembled according to RoyaltyStat's protocols, had to be maintained because of its economic value: "I was building a product and I knew I could not give this product without payment. So I would not disclose it to potential clients." SMF, ¶ 3. Pacheco therefore stated unequivocally that the compilation does have independent economic value: "Q. So the data had independent value. A. Yes." SMF, ¶ 5. Other industry participants likewise treat similar information as confidential to protect its economic value. SMF, ¶ 7. RoyaltyStat's compilation and attendant protocols therefore constitute trade secrets under the MUTSA. *AirFacts*, 909 F.3d at 95.

Likewise, as noted above, Defendants have produced "training materials" detailing RoyaltyStat's nonpublic internal processes and designated those materials as Confidential. ECF 125-50. By their actions, Defendants' themselves have acknowledged that the materials have

"competitive value." ECF 79 at 3-4, § 2.1.

      **c.**    **Pacheco admits that substantial efforts were taken to maintain the confidentiality of RoyaltyStat's trade secrets.**

RoyaltyStat employed a series of efforts to protect the confidentiality of its compilation of data and protocols for assembling the compilation. SMF, ¶¶ 3, 6. Pacheco was instructed to keep this information confidential. *Id.* Pacheco therefore took steps to assure that RoyaltyStat's data and protocols would remain confidential including requiring customers to sign an agreement with provisions ███████████████████████████████████████ ███████. SMF, ¶¶ 6, 22. RoyaltyStat's compilation of data and protocols are therefore protectable as trade secrets. *AirFacts*, 909 F.3d at 95. In addition, Defendants' designation of RoyaltyStat's nonpublic internal processes as Confidential is a concession that this information would only be revealed to third parties "in confidence." ECF 79 at 3-4, § 2.1.

      **d.**    **Defendants have admitted to misappropriating RoyaltyStat's trade secrets.**

Defendants have admitted that Pacheco took the nonpublic information that identified the license agreements and related information compiled by RoyaltyStat to launch the competing IntangibleSpring database. SMF, ¶ 26. Defendants have also produced from their files documents containing RoyaltyStat nonpublic information, including agreements collected but not made publicly available and internal operating details and instructions. SMF, ¶¶ 29-30. Pacheco had no right to retain RoyaltyStat's confidential information after he was fired, and IntangibleSpring never had any right to the information. IntangibleSpring has therefore obtained RoyaltyStat's trade secrets by improper means, and Pacheco is complicit in IntangibleSpring's trade secret misappropriation.

15

III.   **ROYALTYSTAT OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

A.   **LEGAL STANDARD**

RoyaltyStat restates the legal standards governing summary judgment and trade secret misappropriation under the MUTSA as set forth in Part II(A) above.   The controlling law regarding copyright and false advertising is set forth below.

1.   **Copyright**

Copyright protection extends to the original expression of an author that is fixed in a tangible medium of expression.   17 U.S.C. § 102.   "Original" means simply that the work was independently created and has a minimum degree of creativity.   *Feist Publications, Inc. v. Rural Service Co., Inc.* 499 U.S. 340, 345 (1991).   Congress has expressly recognized that the original selection, coordination and arrangement in a database constitutes expression protectable under copyright.   H.R. REP. No. 94-1476, at 54 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5667.   Copyright protection is not precluded simply because the database is based on a collection of factual information.   *Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 810 (D. Md. 1995).   Rather, the threshold level of originality has been held to have been met by an author's integration of publicly available information from which a database is created and maintained.   *Metropolitan Regional Information Systems v. American Home Realty Network, Inc.*, 888 F.Supp.2d 691, 710 (D. Md. 2012).

A legal entity owns as "works-for-hire" the copyrights in works created for it by employees in the regular course of their duties.   17 U.S.C. § 101.   Whether an individual is an employee for purposes of establishing work-for-hire is not measured by state employment law. Rather, it is measured by a number of factors drawn from agency law, including who provided the materials and work space for creation of the work, whether the individual was employed

16

solely by the entity, whether the individual possessed a particular skill needed to create the work, and whether the individual worked on different projects for the employer. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740, 751-2 (1989).

