**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ROYALTYSTAT, LLC,                *

      Plaintiff,               *

      v.                   *        Civil Action No. 8:15-cv-03940-PX

INTANGIBLESPRING, CORP., *et al.*,     *

      Defendants.          *
                           ***

## <u>MEMORANDUM OPINION</u>

This case centrally concerns the copyrightability of a database that supports a royalty research business. Pending before the Court is Defendants IntangibleSpring, Inc. ("IntangibleSpring") and Raul Pacheco Quintanilla ("Pacheco")'s motion for summary judgment (ECF No. 123), Plaintiff RoyaltyStat, LLC ("RoyaltyStat")'s cross-motion for summary judgment (ECF No. 135), and the parties' dispute over the allegedly privileged nature of certain documents submitted as part of the record evidence. ECF No. 146. The motions are fully briefed. A conference call was held on April 3, 2019, regarding RoyaltyStat's claims of privilege (ECF Nos. 151–52), and no further hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court grants in part and denies in part Defendants' motion for summary judgment, denies RoyaltyStat's motion for summary judgment, and finds that RoyaltyStat has waived any privilege associated with the exhibit in question.

### I.      Background

RoyaltyStat, LLC ("RoyaltyStat") publishes a database of royalty rate information gathered primarily from licensing agreements included within corporations' Securities and Exchange Commission ("SEC") filings. ECF No. 63-1 at 2. The RoyaltyStat database is comprised of information extracted from the agreements. ECF No. 125-48 at 2. Subscribers pay

RoyaltyStat a fee to access the database through unique usernames and passwords, after signing a subscription agreement that limits use of the data.  ECF No. 135-2 at 46–47.

RoyaltyStat was the first royalty database on the market.  In 1997, Dr. Ednaldo Silva, RoyaltyStat's founder, published an article about the potential for such databases.   ECF No. 63-1 at 2; ECF No. 135-15 at 4.  Since the company's inception, Silva has acted as RoyaltyStat's managing director.  In that capacity, he has established RoyaltyStat's employee responsibilities and manages its staff.  ECF No. 113-1 at 18; ECF No. 135-6 at 7.

RoyaltyStat hired Pacheco in 2000.  From 2000 to 2004, Pacheco extracted information from license agreements and made suggestions for how to edit fields for the database.  ECF No. 129-1 at 29; ECF No. 125-24 at 2.  Pacheco's access to the database was password protected.  ECF No. 125-20 at 2.  During the course of Pacheco's employment, he secured permission to download the database onto his computer to complete his work.  ECF No. 140-2 at 3.  Silva also expressly directed Pacheco to not disclose specific database information to anyone outside the company.  ECF No. 125-27 at 5; ECF No. 135-8 at 1.  Pacheco understood that access to the database was limited to subscribers who paid and signed the subscription agreement.  ECF No. 135-2 at 46–47.

Throughout Pacheco's lengthy tenure with RoyaltyStat, Silva referred to Pacheco as an independent contractor and as an intern for the company.  ECF No. 140-8 at 2; ECF No. 141-5.  In the beginning, Pacheco completed his work on a computer that Silva had purchased for him.  ECF No. 145-5 at 5.  Pacheco worked in Silva's home or an apartment paid for by Silva.  ECF No. 141-5 at 2.  At some point, however, Pacheco purchased his own computer for use with RoyaltyStat and, in 2001, he began to work from Mexico.  ECF No. 145-5 at 6; ECF No. 135-2 at 26.  The parties dispute whether Pacheco signed a confidentiality agreement in connection

with his employment.  *Compare* ECF No. 129-2 at 2, *with* ECF No. 145-4 at 5–6. In 2002,

Pacheco began to work as a supervisor and sales representative for RoyaltyStat.  ECF No. 129-2

at 4.  During his tenure, RoyaltyStat paid Pacheco a monthly stipend and commissions earned in

connection with Pacheco's sales of subscriptions.  ECF No. 135-2 at 30.

   In 2004, Pacheco ceased his data extraction work entirely to focus on sales.  *Id.*

However, as late as January 2011, Pacheco continued to download portions of the RoyaltyStat

database.  ECF No. 125-61 at 3.  In September 2011, RoyaltyStat terminated Pacheco and

revoked his permission to access and download the database.  ECF No. 129-2 at 5.

   Shortly after his termination, Pacheco founded IntangibleSpring.  ECF No. 129-2 at 5.