A copyright registration provides *prima facie* evidence of the ownership and validity of the asserted copyrights.   17 U.S.C. § 410(c).   Copyright protection extends to all original expression contained in the registered work. *Metropolitan Regional Information Systems*, 888 F.Supp.2d at 706 ("[A]n owner and registrant of a [copyrighted database] may bring an infringement action on the underlying parts where it also owns copyrights in the underlying parts, even where those parts have not been individually registered").

### 2.    False Advertising

False advertising under the Lanham Act is established when "(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002)).   Where the defendant has stated a literal falsehood, the plaintiff need not allege or prove evidence of consumer deception. *Id.*; *RoyaltyStat, LLC v. IntangibleSpring Corp.*, No. PX-15-3940, 2018 WL 348151, at *4 (D. Md. Jan. 10, 2018).

### B.    ARGUMENT

### 1.    Defendants Have Not Established That No Jury Could Reasonably

17

**Find That RoyaltyStat's Copyrights Are Valid And Infringed.**

      **a.**      **According to Defendants' own admissions, RoyaltyStat owns all rights in its copyrights**

As a result of its copyright registrations, RoyaltyStat is presumed to own all right, title and interest in the original expression embodied in its database. 17 U.S.C. § 410(c). Defendants attempt to challenge RoyaltyStat's ownership based solely on the claim that, prior to 2004, Pacheco was the actual author of the original expression in RoyaltyStat's database. Defendants' Motion at 21-22.[1] Defendants' challenge is fatally flawed for at least two reasons.

First, the evidence indicates that the RoyaltyStat database was designed by Dr. Silva, RoyaltyStat's founder and managing director. SMF, ¶¶ 17-21. Witnesses repeatedly testified to this point, and Pacheco himself admitted that the genesis for the initial work on the database was an article written by Dr. Silva in which the early stages of the database were outlined. *Id.* In his pleadings, Pacheco also classified his work regarding the RoyaltyStat database as "data processing." ECF 72 at 10, ¶ 27. That is consistent with the fact that for the 11 years he worked for RoyaltyStat, he never suggested that he had any copyrights in the RoyaltyStat database. That did not happen until he conferred with his lawyers to concoct defenses for this lawsuit. SMF, ¶ 24. Pacheco's self-interested actions raise significant questions of credibility that preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 160 (4th Cir. 2012).

But Pacheco's challenge to RoyaltyStat's ownership of its copyrights must fail for a more

---

[1] Defendants do not challenge RoyaltyStat's ownership of copyrights in the original expression created after 2004, and therefore concede RoyaltyStat's ownership. *See id.*

basic reason.  RoyaltyStat owns any creation of original expression by Pacheco as a work made for hire.  The Copyright Act provides that works created by an "employee acting within the scope of his or her employment" are owned by the employer.  17 U.S.C. § 101.  Whether someone is an "employee" for purposes of the work for hire provisions of the Copyright Act is determined by a number of factors taken from the law of agency; it is irrelevant whether that person qualifies as an "employee" under state law.  *Center for Creative Non-Violence*, 490 U.S. at 740, 751-2.  Applying those factors here, it is clear that any original expression created by Pacheco was, by his own admission, work made for hire for RoyaltyStat.

Pacheco worked solely and exclusively for RoyaltyStat for 11 years, beginning from its formation in 2000 and including through 2004.  SMF, ¶¶1, 11.  He was provided CDs with license agreements from which the data for inclusion in the RoyaltyStat database was to be extracted.  SMF, ¶ 12.  The license agreements were purchased by RoyaltyStat or Dr. Silva acting on behalf of RoyaltyStat.  SMF, ¶¶ 2, 12.  The computer Pacheco used was provided by RoyaltyStat.  SMF, ¶ 13.  All of Pacheco's work was done from homes or apartments paid for by RoyaltyStat or Dr. Silva acting on behalf of RoyaltyStat.  SMF, ¶ 15.  Pacheco had no special skill, and testified that no particular skill other than facility with the English language was necessary.  SMF, ¶ 16.  Pacheco was paid a regular salary that was not dependent on reaching any milestones or delivering a particular level of output  or work product.  SMF, ¶ 14.  Pacheco also began selling subscriptions of the database on behalf of RoyaltyStat.  SMF, ¶ 22.  Rather than performing a specific, specialized skill at his own discretion and direction, Pacheco was assigned various tasks and projects by Dr. Silva, from data entry to project management and sales, which he disliked performing.  SMF, ¶ 14.  In the signature block of his email, Pacheco identified himself as affiliated with and acting on behalf of RoyaltyStat while he was working on

19

the RoyaltyStat database.  SMF, ¶ 22.