IntangibleSpring maintains a database that directly competes with RoyaltyStat.  *Id.*  The two

databases are similar in style, design, and business objectives—to provide easily accessible

royalty information for paid subscribers.  At its inception in 2011, IntangibleSpring's database

included approximately 10,000 agreements, roughly the same number of agreements as in the

RoyaltyStat database.  ECF No. 135-14 at 1; ECF No. 135-20 at 1.  IntangibleSpring claimed to

be adding about 600 agreements per month to their database, but only had ███ records in

2018.  ECF No. 135-20; ECF No. 125-52 at 9.  Pacheco testified that he used the knowledge he

acquired while employed with RoyaltyStat on locating relevant data to build the IntangibleSpring

database.  ECF No. 129-10 at 10.

   IntangibleSpring represents that, unlike RoyaltyStat, it does not include data from certain

types of licensing agreements or agreements obtained from Freedom of Information Act

requests.  ECF No. 129-2 at 5.  Yet, IntangibleSpring's database included four entries gained

from Freedom of Information Act requests.  ECF No. 137-7 at 13.  The data accessible through

IntangibleSpring's database employs language also found in RoyaltyStat's database that does not

appear in the original licensing agreements, including errors that are found in RoyaltyStat's descriptions of agreements. ECF No. 137-7 at 19. RoyaltyStat's descriptions overlapped with the text of the source agreements 98% of the time, while IntangibleSpring's only overlapped 45% of the time. ECF No. 125-52 at 29. Out of RoyaltyStat's 16 and IntangibleSpring's 49 data categories, the titles of five categories overlapped verbatim. ECF No. 125-52 at 11.

RoyaltyStat registered its database with the United States Copyright Office and was issued certificates, effective in 2009 and 2015, regarding original expression in the text, selection, coordination, and arrangement of data. ECF No. 125-45; ECF No. 125-46. However, RoyaltyStat did not seek any special relief for its trade secrets when depositing portions of its database to the Copyright Office. *See id.* On December 23, 2015, RoyaltyStat filed this action against Pacheco and IntangibleSpring, alleging violations of the Copyright Act, 17 U.S.C. § 101 *et seq.*; the Lanham Act, 15 U.S.C. § 1125(a); the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code, Com. Law § 11-1201 *et seq.*; and tortious interference with contract. Defendants now move for summary judgment in their favor on all claims, contending that RoyaltyStat has failed to generate sufficient triable issues of genuine material fact. RoyaltyStat cross-moves for summary judgment in its favor solely as to the MUTSA claim.

## II.    Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

4

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### III.    Analysis

#### A.  Attorney-Client Privilege

As a preliminary matter, the Court must determine whether it may consider as part of the record evidence a report which had been attached to an email that Pacheco's supervisor, Marcia Coutinho, sent to him and Silva. RoyaltyStat contends that the report is protected by the attorney-client privilege. The report in question is a representative sample of a competitor

database.  Silva had forwarded the email and attachments from Coutinho to RoyaltyStat's attorney for the purposes of receiving legal advice as to whether the competitor was infringing on RoyaltyStat's copyright, to which the attorney responded in writing.  However, Pacheco was not included in the correspondence with the attorney.

Defendants do not seek to use the letter written by the attorney, but do wish to admit the other emails and the attached report that was sent to Pacheco.  RoyaltyStat objects on privilege grounds.  Attorney-client privilege protects confidential communications between lawyer and client from disclosure.  *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998).  Courts narrowly construe the privilege because "its application interferes with 'the truth seeking mission of the legal process.'"  *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338 (4th Cir. 2005) (quoting *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986)).  "The party invoking the attorney-client privilege bears the burden of demonstrating its applicability."  *Clark v. Unum Life Ins. Co. of Am.*, 799 F. Supp. 2d 527, 536 (D. Md. 2011).

"Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege."  *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).  However, disclosure of protected attorney communications between and among corporate employees does not waive the privilege "if the information is relayed from a non-lawyer employee or officer to other employees or officers of the corporation on a need to know basis."  *F.C. Cycles, Int'l, Inc. v. Fila Sport, S.P.A.*, 184 F.R.D. 64, 71 (D. Md. 1998); *see also Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981).  Similarly, when the information is disclosed to a third-party who needs to know the information, and who "is the 'functional equivalent' of an employee for the corporation," disclosure does not amount to waiver. *Maxtena, Inc. v. Marks*, No. DKC 11-0945, 2014 WL 4384551, at *20 (D. Md. Sept. 2, 2014).

For purposes of this analysis, the Court assumes without deciding that the report attached to the request for attorney advice was protected by the attorney-client privilege when forwarded to counsel. However, even giving RoyaltyStat the benefit of the doubt in that respect, the email chain reflects that RoyaltyStat waived any privilege as to the report itself when the report was forwarded to Pacheco after Silva received the attorney's advice. The email correspondence reflects that Pacheco was first asked to compare the competitor database to RoyaltyStat's before the attorney was involved. Then, *after* Silva obtained his attorney's advice, Pacheco received a copy of the report without any further instruction or communication. Nowhere does the email chain suggest that Pacheco was given the report so he could follow counsel's guidance. Nor did anyone advise Pacheco that such information is privileged or somehow protected from disclosure. *See United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 190–91 (D.D.C. 2014). Thus, finding that any privilege was waived, the Court will consider the exhibit.