There can be no doubt under these circumstances that Pacheco was acting as an agent of RoyaltyStat.  As such, any original expression he created belonged to RoyaltyStat as a work for hire because he was an employee acting within the scope of his employment.  *Center for Creative Non-Violence*, 490 U.S. at 740, 751-2.  By Pacheco's own admission, no one other than RoyaltyStat can lay claim to ownership of the original expression in the RoyaltyStat database prior to 2004.  Defendants' Motion at 22 (alleging that Pacheco alone is the author and owner of copyrights in certain records contained in the RoyaltyStat database).

The sole case cited by Defendants in arguing to the contrary, *see* Defendants' Motion at 21, is completely inapposite.  In that case, the plaintiff asserted copyrights in software owned by it but created by a non-employee.  *Princeton Payment Sols., LLC v. ACI Worldwide, Inc.*, No. 1:13-cv-852, 2014 WL 4104170, at *1 (E.D. Va. Aug. 15, 2014).  The plaintiff and the non-employee, however, entered into two separate agreements identifying the non-employee as a consultant, including one that had a definitive termination date.  *Id.*, at *5.  The non-employee also had complete control over writing the code with no direction from the plaintiff.  *Id.*, at *4. The situation in *Princeton Payment* stands in stark contrast to the facts of this case, where for 11 years, RoyaltyStat was Pacheco's only employer, he performed non-skilled work of different types at Dr. Silva's discretion and direction, he held himself out as a representative of RoyaltyStat, and all the work he did regarding RoyaltyStat's database was done using materials RoyaltyStat provided on equipment RoyaltyStat provided in places RoyaltyStat paid for and for which Pacheco was paid on a regular monthly basis.  Pacheco was thus an employee for purposes of the work-for-hire provisions of the Copyright Act.

Thus, Defendants cannot prevail on their challenge to RoyaltyStat's ownership of its

copyrights.

> **b.    Defendants rely on erroneous legal standards regarding the scope and validity of RoyaltyStat's copyrights**

Defendants begin their attack on RoyaltyStat's copyrights with a restatement of a proposition that, as has been repeatedly pointed out when they made it previously, is wrong as a matter of law. Defendants continue to assert that RoyaltyStat's '781 Registration, the first of its copyright registrations, is limited to "five pages of text within the deposit." Defendants' Motion at 13-14. Noticeably absent from Defendants' argument is any citation to supporting case law or authority. This omission is not surprising because as RoyaltyStat has pointed out repeatedly, "an owner and registrant of a [copyrighted database] may bring an infringement action on the underlying parts where it also owns copyrights in the underlying parts, even where those parts have not been individually registered." *Metropolitan Regional Information Systems*, 888 F.Supp.2d at 706; *see also* ECF 27 at 10. All that Defendants cite are out-of-context quotes from the Copyright Compendium. *Id.* But the Copyright Compendium was considered by the *Metropolitan Regional* court in rejecting the very position Defendants have repeatedly and erroneously advanced. *See id.* at 706-707. Thus, the Compendium as considered and applied by the courts directly refutes Defendants' assertion that only "five pages of text" of RoyaltyStat's database is protected. Assertions that are not only unsupported by, but also contrary to, the law cannot be the basis for summary judgment.

Defendants' remaining arguments are likewise rife with errors of law and fact that preclude the grant of summary judgment. Defendants first make much of the purported "thin" copyright protection due databases. Defendants Motion at 14-15. However, even "thin" copyrights are protectible, particularly against slavish copying of the type present here. Defendants' attempt to dismiss RoyaltyStat's copyright protection in its database because the

database contains factual material is a mere sleight of hand of the type courts have rejected. *See, e.g., Montgomery County Ass'n of Realtors*, 878 F. Supp. at 810.