RoyaltyStat also argues that evidence pertaining to RoyaltyRange, another competitor, must not be considered by the Court because it was produced "at the end of discovery" and is inadmissible hearsay. ECF No. 145 at 6. However, these documents are not, on their face, inadmissible. Rather, they appear to be the business records of RoyaltyRange. *See* Fed. R. Evid. 803(6). IntangibleSpring's expert also intends to opine on issues of copyrightability based in part on the RoyaltyRange report. The expert opinions are not currently the subject of any separate challenge and so the underlying data is relevant in that respect. *See* Fed. R. Evid. 703. Thus, at this stage, the Court will consider this evidence.[1]

The Court next turns to the parties' motions for summary judgment. The Court first

---

[1] The Court recognizes that the parties have yet to file motions to strike their respective experts, and if they do file such *in limine* motions, such challenges may resurrect the admissibility of the bases for proffered expert opinions.

considers Defendants' motion for summary judgment challenging the sufficiency of the evidence as to all claims against them, and next RoyaltyStat's motion on its Maryland Uniform Trade Secrets Act claim.

### B. Copyright Infringement (Count I)

Defendants lodge several attacks on RoyaltyStat's copyright infringement claim, none of which are successful. The Copyright Act protects "original works of authorship." 17 U.S.C. § 102. To state a claim for copyright infringement, a plaintiff must allege facts establishing that (1) the plaintiff owned copyrighted material and (2) the infringer copied protected elements of that material. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001). RoyaltyStat has generated sufficient evidence on each of these elements, demonstrating that a reasonable factfinder could find that Defendants violated the Copyright Act. Thus, the infringement action will proceed to trial.

### 1. Copyrighted Material

Defendants first contend that summary judgment in its favor is warranted on the copyright claim because RoyaltyStat's database was not sufficiently creative to trigger copyright protection. A certificate of registration from the United States Copyright Office constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). The Copyright Office granted RoyaltyStat certificates of registration to the text, selection, coordination, and arrangement of data, establishing prima facie evidence of the validity of the copyright. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010), *as amended* (Aug. 24, 2010). Thus, Defendants must overcome the presumption that copyright protection should be accorded to RoyaltyStat. *See Montgomery*

*Cty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 810 (D. Md. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996).

On the question of whether a work is sufficiently "creative" to be accorded copyright protection, a compilation's selection and arrangement of facts must not be "so mechanical or routine as to require no creativity whatsoever." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991). Garden-variety categorizations, while not creative in their own right, "do[] not negate the original presentation and arrangement of the information in the database." *Montgomery Cty. Ass'n of Realtors, Inc.*, 878 F. Supp. at 810. Although the selection and arrangement of facts may be protected, the underlying facts in a compilation are not entitled to copyright protection. *Feist*, 499 U.S. at 359.

RoyaltyStat has generated sufficient evidence to survive summary judgment on the question of creativity. In curating the database, RoyaltyStat selected particular types of licensing agreements for inclusion and also included agreements discoverable only through Freedom of Information Act requests. ECF No. 129-2 at 5. RoyaltyStat purposely omitted annual reports, exhibits, and settlement agreements, even if they included a royalty. ECF No. 125-50 at 12. RoyaltyStat further exercised discretion in selecting the particular information to extract from the agreements. *See* ECF No. 125-52 at 9–10 (RoyaltyStat extracting data for only ■ categories, as compared to competitor IntangibleSpring's ■ categories).

Defendants counter that RoyaltyStat's arrangement of information lacked creativity as a matter of law because it essentially mimics industry convention. *See Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 674, 682 (2d Cir. 1998). The record evidence, however, reflects broad diversity within the industry as to how such data is arranged, compiled, and organized. RoyaltyStat, for example, employed ■ categories of information in the database. ECF No. 125-

52 at 9–10.[2]  IntangibleSpring uses ▮ categories, roughly three times the number of RoyaltyStat.

ECF No. 125-52 at 9–10.[3]  Another competitor, RoyaltyRange, employs 26 categories of

information, several of which have sub-categories (ECF No. 125-56 at 2),[4] and another, ktMINE,

uses 12 categories.  ECF No. 125-57 at 2.[5]  Additionally, although industry competitors have

some of the same categories, none have complete overlap.  These differences suggest that

RoyaltyStat exercised creativity in its arrangement, rather than merely conforming to industry

norms.  This is particularly true where RoyaltyStat produced the first database in the industry,

raising questions about whether industry norms surrounding such databases were in existence at

the time of RoyaltyStat's database creation.