Defendants then misrepresent the nature and content of RoyaltyStat's database in an effort to minimize the level of originality contained in the database. First, it cannot be disputed that RoyaltyStat created original text that is included in its database. RoyaltyStat's expert, John Fendrick, examined the text in the RoyaltyStat "Description" field and compared it to the text in the original agreements. He identified numerous records where language appearing in the RoyaltyStat description did not appear in the original source document. SMF, ¶ 31. Defendants did not challenge these findings. In fact, Defendants' expert, Frederick Haggerty, did not attempt to rebut Mr. Fendrick's analysis; he simply performed an entirely different type of analysis. SMF, ¶ 33.

Mr. Haggerty's analysis, however, says nothing about the level of originality in RoyaltyStat's database. To perform his comparison of descriptions to the original agreements, he first removed some of the language used. Defendants' Motion at 19. He then compared the remainder to "determine what percentage of the words contained within the description field were also present within the underlying license agreement." *Id.* He did not, however, consider the phrasing or syntax, i.e., how the words were put together. SMF, ¶ 33. His analysis simply identifies what words were used; it is irrelevant to the question of whether those words were put together in an original way. Moreover, the percentages are misleading because for IntangibleSpring, but only IntangibleSpring, the comparison is made to the agreements and information outside the agreement. *Id.* The comparison is therefore unreliable.

Mr. Haggerty's analysis is also undercut by his own results considered in light of Defendants' admissions. Mr. Haggerty admitted that RoyaltyStat's descriptions contain

language not contained in the original agreements. Defendants' Motion at 20. That is consistent with Mr. Fendrick's findings. SMF, ¶ 31. Defendants also admit that RoyaltyStat had a specific manner of expression for its descriptions, which was memorialized in training materials. Defendants Motion at 19; ECF 125-50. If all RoyaltyStat was doing was copying and pasting directly from the agreements, there would have been 100% overlap in the words used and RoyaltyStat would have had no need to develop training materials governing how the descriptions in its database were to be expressed.

RoyaltyStat's originality in its license descriptions is in and of itself sufficient to defeat Defendants' summary judgment claim. *See Montgomery County Ass'n of Realtors*, 878 F. Supp. at 810. However, Defendants' motion also fails as to the remainder of the original expression in RoyaltyStat's database.

Defendants assert that RoyaltyStat's choice of fields and data are "obvious and typical" to competitors offering royalty rate databases and an "industry standard." Defendants' Motion at 17-18. These assertions are, again, based solely on the analysis of Mr. Haggerty, which is, again, flawed.

For the analysis on which Defendants rely, Mr. Haggerty considered certain reports obtained from a single third party, RoyaltyRange. Mr. Haggerty did not obtain the reports himself, nor could he identify the person who did obtain the report. SMF, ¶ 34. He did not know who the competitors in the industry are and he did not consider the databases of any other third parties. SMF, ¶ 34. Accordingly, there is insufficient evidence from which one can reasonably conclude that the fields and data identified by Mr. Haggerty are "industry standard."

Moreover, a simple comparison reveals that RoyaltyStat's choices as to fields and data are distinct from those of RoyaltyRange. In addition to the licensee, licensor, royalty rate,

23

royalty base, duration and territory fields identified by Defendants (*see* Defendants' Motion at 17), RoyaltyStat's database includes fields for CIK, Agreement Title, Industry, SIC Code, Licensor's Country, Licensee's Country, and Original Base.   ECF 125-46 at 24. IntangibleSpring's database ███████████████████████████████████████.   ECF 125-52 at 9-10.  RoyaltyRange, by contrast, does not include fields such as ████████████ and uses ████████████████████████████████████████████████████████

*See* ECF 125-51.

In the end, all that Defendants have really established is that the authority on which they rely is inapposite.  According to Defendants' own evidence, a party seeking to fairly compete in the offering of a database of license royalty rates has many options from which to choose to create his original selection, coordination and arrangement that yields a product that is also useful.  As a result, this is simply not a case where there are only "two to three options" or "options that have been selected countless times before and have become typical."  *See* Defendants' Motion at 15-16 (quoting *Matthew Bender & Co. v. West Publishing Co.*, 158 674, 682 (2d Cir. 1998)).