Moreover, the industry includes both data compiled by extracting agreement terms

verbatim and normalizing terms across agreements to facilitate easier comparisons.  *See* ECF No.

125-27 at 2 (competitor presenting both verbatim and normalized information on territory).

---



    [2]  RoyaltyStat's categories include: ███████████████████████████████

██████████ . *Id.*

    [3]  IntangibleSpring's categories include: ████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████ . *Id.*

    [4]  RoyaltyRange's categories include: type, licensor, licensee, licensor's activities, licensee's activities,
description of object, geographical scope, date of agreement, effective date, cessation date, terms, exclusivity, class
of product limitation, restrictions of the use, extent and duration of legal protection, useful life, stage of
development, rights to enhancements, revisions and updates, expectation of future benefits, functions (research
development, marketing, defense and protection, design and quality control), risks (successful research and
development, unsuccessful marketing, product obsolescence, infringement, product liability), costs and assets (costs
to support the performance of functions, costs when relevant risks come to fruition, compensation to other parties,
research and development costs, marketing costs, knowledge of own employees), characterization of the transaction
involving intangibles (use of, transfer of, and rights in intangibles), and remuneration (royalty rate, base, other
payments, compensation, and other details).  *Id.*

    [5]  ktMINE's categories include: document summary, licensor, licensee, filing company, effective date, SIC
Code, verbatim territory, normalized territory, exclusivity, agreement type, industry, and royalty rate.  *Id.*

RoyaltyStat chose to display "the most important 10 countries" in the territory field and lesser important countries listed in "Other Comments." ECF No. 125-50 at 12. Indeed, RoyaltyStat implemented many other stylistic choices in arranging the data. ECF No. 125-50 at 2–13. This evidence, viewed most favorably to RoyaltyStat, precludes summary judgment on the question of creativity. *See M. Kramer Mfg. Co.*, 783 F.2d at 438 (stating copyright protection may extend to a factual compilation where there is a minimal level of creativity in organizing the component parts); *see also U.S. Payphone, Inc. v. Execs. Unlimited of Durham, Inc.*, Nos. 89-1081, 89-1085, 931 F.2d 888 (Table), 1991 WL 64957, at *2–3 (4th Cir. 1991).

RoyaltyStat's database also reflects written creativity. Although Defendants' expert states that the "descriptions are 100% made from extract text," ECF No. 125-52 at 27, some evidence shows that the descriptions included language that was not present in the licensing agreements. *See* ECF No. 125-50 at 6 ("We grab sentences from all over the agreement, mix and elaborate our own description."). Furthermore, RoyaltyStat analysts were directed to avoid adjectives and adverbs when drafting the product description. ECF No. 125-50 at 3, 12. Taking all inferences in the light most favorable to RoyaltyStat, it has demonstrated creativity in the written text. S*ee also M. Kramer Mfg. Co.*, 783 F.2d at 438 ("No matter how poor artistically the 'author's addition,' it is enough [to be creative] if it be his own."). A reasonable factfinder could find the database represents a series of creative choices regarding what and how information is included and organized, thus warranting copyright protection. *See Montgomery Cty. Ass'n of Realtors, Inc.*, 878 F. Supp. at 810.

## 2. Ownership

Defendants next argue that even if RoyaltyStat's database is copyrightable, RoyaltyStat cannot prove it is the rightful owner for the database records created between December 13, 2000

and September 4, 2004.  Defendants more particularly contend that because the work in question

does not amount to a "work made for hire," RoyaltyStat cannot assert ownership for purpose of a

copyright infringement claim.  17 U.S.C. § 201(a); *Cmty. for Creative Non-Violence v. Reid*, 490

U.S. 730, 737 (1989).  Again, the Court disagrees with Defendants.

A work made by an employee within the scope of employment is owned by the employer.

*Reid*, 490 U.S. at 738.  However, "[a]n independent contractor's work will be classified as 'for

hire' only if: (1) he was specially commissioned to create the work in question, (2) the created

work falls within one of nine statutorily defined categories, and (3) the parties expressly agreed

in a written instrument signed by them that the work would be a work made for hire."  *Armento*

*v. Laser Image, Inc.*, 950 F. Supp. 719, 728 (W.D.N.C. 1996), *aff'd*, 134 F.3d 362 (4th Cir.

1998).  To determine whether an individual is an employee or an independent contractor, courts

"consider the hiring party's right to control the manner and means by which the product is

accomplished."  *Reid*, 490 U.S. at 751.  Relevant factors include:

> the skill required; the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the
> parties; whether the hiring party has the right to assign additional
> projects to the hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the work is part
> of the regular business of the hiring party; whether the hiring party
> is in business; the provision of employee benefits; and the tax
> treatment of the hired party.

*Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 313 (4th Cir. 2011) (quoting *Reid*,

490 U.S. at 751–52).

Pacheco argues that the record evidence demonstrates that he created the database as an

independent contractor and so owns the copyright.  However, genuine issues of material fact

preclude the Court from reaching the same conclusion.  Although Defendants state that "Pacheco

authored all records within the RoyaltyStat database from 2000-2004" (ECF No. 141 at 23),[6] Defendants also admit that Pacheco was *not* the sole author of the contested materials.  *See* ECF No. 125 at 22 (admitting that another hired party extracted data for the description field). Moreover, despite Pacheco's assertions that he was responsible for selecting the data to extract and that he "regularly suggest[ed] new fields" (ECF No. 125-22 at 9; ECF No. 192-2 at 4), other evidence reflects that Silva determined the content of the database.  ECF No. 135-15 at 3.

Nor does the undisputed record evidence, construed most favorably to RoyaltyStat, establish as a matter of law that Pacheco was an independent contractor.  To be sure, Silva may have referred to him as such.  ECF No. 140-8 at 2.  And Pacheco eventually conducted his work on his own computer in Mexico and "absorbed expenses, used mostly for [RoyaltyStat], such as fast speed internet connection, tel. bill, computer, rent. etc."  ECF No. 140-5 at 3.  However, Pacheco also held himself out as representing RoyaltyStat and worked with RoyaltyStat for eleven years.  *See, e.g.*, ECF No. 125-48 at 5–6.  Pacheco further testified that RoyaltyStat was his sole source of income, a fact supporting that Pacheco was an employee.  ECF No. 135-2 at 7. Taking all inferences in the light most favorable to RoyaltyStat, summary judgment on this ground must be denied.  A reasonable factfinder could find that Pacheco was a RoyaltyStat employee, and thus the database was a work for hire owned by RoyaltyStat.

### 3.  Copying of the Material

Defendants next argue that summary judgment is warranted because no evidence suggests that Pacheco copied RoyaltyStat's protected material.  *Id.* at 17–19.  Copying of protected material may be proven directly or indirectly.  *M. Kramer Mfg. Co.*, *v. Andrews,* 783 F.2d 421, 445 (4th Cir. 1986).  "Direct evidence of copying includes evidence such as party

---

[6]  In support, Defendants cite to an affidavit sworn by Pacheco but have failed to file the affidavit.

admissions, witness accounts of the physical act of copying, and common errors in the works of plaintiffs and the defendants." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 537 (4th Cir. 2015), *as amended* (June 24, 2015) (quoting *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006)) (internal marks omitted).  Indirect copying is proven when an individual has access to the original work and a "substantial similarity" exists between the individual's work and the original work. *Humphreys*, 790 F.3d at 537–38.

 Substantial similarity exists where there is both extrinsic and intrinsic similarity. *Universal Furniture Int'l*, 618 F.3d at 435.  Extrinsic similarity is an objective inquiry that "looks to external criteria of substantial similarities in both ideas and expression," often by reference to expert testimony. *Id.* at 435–36 (quoting *Apple Comput. Co. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)) (internal quotation marks omitted).  Intrinsic similarity, "in contrast, implicates the perspective of the works' intended observer and looks to the total concept and feel of the works." *Humphreys*, 790 F.3d at 538 (quoting *Universal Furniture*, 618 F.3d at 426) (internal marks omitted).  Because Defendants concede access (ECF No. 125 at 23), the Court turns to the evidence generated as to the alleged similarity of the two databases.

 A reasonable factfinder could conclude that the databases are extrinsically similar. RoyaltyStat's copyright expert concludes that IntangibleSpring's database is substantially similar to RoyaltyStat's because the two share common errors and word choices not found in the source documents, the license agreements.  ECF No. 137-7 at 19–20.[7]  The databases also overlap identically as to five categories.  ECF No. 125-52 at 10. Defendants' expert, by contrast, concludes that any similarities between the databases arise from the similarities in the inputted data, not on account of copying.  ECF No. 125-52 at 30–31.  In support, the expert notes that

---

[7] These common errors are also evidence of direct copying.  *See Humphreys*, 790 F.3d at 537.

RoyaltyStat's database descriptors overlapped with the text of source 98% of the time, while IntangibleSpring's only overlapped 45% of the time. ECF No. 125-52 at 27. Such competing evidence precludes summary judgment on the question of extrinsic similarity. *See Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 747 n.14 (D. Md. 1996) ("Issues of credibility, however, are not before the Court on summary judgment.").