To the contrary, the situation here is more akin to a case cited in the *Matthew Bender* decision upon which Defendants rely.  In *Kregos v. Associated Press*, summary judgment as to copyrightability of "pitching forms" was overturned where the author expressed a pitcher's performance in terms of nine statistics from "at least scores of available statistics about pitching performance available to be calculated from the underlying data and therefore thousands of combinations of data that a selector can choose to include in a pitching form."  937 F.2d 700, 704 (2d Cir. 1991).  As IntangibleSpring's database shows, there are numerous fields and categories available to express information about royalty rates for licensed intangibles, and

RoyaltyStat has chosen from among these options.

RoyaltyStat's copyrights in its database are the subject of two registrations and are presumed to be valid.  17 U.S.C. § 410(c); SMF, ¶¶ 8-10.  Defendants have the burden of overcoming that presumption, and that they cannot do based on the only evidence they have, namely, the flawed analysis of their expert, Mr. Haggerty.

### c.    RoyaltyStat's evidence of slavish copying by Defendants is uncontroverted

Defendants' Motion as to RoyaltyStat's copyright claims fails for another fundamental reason.  There is uncontroverted evidence of slavish copying by Defendants.

In his examination of the data produced by Defendants, Mr. Fendrick identified language in IntangibleSpring's description of agreements (the text added to the extracted data) that is ████████████████████████████.  SMF, ¶ 31.  IntangibleSpring's descriptions even included ████████████████████████████████████ ████████.  *Id.*  Defendants have not challenged Mr. Fendrick's analysis or conclusions.  In addition, Defendants produced from their files tables consisting of records assembled for potential inclusion in RoyaltyStat's database.  SMF, ¶ 29.  There is no dispute that IntangibleSpring had no right to have those tables in its position, but yet it did.  Mr. Fendrick concluded that Defendants ████████████████████████████████ ████████████████████████████████████  SMF, ¶ 32 (Fendrick Report at 13, ¶ 35).  Defendants are simply wrong when they represent that "no direct evidence of copying is present in this case."  Defendants' Motion at 22.  There can as a result be no question that Defendants have copied portions of RoyaltyStat's database.  This alone is sufficient to defeat summary judgment.

While there is no need to address Defendants' remaining assertions of a purported lack of

substantial similarity under the "extrinsic" and "intrinsic" analyses, *see* Defendant' Motion at 23-26, they are nevertheless noteworthy as examples of the lack of merit in Defendants' Motion. The first problem with Defendants' substantial similarity argument is that it relies largely on the same flawed analysis of Mr. Haggerty that they relied on for their invalidity assertions. *See id.* at 24 (noting differences cited by Mr. Haggerty and assertion based on his analysis that the overlapping fields he identified are "common to competitor databases in this industry"). The problems with that analysis, *see* Part III(B)(1)(b), *supra*, apply with equal force to Defendants' substantial similarity positions.

Defendants compound these problems by comparing apples to oranges. First, in support of its alleged "extrinsically similar" analysis, Defendants acknowledge that "the court must analyze the works as a whole." Defendants' Motion at 23. Mr. Fendrick concluded, however, that IntangibleSpring did not produce its database as it actually exists. SMF, ¶ 32. Defendants have not disputed this conclusion. Accordingly, neither RoyaltyStat nor the Court can compare the IntangibleSpring database as a whole because neither has seen it.

Defendants then proceed to make representations about the comparative content of the databases based on statistics such as the percentages of the "categories" of licenses in each database. Defendants' Motion at 24. But, those percentages are based on a distinctly different number of records – ▮▮▮ for RoyaltyStat and ▮▮▮ for IntangibleSpring. *Id.* The proper comparison would be to compare the population of records (same licensor, licensee, licensed property) that appear in both databases. Defendants did not do that comparison and what they are left with is unreliable and misleading.