As for intrinsic similarity, sufficient evidence allows a reasonable factfinder to conclude that the databases are intrinsically similar. The databases share many of the same headings and present the information with similar descriptions. ECF No. 125-52 at 10; ECF No. 137-7 at 2. Visually, both are organized by fields. ECF No. 125-52 at 10. Ultimately, the Court cannot conclude as a matter of law that the databases are so intrinsically dissimilar that Defendants could not have copied the RoyaltyStat database. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), *superseded by statute on other grounds as stated in Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) ("The test for similarity of ideas is still a factual one, to be decided by the trier of fact.").

Finally, on a matter related to the similarity of the databases, Defendants contend that RoyaltyStat is only entitled to "thin" protection and can recover only "against virtually identical copies." ECF No. 140 at 15–16; *see also Kregos v. Associated Press*, 937 F.2d 700, 710 (2d Cir. 1991). The question of RoyaltyStat's scope of copyright protection cannot be resolved on summary judgment for the same reasons. Whether the databases are sufficiently similar, in whole or in part, is a question best left for the factfinder at trial. Defendants' motion for summary judgement is denied as to the copyright claim.

### C.  False Advertising (Count Two)

RoyaltyStat's false advertising claim under the Lanham Act is confined to

IntangibleSpring's website representation that it has added "600 new agreements" to its database each month. ECF No. 135 at 34; *cf. Verisign*, 848 F.3d at 299 (stating that a plaintiff "must be able to point to at least one challenged statement that satisfies all five Lanham Act requirements").

To withstand challenge as to its false advertising claim, RoyaltyStat must produce sufficient evidence that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Verisign, Inc. v. XYZ.com, LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017) (quoting *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015)) (internal quotation marks omitted). RoyaltyStat has succeeded in this regard.

First, the record evidence supports that the statement in question is demonstrably false. Between September 2013 and February 2015, the IntangibleSpring website proclaimed, "We add an average of 600 agreements per month." ECF No. 135-20; *see also Design Resources*, 789 F.3d at 502. When IntangibleSpring launched, it had approximately 10,000 agreements. ECF No. 137-1 at 8. By the end of 2018, it had only ███ agreements. ECF No. 125-52 at 9. On average, therefore, the new agreements incorporated into the database per month fall below the claimed number.

Next, a reasonable factfinder could determine that the statement was material. A statement is material when it is "'likely to influence the purchasing decision.'" *JTH Tax, Inc. v.*

*H&R Block Eastern Tax Servs., Inc.*, 28 F. App'x 207, 214 (4th Cir. 2002) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)).[8] RoyaltyStat has generated evidence that potential customers in this industry choose databases based on the number of license agreements available. ECF No. 125-44 at 4. The statement is thus likely to influence the purchasing decisions of the potential customers for whom RoyaltyStat and IntangibleSpring are competing. *See Victor Stanley, Inc. v. Creative Pip, Inc.*, No. MJC-06-2662, 2011 WL 4596043, at *16 (D. Md. Sept. 30, 2011); *see also Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs., LLC*, 875 F. Supp. 2d 511, 530 (D. Md. 2012) ("[M]ateriality is generally a question of fact for the jury.").

Defendants next argue that RoyaltyStat has not generated any evidence demonstrating that the statement would likely deceive a substantial segment of its audience. However, "'[w]here the advertisement is literally false, a violation may be established without evidence of consumer deception.'" *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002)). Defendants' statement was literally false, and so "deception of the purchasing audience is presumed." *De Simone v. VSL Pharm., Inc.*, No. TDC-15-1356, 2019 WL 2570068, at *6 (D. Md. June 20, 2019).

Defendants next contend that RoyaltyStat has failed to demonstrate that it has been actually injured or is likely to be injured. However, Defendants raise this argument for the first time in their reply brief. ECF No. 141 at 30. Ordinarily, courts will not consider an argument

---

[8] A split among the Circuits exists as to whether materiality must be demonstrated when a statement is literally false. *Concordia Pharm., Inc. v. Method Pharm., LLC*, No. 3:14CV00016, 2016 WL 1271082, at *9 & n.10 (W.D. Va. Mar. 29, 2016). *Compare Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000), *with Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250–51 (11th Cir. 2002) (noting that "the Fifth Circuit blurred the boundary between the two elements [of consumer deception and materiality] in its recent *Pizza Hut* decision"). At this juncture, the Court assumes without deciding that RoyaltyStat must demonstrate materiality.

raised for the first time in a reply. *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734–35 (D. Md. 2006). RoyaltyStat did not have an opportunity to counter Defendants' argument, nor was the reply Defendants' first opportunity to address this argument. Although RoyaltyStat's claim may eventually fail on its ability to demonstrate injury, the Court will not preclude the claim on summary judgment.