The remainder of Defendants' argument rests on the assertion that there can be no substantial similarity because Defendants' database has content that RoyaltyStat's does not. *See,*

*e.g,* Defendants' Motion at 25 (arguing no "intrinsic similarity" because "[n]ine of RoyaltyStat's fields are extracted from license agreements, while twenty-four of IntangibleSping's fields are extracted from license agreements."). This argument is nonsensical. Adding additional material to an unauthorized copy is still copying. The additional material at best merely makes IntangibleSpring's database a derivative work. *See* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works ... A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a 'derivative work.'") As the copyright holder, RoyaltyStat has the exclusive right to create derivate works based on its database. *Id.*, § 106(2).

Summary judgment cannot be sustained based on the evidence of record.

> **d.    Defendants have serious credibility questions that preclude granting of summary judgment in their favor**

Defendants' ask the Court to grant summary judgment on RoyaltyStat's copyright infringement claims based in large part on the information contained in data produced by Defendants for analysis by the parties' experts. Mr. Fendrick concluded, however, that the data produced by Defendants did not represent the actual IntangibleSpring database. *See* SMF, ¶ 32 (Fendrick Report at 2, ¶ 6) ("I also do not believe that the IntangibleSpring database that was provided was the database of record at the time of the original filing in 2015 and that the data was changed after the original filing."). This conclusion was based on several notable discrepancies.

Mr. Fendrick first observed that while IntangibleSpring appears to include the same

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████  SMF, ¶ 32. Then, he noticed that the IntangibleSpring database contains

agreements ███████████████████████████████████████████████
███████████████████████████████████████ SMF, ¶¶ 28,
32; Defendants' Motion at 24.  Finally, Mr. Fendrick found that IntangibleSpring changed the
descriptions in its database prior to producing the data for review.  SMF, ¶ 32.  When he
compared the IntangibleSpring descriptions cited in RoyaltyStat's complaint with the same
descriptions in the data produced by IntangibleSpring, he found the language had been changed.
SMF, ¶ 32.

In addition, by his own admission, Pachecho, who for all practical purposes is
IntangibleSpring, ended his tenure at RoyaltyStat feeling "quite hostile" and "angry" so he
worked less and was eventually fired.  SMF, ¶¶ 23, 25.  He never claimed to own any interest in
RoyaltyStat's database, however, until he was sued.  SMF, ¶ 24.  Then, Defendants made
material misrepresentations about the content of the IntangibleSpring database and altered
evidence since the filing of the complaint.  SMF, ¶¶ 27, 32.

These actions raise multiple serious concerns, but, at a minimum, they demonstrate
substantial questions of credibility that preclude granting summary judgment.

## 2.   RoyaltyStat Has Established That It Is Entitled To Summary Judgment As To Its Trade Secret Claim.

As set forth above, RoyaltyStat is entitled to summary judgment on its trade secret
claims.  *See* Part II(B), *supra*.  Defendants' assertion that RoyaltyStat has failed to establish the
existence of a trade secret, *see* Defendants' Motion at 27-31, is clearly belied by the undisputed
facts.  It is also based on a misstatement of the controlling law.  As the Fourth Circuit has
recently made clear, Defendants' statement that RoyaltyStat "cannot claim trade secret rights in
factual information extracted from publicly available [SEC] filings" is simply wrong as a matter
of law.  *See AirFacts*, 903 F.3d at 95.  Likewise, Defendants' assertion that RoyaltyStat did not

take reasonable measures to protect its trade secrets, Defendants' Motion at 31-32, is fatally undercut by both the facts and the law. Pacheco was acting as an agent for his sole employer of 11 years, RoyaltyStat. *See* Part III(B)(1)(a), *supra*. His own actions acknowledged his duty to maintain the confidentiality of RoyaltyStat's trade secrets. SMF, ¶¶ 3, 6, 22. He was therefore under at least an implied duty to keep RoyaltyStat's information confidential, which, according to Defendants' own authority, is all that is needed. Defendants' Motion at 32, quoting *MicroStrategy Servs. Corp. v. OpenRisk, LLC*, No. 1:14CV1244 JCC/IDD, 2015 WL 2126924 (E.D. Va. May 6, 2015).