### D.  Tortious Interference with Contract (Count Four)

RoyaltyStat claims that Defendants "tortiously interfered with RoyaltyStat's contracts by inducing one or more of RoyaltyStat's subscribers or employees, after Mr. Pacheco was no longer associated with RoyaltyStat, to provide him with copies of the RoyaltyStat database content." ECF No. 112 ¶ 66. But RoyaltyStat has generated no evidence in support of this claim. ECF No. 135 at 36. Because RoyaltyStat has not generated evidence of actual inducement or interference with any existing customers, Defendant's motion for summary judgment is granted as to the tortious interference claim.

### E.  Maryland Uniform Trade Secrets Act (Count Three)

Each party moved for summary judgment in its favor on RoyaltyStat's Maryland Uniform Trade Secrets Act ("MUTSA") claim. To establish a violation of MUTSA, RoyaltyStat must demonstrate that (1) it possessed a valid trade secret, and (2) Defendants misappropriated the trade secret. Md. Code, Com. Law § 11-1201. One type of misappropriation occurs when a person discloses another's trade secret without express or implied consent and, at the time of the disclosure or use, the person knew or had reason to know that the person's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. § 11-1201(c)(2)(ii)(2). A trade secret includes information and processes that (1) derive independent economic value from not being generally known to, and not being readily

18

ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use; and (2) are the subject of reasonable efforts to maintain their secrecy.  Md.

Code, Com. Law § 11-1201(e).

The record evidence is not one-sided, and thus precludes summary judgment in favor of

either party on the MUTSA claim.[9]  Although the evidence demonstrates that the database

information is valuable, the Court cannot find that RoyaltyStat did or did not reasonably protect

the secrecy of the information as a matter of law.  The database's economic value lies in

providing customers quick access to relevant information that would otherwise be costly to

obtain.  *See* ECF No. 135-2 at 15 (Pacheco agreeing that the data had value); *AirFacts, Inc. v. de

Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018).  RoyaltyStat spends $1.2 million per year to extract

data and has sorted through 16 million exhibits to identify just 16,000 license agreements.  ECF

No. 113-1 at 62.  The library of agreements in RoyaltyStat's database is not readily ascertainable

in that form.  *See* ECF No. 129-10 at 31 (explaining that it took four people working Monday

through Saturday to extract data for IntangibleSpring's launch); *see also LeJeune v. Coin

Acceptors, Inc.*, 381 Md. 288, 310 (2004).

However, the evidence is mixed as to whether RoyaltyStat expended reasonable efforts to

maintain the secrecy of the database.  Some evidence demonstrates that RoyaltyStat provides its

customers with a unique password-protected account, using "NT security" and encrypting the

password as it is transmitted across the internet.  ECF No. 125-20 at 2.  RoyaltyStat further limits

employee access to the database based on job necessity, and only a limited number of

employees—and no customers—could download the entire database.  ECF No. 125-61 at 3.

Customers could only obtain database reports by agreeing to not share documents or use data "in

---

[9]  Although the Second Amended Complaint alleges that Defendants also misappropriated RoyaltyStat's
customer list, ECF No. 112 ¶ 56, RoyaltyStat appears to have abandoned this claim.

a manner that is a substitute for, or alternative to, RoyaltyStat" or after the subscription expired. ECF No. 129-10 at 11; ECF No. 135-2 at 46–47; ECF No. 137-2 at 1.  *See Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993).  Thus, a reasonable factfinder could find that RoyaltyStat reasonably protected its database.

On the other hand, a reasonable factfinder could conclude that RoyaltyStat did not expend reasonable efforts to protect the database. It is not at all settled the RoyaltyStat had Pacheco sign a confidentiality agreement.  *Compare* ECF No. 129-2 at 2, *with* ECF No. 145-4 at 5–6; *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999); *MicroStrategy Servs. Corp. v. Open Risk, LLC* (No. 1:14CV1244 JCC/IDD, 2015 WL 1221263, at *7 (E.D. Va. Mar. 17, 2015), *on reconsideration*, 2015 WL 2126924 (E.D. Va. May 6, 2015) ("[T]rade secret protection is eviscerated when otherwise protected information is disclosed to others who have no obligation to protect its confidentiality.").  Additionally, when Pacheco ceased performing quality control work on the database, his permission to download the database was not revoked, a decision that Silva concedes was "mistakenly" made.  ECF No. 129-6 at 36. RoyaltyStat contractors and employees, including Silva, also regularly sent portions of the database and their passwords to each other's personal email addresses.  ECF No. 129-2 at 6–7; ECF No. 129-17 at 8, 12–13.  Furthermore, RoyaltyStat did not seek any special protection for its trade secrets when depositing database records to the Copyright Office.  *See PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105 (KBF), 2016 WL 7116132, at *8 (S.D.N.Y. Dec. 5, 2016).  *But cf. MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 418 (E.D. Va. 2004) ("[T]he mere fact that documents are filed unsealed and are available in public court files does not destroy the secrecy of such documents in the absence of evidence of further publication.").  Thus, a factfinder could determine that RoyaltyStat did not take reasonable steps to maintain the secrecy

20

of the database.