For the same reasons, Defendants' assertion that there is insufficient evidence of acquisition of RoyaltyStat's trade secrets by improper means, Defendants' Motion at 32-33, lacks any merit. Defendants' argument on this point boils down to the incredible assertion that Pacheco had access to RoyaltyStat's confidential information and know-how for 11 years, but yet somehow did not understand that the information could not be taken and used to start a competing company. *See id.* ("Plaintiff gave Defendant Pacheco access to [its] trade secrets under no contractual restrictions on their confidentiality or disclosure"). Pacheco's own words and actions as outlined above demonstrate that Defendants' assertion has no merit.

Finally, contrary to Defendants' assertions (*id.* at 30), nothing about RoyaltyStat's copyright applications and registrations constitutes a waiver of its trade secrets. The deposits in support of RoyaltyStat's copyright registrations represent data that is available to subscribers. The trade secrets being asserted are ones that Defendants themselves admit are not available to subscribers. SMF ¶¶ 3, 6. The fact that RoyaltyStat did not file its copyright applications utilizing the Copyright Office's "special relief and trade secret" procedures is irrelevant to the trade secrets being asserted here.

RoyaltyStat's motion for summary judgment as to its MUTSA trade secret claim should therefore be granted and Defendants' Motion as to that claim denied.

3.    **Defendants Have Not Established That No Jury Could Reasonably Find That IntangibleSpring's Express Statements Constitute False Advertising**

RoyaltyStat has alleged that Defendants have committed false advertising by "false and misleading representation of fact regarding the nature and quality of both the RoyaltyStat database and the IntangibleSpring database." ECF 112 at 13, ¶ 51.  Among the false and misleading statements was IntangibleSpring's claim that it was adding 600 agreements per month to its database, a statement published on IntangibleSpring's website.  *Id.*, ¶ 35; *see also* ECF 125-61 at 9-10 (RoyaltyStat Response to Interrogatory No. 10).  This statement alone is sufficient basis for a jury to conclude that Defendants have committed false advertising.

Pacheco testified that IntangibleSpring started with approximately 10,000 license agreements in its database.  SMF ¶ 27 (**Ex. 2**, IntangibleSpring Depo., Aug. 30, 2018 at 35:11-13).  If IntangibleSpring added 600 agreements per month for even a year, it would have at least 17,200 total agreements in its database.  Defendants' own expert confirmed, however, that IntangibleSpring had at most ███ agreements in its database as of the end of 2018.  ECF 125-52 at 9.  Defendants' statement is therefore literally false.

Defendants' false statement is material.  The undisputed evidence shows that purchasers and potential purchasers of RoyaltyStat's and IntangibleSpring's database subscriptions consider the number of agreements in the database to be an important factor that influences their purchasing decision.  SMF ¶ 27.  Defendants made the material false statement in interstate commerce when they broadcast it over a website to sell to clients and potential clients throughout the U.S.  *See Bros. of the Wheel M.C. Executive Council, Inc. v. Mollohan*, 609 F. App'x 149 (4th Cir. 2015) (holding that internet activity is a use in commerce) (cited in *Verisign, Inc. v.*

*XYZ.com, LLC*, No. 1:14-CV-01749, 2015 WL 7430016, at *4 (E.D. Va. Nov. 20, 2015), aff'd,

848 F.3d 292 (4th Cir. 2017)).  RoyaltyStat has alleged that it has been and will continue to be

harmed by Defendants' material false statements because they have caused RoyaltyStat to lose

customers.  ECF 125-61, at 4-5, 14-15.  Defendants do not dispute that RoyaltyStat has suffered

the losses it claims.  *See* Defendants' Motion at 35-36.

On this record, there is more than enough evidence, taken as true, on which a jury could

sustain a claim for false advertising under the Lanham Act.  *PBM Prods.*, 639 F.3d at 120.

Defendants' arguments to the contrary are entirely off-target for several reasons.  First,

Defendants take a myopic view of the record to assert that there is insufficient evidence of

Defendants' statements that their database is the same quality as RoyaltyStat's at a lower price.

Defendants' Motion at 34.  However, even assuming there was no evidence of that exact

statement, it was never the sole basis for RoyaltyStat's false advertising claim.  Its absence

therefore cannot be dispositive.  Secondly, Defendants' assertion that RoyaltyStat cannot show

communications beyond "relatively isolated" potential customers, *id.*, is clearly wrong.