Likewise, a reasonable factfinder could reach two differing conclusions as to whether RoyaltyStat's internal processes constitute trade secrets. Some evidence supports that its the processes derive value from not being generally known in the industry. *See* ECF No. 135-4 at 12 (Pacheco describing competitor ktMINE as providing "messy" data because of its different methods of data extraction). However, there is competing evidence about whether RoyaltyStat engaged in reasonable efforts to protect the secrecy of its methods. After outsourcing part of its search for relevant data, RoyaltyStat decided to bring the entire process in-house for the express purpose of protecting its trade secrets. ECF No. 125-22 at 18. Furthermore, Silva gave directions that specific information should not be disclosed to avoid providing others with "the necessary information to obtain the documents without paying us." ECF No. 125-27 at 5; *see also* ECF No. 135-8 at 1. *See Albert S. Smyth Co. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *3, 6 (D. Md. July 31, 2018) (finding limited employee access and handbook forbidding disclosure constituted reasonable steps to secure secrecy). Yet, as noted above, there is a genuine issue of whether RoyaltyStat had its employees or contractors sign nondisclosure agreements. And RoyaltyStat emailed its training instructions to student interns' personal email accounts. ECF No. 125-48 at 2–6. Thus, reasonable factfinders could disagree as to whether the internal processes were sufficiently protected to constitute trade secrets.

Finally, as to the element of misappropriation of the trade secrets, the record evidence demonstrates that Pacheco downloaded the RoyaltyStat Tableau—the portion of the database containing information on royalty rates—while he was still working for RoyaltyStat. ECF No. 140-2 at 3–4. Pacheco also admits that he knew where to find the license agreements because of his work with RoyaltyStat. ECF No. 129-10 at 10. "'[A]s a general rule, a former employee is

obligated not to disclose or use the confidential information acquired during his employment.'"

*Bond v. PolyCycle, Inc.*, 127 Md. App. 365, 379 (1999) (quoting George J. Alexander,

*Commercial Torts* 102–03 (2d ed. 1988). Given Silva's directions to maintain the confidentiality

of this information, and Pacheco's understanding that he was only to grant access to the database

to subscribers who paid and signed the subscription agreement, sufficient evidence exists that

Pacheco did not have authority to disclose or use RoyaltyStat's trade secrets. ECF No. 25-27 at

5; ECF No. 135-8 at 1; ECF No. 135-2 at 46–47; *see also Bond*, 127 Md. App. at 379.

However, a genuine dispute of fact remains as to whether Defendants actually used or

disclosed the alleged trade secrets. Viewing all facts in the light most favorable to RoyaltyStat,

sufficient evidence exists that Pacheco used the database and the internal processes to aid in

launching his competing business, IntangibleSpring, and so misappropriated trade secrets. Md.

Code, Com. Law § 11-201(c)(2)(ii)(2); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters.,*

*Inc.*, 190 F. Supp. 2d 785, 800 (D. Md. 2002). However, a reasonable factfinder could also

conclude that Defendants did not use or disclose RoyaltyStat's database and internal processes in

launching IntangibleSpring, given the differences between the two databases. *See* ECF No. 125-

52 at 30–31. Moreover, a reasonable factfinder could determine that Pacheco did not improperly

acquire the trade secrets because he had permission to download the data and learn the internal

processes during his tenure at RoyaltyStat. *See Diamond v. T. Rowe Price Assocs., Inc.*, 852 F.

Supp. 372, 411 (D. Md. 1994). Thus, the cross-motions for summary judgment are denied, and

the MUTSA claim will proceed to trial.

## IV.    Conclusion

For the foregoing reasons, IntangibleSpring and Pacheco's motion for summary judgment

is granted in part and denied in part (ECF No. 123); RoyaltyStat's motion for summary judgment

is denied (ECF No. 135); and the Court finds that any attorney-client privilege regarding the fourth exhibit to ECF No. 141 was waived.  A separate Order follows.

The Court is filing a separate, redacted version of this Memorandum Opinion under seal. The parties shall have **<u>fourteen</u>** days to file a letter pleading explaining whether any changes are necessary to the level of redaction, with supporting law.  If no party files a letter pleading, the Court will unseal the redacted version.


8/1/2019_____                           _____/S/_____
Date                                                                    Paula Xinis
                                                                            United States District Judge