IntangibleSpring broadcast the allegation that it was adding 600 agreements per month

worldwide, including throughout the U.S., on its website.  This is not directed to a "relatively

isolated" audience.  In addition, RoyaltyStat's evidence demonstrates a literally false statement.

RoyaltyStat therefore does not have to prove any deception.  *PBM Prods.*, 639 F.3d at 120.  The

size of Defendants' intended audience is therefore completely irrelevant.  Finally, Defendants'

statement is very specific.  It cannot be dismissed as mere "puffery," as Defendants contend, *see*

Defendants' Motion at 35-36.  *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 302–03 (4th

Cir. 2017) (defining "puffery" as "vague" and "general claim[s] of superiority" and noting

"[p]uffery and statements of fact are mutually exclusive") (quoting *Pizza Hut, Inc. v. Papa*

*John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000); 4 J. Thomas McCarthy, McCarthy on Trademark and Unfair Competition § 27.38 (4th ed. 1996); *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004)).

Accordingly, there is sufficient evidence in the record on which a jury could readily find in favor of RoyaltyStat on its false advertising claim. Defendants' Motion must therefore be denied.

> **4.   Defendants Have Not Established That No Jury Could Reasonably Find That Defendants Have Tortiously Interfered With RoyaltyStat's Contracts With Its Customers**

Defendants' only basis for seeking summary judgment on RoyaltyStat's tortious interference claim is Pacheco's explanation of the source of IntangibleSpring's data during his deposition. Defendants' Motion at 36. Since that deposition, however, facts have come to light raising serious issues with Pacheco's credibility regarding his explanation concerning the IntangibleSpring database. Specifically, RoyaltyStat's expert, after reviewing IntangibleSpring's data, has concluded that IntangibleSpring changed the data between the time the complaint was filed and the time the data was produced for inspection. *See* Part III(B)(1)(d), *supra*. RoyaltyStat is therefore entitled to examine Pacheco before a panel of jurors who can assess for themselves the credibility of his testimony about the source of IntangibleSpring's data in light of RoyaltyStat's evidence of altering relevant records and evidence.

Because Defendants' Motion as to RoyaltyStat's tortious interference claim turns entirely on credibility issues, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 160 (4th Cir. 2012).

## IV.    CONCLUSION

For the foregoing reasons, the undisputed facts of record prove that Defendants IntangibleSpring, Inc., and Raul Pacheco Quintanilla are liable to RoyaltyStat, Inc., under Count III, violation of the Maryland Uniform Trade Secrets Act, and partial summary judgment should issue against Defendants and in favor of RoyaltyStat as to Count III. The factual record also demonstrates that there are material disputes of fact, including as to Defendants' credibility, that RoyaltyStat is entitled to present to the jury. Defendants' Motion for Summary Judgment must therefore be denied.

Dated: February 15, 2019                    Respectfully submitted,


                                            _____/s/*Billy B. Ruhling, II*_____
                                            Billy B. Ruhling, II (Fed. Bar No. 17827)
                                            Cecil Key (Admitted *Pro Hac Vice*)
                                            DiMuroGinsberg, P.C.
                                            1101 King Street, Suite 610
                                            Alexandria, VA 22314
                                            Tel: 703-684-4333
                                            Fax: 703-548-3181
                                            bruhling@dimuro.com
                                            *Counsel for RoyaltyStat LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 15, 2019, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF system, which will automatically serve the following counsel of record:

John P. Lynch
McNamee, Hosea, Jernigan, Kim,
    Greenan & Lynch, P.S.
6411 Ivy Lane, Suite 200
Greenbelt, MD  20770
Tel: 301-441-2420
Fax: 301-982-9450
Email: jlynch@mhlawyers.com

John Anthony Di Giacomo
Revision Legal, PLLC
444 Cass St., Suite D
Traverse City, MI  49684
Tel: 231-714-0100
Fax: 231-714-0200
Email: john@revisionlegal.com

*/s/ Billy B. Ruhling, II*
Billy B. Ruhling, II (Fed. Bar No. 17827)

34